IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                              :
THE UNITED STATES OF AMERICA                  :
*ex rel.* (UNDER SEAL),                       :
                                              :
                  Plaintiff,                  :
                                              :          Civil No. 12 Civ. 0300(JPO)
          v.                                  :
                                              :
(UNDER SEAL)                                  :
                                              :
                  Defendant.                  :
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


**FIRST AMENDED COMPLAINT FILED *IN CAMERA* AND UNDER SEAL
PURSUANT TO 31 U.S.C. § 3730(b)(2)**


**DO NOT ENTER IN ECF/PACER**


**DO NOT PUT IN PRESS BOX**

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

THE UNITED STATES OF AMERICA
*ex rel.* MARC D. BAKER

    and

STATE OF ARKANSAS
*ex rel.* MARC D. BAKER

    and

STATE OF CALIFORNIA                         **Civ. No. 12 Civ. 0300(JPO)**
*ex rel.* MARC D. BAKER

    and                                     **FIRST AMENDED**

STATE OF CONNECTICUT            **COMPLAINT UNDER**
*ex rel.* MARC D. BAKER              **FEDERAL AND STATE**
                                        **FALSE CLAIM ACTS**
    and

STATE OF COLORADO                **FILED *IN CAMERA* AND**
*ex rel.* MARC D. BAKER             **UNDERSEAL PURSUANT**
                                        **TO 31 U.S.C. § 3730(b)(2)**
    and

STATE OF DELAWARE             **DO NOT ENTER IN**
*ex rel.* MARC D. BAKER             **PACER**

    and                                     **DO NOT PUT IN PRESS**

DISTRICT OF COLUMBIA             **BOX**
*ex rel.* MARC D. BAKER

    and

STATE OF FLORIDA
*ex rel.* MARC D. BAKER

    and

STATE OF GEORGIA
*ex rel.* MARC D. BAKER

|                                                          |     |                                              |
|----------------------------------------------------------|-----|----------------------------------------------|
| and                                                      | :   |                                              |
|                                                          | :   |                                              |
| STATE OF HAWAII                                          | :   |                                              |
| *ex rel.* MARC D. BAKER                                  | :   |                                              |
|                                                          | :   |                                              |
| and                                                      | :   |                                              |
|                                                          | :   |                                              |
| STATE OF ILLINOIS                                        | :   |                                              |
| *ex rel.* MARC D. BAKER                                  | :   |                                              |
|                                                          | :   |                                              |
| and                                                      | :   |                                              |
|                                                          | :   |                                              |
| STATE OF INDIANA                                         | :   |                                              |
| *ex rel.* MARC D. BAKER                                  | :   |                                              |
|                                                          | :   | **Civ. No. 12 Civ. 0300(JPO)**               |
| and                                                      | :   |                                              |
|                                                          | :   |                                              |
| STATE OF LOUISIANA                                       | :   | **FIRST AMENDED**                            |
| *ex rel.* MARC D. BAKER                                  | :   | **COMPLAINT UNDER**                          |
|                                                          | :   | **FEDERAL AND STATE**                        |
| and                                                      | :   | **FALSE CLAIM ACTS**                         |
|                                                          | :   |                                              |
| STATE OF MARYLAND                                        | :   | **FILED *IN CAMERA* AND**                    |
| *ex rel.* MARC D. BAKER                                  | :   | **UNDERSEAL PURSUANT**                       |
|                                                          | :   | **TO 31 U.S.C. § 3730(b)(2)**                |
| and                                                      | :   |                                              |
|                                                          | :   |                                              |
| COMMONWEALTH OF MASSACHUSETTS                            | :   |                                              |
| *ex rel.* MARC D. BAKER                                  | :   | **PACER**                                    |
|                                                          | :   |                                              |
| and                                                      | :   | **DO NOT PUT IN PRESS**                      |
|                                                          | :   | **BOX**                                      |
| STATE OF MICHIGAN                                        | :   |                                              |
| *ex rel.* MARC D. BAKER                                  | :   |                                              |
|                                                          | :   |                                              |
| and                                                      | :   |                                              |
|                                                          | :   |                                              |
| STATE OF MINNESOTA                                       | :   |                                              |
| *ex rel.* MARC D. BAKER                                  | :   |                                              |
|                                                          | :   |                                              |
| and                                                      | :   |                                              |
|                                                          | :   |                                              |
| STATE OF MONTANA                                         | :   |                                              |
| *ex rel.* MARC D. BAKER                                  | :   |                                              |

|  |  |  |
|---|---|---|
| and | : |  |
|  | : |  |
| STATE OF NEVADA | : |  |
| *ex rel.* MARC D. BAKER | : |  |
|  | : |  |
| and | : |  |
|  | : |  |
| STATE OF NEW HAMPSHIRE | : | **Civ. No. 12 Civ. 0300(JPO)** |
| *ex rel.* MARC D. BAKER | : |  |
|  | : |  |
| and | : |  |
|  | : | **FIRST AMENDED** |
| STATE OF NEW JERSEY | : | **COMPLAINT UNDER** |
| *ex rel.* MARC D. BAKER | : | **FEDERAL AND STATE** |
|  | : | **FALSE CLAIM ACTS** |
| and | : |  |
|  | : | **FILED *IN CAMERA* AND** |
| STATE OF NEW MEXICO | : | **UNDERSEAL PURSUANT** |
| *ex rel.* MARC D. BAKER | : | **TO 31 U.S.C. § 3730(b)(2)** |
|  | : |  |
| and | : | **DO NOT ENTER IN** |
|  | : | **PACER** |
| STATE OF NEW YORK | : |  |
| *ex rel.* MARC D. BAKER | : | **DO NOT PUT IN** |
|  | : | **PRESS BOX** |
| and | : |  |
|  | : |  |
| STATE OF NORTH CAROLINA | : |  |
| *ex rel.* MARC D. BAKER | : |  |
|  | : |  |
| and | : |  |
|  | : |  |
| STATE OF OKLAHOMA | : |  |
| *ex rel.* MARC D. BAKER | : |  |
|  | : |  |
| and | : |  |
|  | : |  |
| STATE OF RHODE ISLAND | : |  |
| *ex rel.* MARC D. BAKER | : |  |
|  | : |  |
| and | : |  |
|  | : |  |
| STATE OF TENNESSEE | : |  |
| *ex rel.* MARC D. BAKER | : |  |
|  | : |  |

and                                             :
                                                :
STATE OF TEXAS                                  :
*ex rel.* MARC D. BAKER                         :        Civ. No. 12 Civ. 0300(JPO)
                                                :
    and                                         :
                                                :
COMMONWEALTH OF VIRGINIA                         :        **FIRST AMENDED**
*ex rel.* MARC D. BAKER                         :        **COMPLAINT UNDER**
                                                :        **FEDERAL AND STATE**
    and                                         :        **FALSE CLAIM ACTS**
                                                :
STATE OF WASHINGTON                             :        **FILED *IN CAMERA* AND**
*ex rel.*  MARC D. BAKER                        :        **UNDERSEAL PURSUANT**
                                                :        **TO 31 U.S.C. § 3730(b)(2)**
    and                                         :
                                                :        **DO NOT ENTER IN**
STATE OF WISCONSIN                              :        **PACER**
*ex rel.* MARC D. BAKER                         :
                                                :        **DO NOT PUT IN PRESS**
    and                                         :
                                                :
DOE STATES 1-20                                 :
*ex rel.* MARC D. BAKER                         :
                                                :
                **Plaintiffs,**                 :
                                                :
         v.                                     :
                                                :
WALGREEN, CO.                                   :
200 Wilmot Road                                 :
Deerfield, Illinois 60015                       :
                                                :
    **SERVE ON REGISTERED AGENT:**              :
    Illinois Corporation Service Company        :
    801 Adlai Stevenson Drive                   :
    Springfield, Illinois 62703                 :
                                                :
            **Defendant.**                      :
                                                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## TABLE OF CONTENTS

I.     NATURE OF THE ACTION ..............................................................2

II.    JURISDICTION AND VENUE ........................................................12

III.   PARTIES ..........................................................................................13

       A.  Plaintiffs ................................................................................13

       B.  Relator ....................................................................................14

       C.  Defendant ...............................................................................15

IV.    THE LAW ........................................................................................16

       A.  Federal and State False Claim Statutes ..................................16

       B.  Federal and State Anti-Kickback Statutes ............................18

       C.  Insurance Frauds Prevention Acts .........................................21

V.     MEDICARE PART D AND OTHER FEDERAL PAYER PROGRAMS ..........24

       A.  Medicare Part D Requirements...............................................24

            1.  CMS Limits Pharmacy Reimbursement for Covered Part D Drugs
                to the Lower of the Negotiated Price or the Usual and Customary
                Price at the Point of Sale ..........................................29

            2.  Defendant Required Pharmacies Enrolled in Its Pharmacy Benefit
                Management Company to Adhere to CMS's Part D Reimbursement
                Policy .........................................................................32

       B.  Medicaid Program Requirements ...........................................35

            1.  State Reimbursement Requirements .........................36

            2.  State Claims Submission Overview...........................37

       C.  Other Federal Payer Programs ...............................................38

VI.    DEFENDANT'S WRONGFUL CONDUCT ..........................................39

       A.  Defendant's PSC Program. ....................................................40

i

B.  Defendant Used Illegal Marketing and Promotional Tactics to Enroll
Ineligible Federal Beneficiaries in the PSC Program ......................................45

C.  The Enrollment Process for Federal Beneficiaries Wrongfully Induced to
Join the PSC Program ...................................................................................52

D.  Defendant Has Mandatory Enrollment Minimums and
Awards Bonuses for Enrolling PSC Program Members,
Including Federal Beneficiaries ......................................................................53

E.  Defendant Failed to Use Patient Screening Programs Available on its
Nationwide Computer Network to Block Federal Beneficiaries ....................56

F.  Defendant Knowingly Violated the Anti-Kickback Statute by
Steering Federal Beneficiaries Exclusively to its
Pharmacies and Ignored Relator's Concerns ..................................................57

G.  Information from Defendant's Computer System Shows that the
Majority of PSC Program Members are Federal Beneficiaries ......................60

H.  Defendant Directed its Employees Not to Promote and to Destroy
Free Discount Drug Cards to Maximize PSC Program Enrollments..............60

I.  Defendant's Unlawful Scheme Resulted in Billions of
Medicare Part D Overcharges for Covered Drugs in Clear
Violation of CMS Requirements ...................................................................61

J.  Defendant's Fraudulent Scheme Resulted in False Claims for
Payment for Overbilled Influenza Vaccines...................................................69

K.  Defendant's Fraudulent Scheme Resulted in False Claims for
Payment for Overbilled Drugs in Violation of Federal and State
Medicaid Requirements .................................................................................71

L.  Defendant Made and Caused to be Made, False Claims and Statements in
Reimbursement Claims to Private Insurers...................................................74

VII.  DEFENDANT MADE, AND CAUSED TO BE MADE, FALSE CLAIMS
AND STATEMENTS IN REIMBURSEMENT CLAIMS AND FALSE
CERTIFICATIONS OF PAYMENT DATA ......................................................78

VIII.  DEFENDANT'S VIOLATIONS UNDERMINE THE PROGRAM
INTEGRITY OF PART D AND THREATEN THE FEDERAL
BENEFICIARY STATUS OF PATIENTS..........................................................83

IX.      DAMAGES.........................................................................................85

COUNT I: VIOLATIONS OF THE FALSE CLAIMS ACT ............................................86

COUNT II: VIOLATIONS OF THE FALSE CLAIMS ACT.............................................88

COUNT III: VIOLATIONS OF THE FALSE CLAIMS ACT ..........................................89

PRAYER AS TO COUNTS I-III.................................................................90

COUNT IV: VIOLATIONS OF THE ANTI-KICKBACK STATUTE..........................91

PRAYER AS TO COUNT IV .....................................................................93

COUNT V: UNJUST ENRICHMENT.................................................................94

PRAYER AS TO COUNT V.......................................................................94

COUNT VI: VIOLATIONS OF THE ARKANSAS MEDICAID FCA .........................95

COUNT VII: VIOLATIONS OF THE CALIFORNIA FCA ...........................................98

COUNT VIII: VIOLATIONS OF THE CALIFORNIA INSURANCE FRAUDS
PREVENTION ACT ...........................................................................101

COUNT IX: VIOLATIONS OF THE COLORADO MEDICAID FCA .......................104

COUNT X: VIOLATIONS OF THE CONNECTICUT FCA FOR MEDICAL
ASSISTANCE PROGRAMS ......................................................................106

COUNT XI: VIOLATIONS OF THE DELAWARE FALSE CLAIMS AND
REPORTING ACT .............................................................................109

COUNT XII: VIOLATIONS OF THE DISTRICT OF COLUMBIA PROCUREMENT
REFORM AMENDMENT ACT .....................................................................112

COUNT XIII: VIOLATIONS OF THE FLORIDA FCA.................................................115

COUNT XIV: VIOLATIONS OF THE GEORGIA STATE FALSE MEDICAID
CLAIMS ACT ................................................................................117

COUNT XV: VIOLATIONS OF THE HAWAII FCA...................................................120

COUNT XVI: VIOLATIONS OF THE ILLINOIS FCA................................................122

COUNT XVII: VIOLATIONS OF THE ILLINOIS INSURANCE CLAIMS FRAUD PREVENTION ACT ..................................................................................125

COUNT XVIII: VIOLATIONS OF THE INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT ...................................................128

COUNT XIX: VIOLATIONS OF THE IOWA FALSE CLAIMS ACT .......................131

COUNT XX: VIOLATIONS OF THE LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW ...........................................................134

COUNT XXI: VIOLATIONS OF THE MARYLAND FALSE HEALTH CLAIMS ACT ..................................................................................137

COUNT XXII: VIOLATIONS OF THE MASSACHUSETTS FCA ............................140

COUNT XXIII: VIOLATIONS OF THE MICHIGAN MEDICAID FCA....................143

COUNT XXIV: VIOLATIONS OF THE MINNESOTA FCA .....................................146

COUNT XXV: VIOLATIONS OF THE MONTANA FCA...........................................149

COUNT XXVI: VIOLATIONS OF THE NEVADA FCA............................................152

COUNT XXVII: VIOLATIONS OF THE NEW HAMPSHIRE FCA ..........................155

COUNT XXVIII: VIOLATIONS OF THE NEW JERSEY FCA...................................158

COUNT XXIX: VIOLATIONS OF THE NEW MEXICO MEDICAID FCA...............161

COUNT XXX: VIOLATIONS OF THE NEW YORK FCA..........................................164

COUNT XXXI: VIOLATIONS OF THE NORTH CAROLINA FCA ..........................167

COUNT XXXII: VIOLATIONS OF THE OKLAHOMA MEDICAID FCA ...............169

COUNT XXXIII: VIOLATIONS OF THE RHODE ISLAND STATE FCA ...............173

COUNT XXXIV: VIOLATIONS OF THE TENNESSEE MEDICAID FCA ..............175

COUNT XXXV: VIOLATIONS OF THE TEXAS MEDICAID FRAUD PREVENTION LAW ..........................................................................178

COUNT XXXVI: VIOLATIONS OF THE VIRGINIA FRAUD AGAINST TAXPAYERS LAW .......................................................................181

COUNT XXXVII: VIOLATIONS OF THE WASHINGTON STATE MEDICAID
FRAUD FCA .................................................................................................184

COUNT XXXVIII: VIOLATIONS OF THE WISCONSIN FALSE CLAIMS FOR
MEDICAL ASSISTANCE ACT .................................................................187

***THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK***

## FIRST AMENDED COMPLAINT

**COMES NOW**, through the undersigned counsel, Relator Marc D. Baker, on behalf of himself, the United States of America ("United States"), and the States of Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Washington, and Wisconsin, the Commonwealths of Massachusetts and Virginia, the District of Columbia, and Doe States 1-20, brings this *qui tam* action under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "FCA"), the Medicare and Medicaid Patient Protection Act of 1987, 42 U.S.C. § 1320a-7b (the "Anti-Kickback Statute"), and similar state laws; the Medicare Prescription Drug, Improvement and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066, 42 U.S.C. § 1395w-101-52; and the Medicare Prescription Drug Benefit, 70 Fed. Reg. 4193 (Jan. 28, 2005) (codified at 42 C.F.R. § 423.1 et seq. ("Medicare Part D"), to recover monetary damages, civil penalties, and other remedies for violations of the Federal healthcare programs, including Medicare, Medicaid, the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS/TRICARE"), the Veterans Administration, and the Federal Employees Health Benefits Program (collectively, "Federal Payer Programs").

Relator also brings this action also on behalf of himself and the States of California and Illinois to recovery statutory damages, civil penalties and other monetary relief for violations of the California Insurance Frauds Prevention Act, CAL. INS. CODE § 1871 *et seq.*, and the Illinois Insurance Claims Fraud Prevention Act, 740 ILL. COMP. STAT. ANN. § 92/1 *et seq.*

1

Relator hereby alleges as follows:

## I.    NATURE OF THE ACTION.

1.      This is a *qui tam* action under the federal and state False Claims Acts, the federal and state Anti-Kickback Statutes, the California Insurance Frauds Prevention Act, and the Illinois Insurance Claims Fraud Prevention Act.   The False Claims Act was enacted in 1863 in response to "widespread corruption and fraud in the sales of supplies and provisions to the union government during the Civil War."   132 CONG. REC. H9382-03 (daily ed. Oct. 7, 1986) (statement of Rep. Glickman).   The law allows a private person with knowledge of a fraud to bring an action in federal district court for himself and for the United States and States and to share in any recovery. The party is known as a Relator, and the action that a Relator brings is called a *qui tam*.

2.      In this *qui tam*, Relator alleges that Defendant knowingly made and caused to be made false statements and claims that were material to the government's decision to reimburse payment of claims for Medicare Part D covered drugs. Defendant's fraudulent course of conduct centers on an illegal scheme to induce or steer Federal Beneficiaries to self-refer their Federal payer business exclusively to Defendant's pharmacies and to overbill Medicare, Medicaid, and other Federal Payer Programs for covered Part D drugs, as well as private insurers.   Two categories of violations arise out of this unlawful scheme.   First, Defendant induced (and continues to induce) millions of Federal Beneficiaries to fill Federal payer prescriptions exclusively at its retail pharmacies in exchange for illegal kickbacks in the form of substantial cash discounts and lower drug prices in violation of the Anti-Kickback Statute.   Second, having induced Federal Beneficiaries to fill Federal payer prescriptions exclusively at its retail

pharmacies, Defendant overbilled the Federal government for covered Part D drugs by submitting claims for payment at higher prices than permitted by law. Defendant's false statements and claims were material to the government's decision to pay the artificially inflated drug prices in violation of the False Claims Act.

3.      Defendant is a nationwide pharmacy chain with over 7,500 retail pharmacy locations in 50 states, the District of Columbia, Puerto Rico, and Guam. Defendant provides pharmaceuticals for millions of disabled, elderly, and military personnel and their families paid for by the United States each year. It receives hundreds of millions of dollars annually in reimbursements for prescription drugs under Medicare Part D and other Federal payer programs.

4.      **Defendant's Anti-Kickback Violations.**   The Anti-Kickback Statute prohibits pharmacies from offering anything of value, *i.e.*, remuneration, to Medicare Beneficiaries ("Federal Beneficiaries") with the intent of inducing the referral of prescription business paid for by the Federal government. For more than five years, Defendant has knowingly and intentionally offered and provided illegal kickbacks through its Prescription Savings Club ("PSC Program") to Federal Beneficiaries to induce them to self-refer their Federal payer business exclusively to Defendant's pharmacies. The PSC Program is a non-networked discount drug program, exclusive to Defendant's stores, that provides Federal Beneficiaries with cash discounts (*i.e.*, 10-percent discount on all purchases of Walgreens-branded products, including over-the-counter medications, baby care and household items, consumables, and photo-finishing) *and* deeply discounted covered and non-covered Part D drugs. Defendant designed and implemented the PSC Program to steer Federal Beneficiaries exclusively to their retail

pharmacies by providing them with substantial financial incentives. Knowing that the PSC Program violates the Anti-Kickback Statute when marketed to Federal Beneficiaries, Defendant falsely stated that Federal Beneficiaries are excluded from the program, while concealing from the Centers for Medicare & Medicaid Services ("CMS" or "Medicare") and Part D Plan Sponsors the systemic solicitation and enrollment of Federal Beneficiaries.

5.    A number of significant events triggered the launch of Defendant's fraudulent scheme under the PSC Program. On January 1, 2006, Medicare's Part D Voluntary Prescription Drug Benefit went into effect. More than 20 million Federal Beneficiaries became eligible for voluntary coverage under Part D. A significant percentage of these Federal Beneficiaries were customers of Defendant, which sought to retain its Federal Beneficiary business as a contracted network pharmacy chain accepting Part D plans. CMS imposed a Part D reimbursement ceiling to limit a pharmacy's reimbursement for covered Part D drugs to the lesser of (a) the Part D Plan Sponsor's negotiated price and (b) the pharmacy's usual and customary price offered to Federal Beneficiaries at the point of sale. The reimbursement ceiling is a basic protection against overbilling Medicare for covered Part D drugs and ensures that Medicare receives the benefit of lower pricing at the point of sale. It also allows Federal Beneficiaries to gain the benefit of lower pricing and lower copayments.

6.    Soon after Part D became effective, Defendant's chief competitors, including Wal-Mart and other pharmacies, implemented deeply discounted prescription drug programs that threatened Defendant's Part D business. Wal-Mart, in particular, offered to Federal payers and Federal Beneficiaries $4 pricing for 30-day supplies of Part

4

D covered generic drugs. Wal-Mart's prices were substantially less than the prices offered at Defendant's stores for the same Part D covered drugs with identical strengths, quantities, and dosages. Wal-Mart's plan also substantially reduced copayments and lessened the impact of the coverage gap for Federal Beneficiaries. Wal-Mart marketed the lower drug prices and copayments available to Federal Beneficiaries, as well as the savings to Medicare Part D and other Federal payer programs by limiting pharmacy reimbursement to "usual and customary" pricing as opposed to the higher negotiated prices of Plan Sponsors.

7.       The risk of losing prescription and Federal payer business, which accounts for 65-percent of Defendant's annual sales, prompted Defendant to develop the PSC Program. To conceal its scheme, Defendant adopted a sham policy that Federal Beneficiaries were excluded from the PSC Program. In reality, however, Defendant has knowingly, intentionally, and systemically marketed the PSC Program to Federal Beneficiaries since its inception by, for example, the following conduct throughout the United States:

        a.       Pressuring pharmacists and pharmacy technicians to market aggressively the PSC Program to customers, including Federal Beneficiaries, at the point of sale.

        b.       Directing its pharmacies to enroll a minimum number of individuals in the PSC Program on a daily and weekly basis. Defendant required each pharmacy to enroll at least one new member per day.

        c.       Tracking PSC Program enrollments and bonuses paid (on store, district, market, operation, and chain levels), and sending daily emails to

pharmacy managers at each store reporting enrollment and bonus data. The emails exhorted staff to market the PSC Program and single out specific pharmacies that failed to meet the mandatory minimums for PSC Program enrollments.

        d.      Marketing and promoting substantial monetary savings offered under the PSC Program directly to Federal Beneficiaries at the point of sale. Defendant's computer system automatically generates standard marketing messages in the form of written solicitations and "leaflets" that offer Federal Beneficiaries substantial discounts to enroll in the PSC Program to fill prescriptions. Defendant staples these leaflets to the front of the prescription drug packaging that is provided to each Federal Beneficiary who fills a prescription at Defendant's pharmacies.

        e.      Offering and providing illegal cash discounts to Federal Beneficiaries in the form of $50 coupon books. Defendant provided the coupons to Federal Beneficiaries as a financial inducement to enroll them in the PSC Program with either no out-of-pocket cost or a net monetary gain to a beneficiary. Defendant offered the coupons to any Federal Beneficiary who inquired about the PSC Program at the pharmacy and enrolled. The booklet contained coupons in various monetary denominations to be used as a cash discount toward purchases at Defendant's stores.

        f.      Paying bonuses to employees for every customer enrolled in the PSC Program, including Federal Beneficiaries.

g.      Failing to impose disciplinary action or sanction on employees who unlawfully enroll Federal Beneficiaries, and criticizing employees for either not satisfying enrollment mandatory minimums or raising concerns about the PSC Program.

h.      Electing not to use CAP Blocks, computer blocking programs commonly used by Defendant to identify and block specific categories of patients, to block Federal Beneficiaries from joining the PSC Program at the time of enrollment or when filling prescriptions.

i.      Failing to remove from the PSC Program customers who are known by Defendant to be Federal Beneficiaries based on the company's payer/insurance profile and prescription history for the customers.

j.      Instructing pharmacy staff not to promote and to destroy free prescription drug discount cards from State and private sector issuers that provide Federal Beneficiaries with deeply discounted drugs, in order to maximize PSC Program enrollments.

8.      Through its fraudulent scheme, Defendant has knowingly and intentionally enrolled more than *5 million* Federal Beneficiaries in the PSC Program throughout the United States, which has resulted in billions of dollars of Federal payer prescriptions steered exclusively to Defendant at artificially higher prices.  A sample of Defendant's computer database for the PSC Program evidences that 58-percent of PSC Program members nationwide are Federal Beneficiaries.   Significantly, Defendant enrolled them knowing in advance that they were Federal Beneficiaries based on historic

payer/insurance information, patient data, and prescription histories on file at Defendant's stores and accessed by pharmacy staff at the time of enrollment.

9.    **Defendant's Overbilling Scheme.**   In addition to causing systemic violations of the Anti-Kickback Statute, Defendant's fraudulent scheme resulted in billions of dollars in Medicare Part D overcharges.   Part D limits a pharmacy's reimbursement for a covered drug to the lower of (a) the Plan Sponsor's negotiated price or (b) the pharmacy's usual and customary price offered to Federal Beneficiaries at the point of sale.  CMS considers a lower point of sale price offered to Federal Beneficiaries to be the pharmacy's "usual and customary" price for purposes of Federal reimbursement.  The pharmacy's reimbursement for covered Part D drugs cannot exceed the lower usual and customary price.

10.    Defendant knew in December 2005 that reimbursement for covered Part D drugs is limited to the lower of the negotiated price or the pharmacy's usual and customary price.  In fact, Defendant's wholly owned pharmacy benefit management company, Walgreens Health Initiatives, Inc. ("WHI"), expressly recognized and contractually required WHI network pharmacies, including Defendant's pharmacies, to limit reimbursement for covered Part D drugs to the lower of the negotiated/contract price or usual and customary pricing at the point of sale.  This requirement applied to all contracted pharmacies, although it was not enforced against Defendant's pharmacies.

11.    By enrolling Federal Beneficiaries in the PSC Program, Defendant established a new "usual and customary" price for covered Part D drugs – one that is lower than its negotiated price for the same drugs, dose, and quantity.  Unlike Wal-Mart, Defendant was unwilling to forego the higher negotiated price reimbursement under Part

8

D plans, as required when a pharmacy offers lower point-of-sale pricing to Federal Beneficiaries.  Defendant knowingly and routinely charged Part D Plan Sponsors the *higher* negotiated price, instead of the *lower* usual and customary price for its covered Part D drugs, including the Overbilled Drugs challenged herein.

12.     Defendant knowingly and intentionally submitted, and caused to be submitted, false prescription reimbursement claims for covered Part D drugs in violation of Part D regulations.  The PSC Program's formulary includes long-term maintenance medications that are covered by Part D plans, including, by way of example, the following drugs: Lisinopril, Metformin HCL, Metoprolol Tartrate, Warfarin Sodium, Lovastatin, Carvedilol, Citalopram Hydrobromide, Pravastatin, Sodium, and Spironolactone (collectively, "Overbilled Drugs").  The Overbilled Drugs are illustrative. Defendant's fraudulent conduct as alleged herein applies to all drugs sold under the PSC Program.  Based on specific prescription and claims reimbursement data for Federal Beneficiaries enrolled in the PSC Program obtained by Relator, the Part D negotiated prices for the Overbilled Drugs substantially exceeded Defendant's usual and customary price offered to Federal Beneficiaries throughout the benefit year.  Relator's evidence documents the amount Defendant overbilled the Federal Payer Programs for specific Part D covered drugs.  By way of example, in 2008 alone, Defendant overbilled the Federal Payer Programs in excess of $215,000,000 for the Overbilled Drugs:

9

| RANK BY FILL | BRAND NAME | TOTAL FILLS | TOTAL GROSS DRUG COST | RANK BY COST | Walgreens Scripts | Average Overbill per Transaction | $ Overbilled |
|---|---|---|---|---|---|---|---|
| 26 | CARVEDILOL | 6,931,551 | $168,492,704.51 | 96 | 1,316,994.69 | $18.67 | $24,588,290.86 |
| 35 | CITALOPRAM HYDROBROMIDE | 5,979,371 | $81,198,577.93 | 173 | 1,136,080.49 | $7.93 | $9,009,118.29 |
| 1 | LISINOPRIL | 28,462,990 | $345,049,130.75 | 47 | 5,407,968.10 | $8.60 | $46,508,525.66 |
| 18 | LOVASTATIN | 8,260,656 | $249,199,586.68 | 65 | 1,569,524.64 | $12.95 | $20,325,344.09 |
| 11 | METFORMIN HCL | 15,751,296 | $248,314,732.91 | 66 | 2,992,746.24 | $15.79 | $47,255,463.13 |
| 12 | METOPROLOL TARTRATE | 15,468,402 | $108,583,184.19 | 142 | 2,938,996.38 | $3.86 | $11,344,526.03 |
| 47 | PRAVASTATIN SODIUM | 4,883,776 | $152,255,209.47 | 101 | 927,917.44 | $17.25 | $16,006,575.84 |
| 72 | SPIRONOLACTONE | 3,745,669 | $55,473,533.58 | 233 | 711,677.11 | $15.42 | $10,974,061.04 |
| 15 | WARFARIN SODIUM | 13,822,768 | $194,910,416.94 | 78 | 2,626,325.92 | $11.08 | $29,099,691.19 |
| | Total | 130740628 | $2,297,602,427.26 | | 19,628,231.01 | | $215,111,596.12 |

13.    Defendant knowingly and intentionally concealed from Plan Sponsors the lower usual and customary prices for Part D covered drugs.  As documented by claims data for more than 3,000 prescriptions for 475 patients throughout the country, Defendant falsely processed claims at the Plan Sponsor's **higher** negotiated prices when the same covered drugs were available to the Federal Beneficiaries enrolled in the PSC Program at substantially lower usual and customary prices.  Defendant's conduct violated Medicare Part D requirements that a pharmacy only charge Plan Sponsors the lower usual and customary price for a covered drug when offered at the point of sale.

14.    As part of its fraudulent scheme, Defendant made and caused to be made false statements and claims for payment for covered Part D drugs in violation of the False Claims Act.  In submitting electronic claims for payment to Plan Sponsors and CMS, Defendant was required to report its "usual and customary" price for each covered Part D drug, in accordance with the National Council for Prescription Drug Programs ("NCPDP") requirements.  As an express condition of payment, CMS requires Plan Sponsors and contract pharmacies to provide accurate, complete, and truthful information and data necessary for CMS to meet the requirements under Part D.  For each Part D prescription, Plan Sponsor must submit data to CMS in the form of a prescription drug event ("PDE") record, which must contain prescription drug cost and payment data to

10

enable CMS to make accurate payments to plans and otherwise administer the Part D benefit.  For each electronic claim for reimbursement submitted by Defendant for a covered Part D drug, Defendant knowingly and intentionally made false statements that its usual and customary price was the full cash price of the drug, instead of the lower PSC Program price offered to Federal Beneficiaries.   Defendant also knowingly and intentionally failed to disclose the lower prices for covered Part D drugs available to Federal Beneficiaries through the PSC Program.   Defendant's false statements and omissions were material to the government's decision to pay false claims for reimbursement at artificially inflated prices.

15.     The United States has been and continues to be substantially damaged by Defendant's fraud.   Excluding damages caused by Defendant's widespread Anti-Kickback violations, actual (single) damages for overcharges to the United States and the Federal Payer Programs amount to billions of dollars.

16.     In addition to monetary damages to the United States, Defendant's fraud has caused systemic Part D program violations, while injuring Federal Beneficiaries and their coverage status.  The Part D program violations include, for example, widespread TrOOP (true out-of-pocket costs) manipulation; undermining the negotiated prices of Plan Sponsors under Part D; prolonging the length of time beneficiaries remain in the coverage gap, which is often referred to as the doughnut hole, prior to reaching catastrophic coverage; artificially inflating the co-payments paid by Federal Beneficiaries for covered drugs; disrupting the coordination of benefits and secondary payer determinations for Federal Beneficiaries by not reporting covered drug transactions to Plan Sponsors and CMS;  pushing Federal Beneficiaries into the coverage gap sooner and

11

prolonging the period of time before they reach catastrophic coverage due to the unreported prescriptions; circumventing Plan Sponsors' drug utilization review and safety of drug interaction edits; and imperiling beneficiaries' Part D eligibility status because of undisclosed coverage.

17.     This Complaint has been filed *in camera* and under seal pursuant to 31 U.S.C. § 3730(b)(2).  It will not be served on Defendant until the Court so orders.  A disclosure of substantially all material evidence and information Relator possesses has been served on the Attorney General of the United States and the United States Attorney for the Southern District of New York pursuant to 31 U.S.C. § 3730(b)(2) and Fed. R. Civ. P. 4.

**II.     JURISDICTION AND VENUE.**

18.     This Court possesses subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. §§ 3730 and 3732 because Relator seeks remedies on behalf of the United States for Defendant's violations of 31 U.S.C. § 3729, some of which occurred in the Southern District of New York, and the Defendant transacts substantial business within the Southern District of New York.

19.     This Court may exercise personal jurisdiction over Defendant under N.Y. C.P.L.R. § 302(a).

20.     This Court has pendant jurisdiction over the State claims pursuant to 31 U.S.C. § 3732(b) and 31 U.S.C. § 3730(e).

21.     This Complaint has been timely filed within the period prescribed by 31 U.S.C. § 3731(b).  The allegations and transactions set forth in this Complaint have not been publicly disclosed prior to filing, in accordance with 31 U.S.C. § 3730(e).

22.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and (c) because the Defendant resides, transacts business, and/or is qualified to do business in this District.  In addition, during the period challenged by this action, Defendant committed the acts proscribed by the False Claims Act in this judicial District.

## III.    PARTIES.

### A. Plaintiffs.

23.     Plaintiff United States of America brings this action by and through its administrative agency, the United States Department of Health and Human Services, Centers for Medicare & Medicaid Services ("CMS"), which is responsible for the administration of all Federal health care programs.  At all times relevant to this Complaint, the United States funded the provision of prescription pharmaceuticals to beneficiaries of the Medicare Part D program administered by CMS.

24.     The States of Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Michigan, Minnesota, Missouri, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Washington, and Wisconsin, the Commonwealths of Massachusetts and Virginia, and the District of Columbia are named as Plaintiffs pursuant to the Court's pendant jurisdiction under 31 U.S.C. § 3732(b) with respect to the related States' false claim and anti-kickback statutes.

25.     The States of California and Illinois are named as Plaintiffs pursuant to the Court's pendant jurisdiction under 31 U.S.C. § 3732(b), and/or the Court's supplemental jurisdiction under 28 U.S.C. § 1367 with respect to the related claims brought for

13

violations of the California Insurance Frauds Prevention Act and the Illinois Insurance Claims Fraud Prevention Act.

26.     Additionally, Plaintiff Doe States 1-20 include Alabama, Alaska, Arizona, Idaho, Kansas, Kentucky, Maine, Mississippi, Missouri, Nebraska, North Dakota, Ohio, Oregon, Pennsylvania, South Carolina, South Dakota, Utah, Vermont, West Virginia, and Wyoming.  Doe States 1-20 include those that enact false claims act statutes with *qui tam* provisions subsequent to the filing of this complaint.

**B.  Relator.**

27.     Relator Marc D. Baker graduated from St. John's University, College of Pharmacy, with a Bachelor of Science degree in 1992, and St. John's University, School of Law, with a Juris Doctorate in 1998.  Mr. Baker is a licensed pharmacist in Florida. He worked for Walgreens Pharmacy as a Pharmacy Manager beginning in April 2001 until December 2011.    Throughout his employment with Walgreens, Mr. Baker performed all responsibilities of a Staff Pharmacist, while also overseeing the operations of the Pharmacy department.

28.     By virtue of his position and responsibilities as a Walgreens Pharmacy Manager for more than ten years, and his routine interaction with other Walgreens pharmacies and pharmacists throughout the country, Relator has become aware of Defendant's fraudulent conduct, as alleged herein.    Pursuant to 31 U.S.C. § 3730(e)(4)(B), Mr. Baker is the "original source" of the information given to the United States regarding Defendant's illegal conduct in violation of Federal and State laws.  He has direct and independent knowledge of the allegations set forth herein and states that

the information concerning Defendant's misconduct was not disclosed publicly prior to his disclosure to the United States.

### C. Defendant.

29.     Defendant Walgreen, Co. ("Walgreens") is a nationwide retail pharmacy chain with more than 7,500 retail pharmacy locations in 50 states, the District of Columbia, Puerto Rico, and Guam. Defendant provides pharmaceuticals for millions of disabled, elderly, and military personnel and their families paid by the United States government. It receives hundreds of millions of dollars annually in reimbursement for prescriptions under Medicare Part D, Medicaid, Tricare/Champus, and state-based prescription reimbursement programs. Prescription drug sales accounted for more than 65-percent of its sales in 2010.

30.     Defendant has operated under a Corporate Integrity Agreement ("CIA") with the Department of Health and Human Services since 2008 following the settlement of a drug pricing case. The CIA primarily applies to therapeutic interchange programs, but it additionally requires Defendant to have implemented policies and procedures to address the following, among other aspects: (a) "the proper and accurate reimbursement of drugs by the Federal health care programs, including the Maximum Allowable Cost (MAC) programs maintained by states in which Walgreens does business, and the Federal Upper Limit (FUL) program maintained by CMS"; and (b) "engaging an independent review organization to assess and evaluate Walgreens' reimbursement from and compliance with the requirements of the Federal health care program requirements (Government Reimbursement Review)."

31.     Defendant operates as a contracted network pharmacy for numerous Part D Plan Sponsors to provide covered Part D drugs to Part D enrollees.   42 C.F.R. § 423.100.  Upon filling a prescription for a Federal Beneficiary, Defendant bills Medicare or the third-party payer.  For prescriptions reimbursed by Medicare, either in whole or in part, Defendant collects any required co-payment from the Federal Beneficiary and seeks reimbursement for the remaining cost from the government.

32.     Defendant is organized and existing under the laws of Illinois with its principal place of business located at 200 Wilmot Road, Deerfield, Illinois 60015.  It may be served through its registered agent, Illinois Corporation Service Company, at 801 Adlai Stevenson Drive, Springfield, Illinois 62703.

## IV.   THE LAW.

### A. Federal and State False Claim Statutes.

33.     The False Claims Act, 31 U.S.C. §§ 3729-3733, provides, *inter alia*, that any person who (1) knowingly presents, or causes to be presented, to the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim made to the United States; or (3) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States for a civil money penalty plus treble damages. 31 U.S.C. § 3729(a)(1)(A)-(B), (G).

34.     The False Claims Act also provides that any person who conspires to violate any provision of the Act is liable to the United States for a civil money penalty plus treble damages.  31 U.S.C. § 3729(a)(1)(C).

35.     The terms "knowing" and "knowingly" are defined to mean "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(i)-(iii). These terms "require no proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1)(B).

36.     The term "claim" is defined to mean "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . ." 31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

37.     The term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.  31 U.S.C. § 3729(b)(4).

38.     The States have enacted false claims statutes, the provisions of which substantially mirror the Federal FCA provided in preceding paragraphs.  Relator asserts

17

claims under the statutes enacted by the States for the State portion of Medicaid false claims as stated herein.  Relator's disclosure of substantially all material evidence and information Relator possesses will be served upon State officials as required by State law.

## B. Federal and State Anti-Kickback Statutes.

39.     Defendant has offered and provided unlawful remuneration to Federal Beneficiaries with the intention of steering or inducing self-referrals of the Federal Beneficiaries' Federal payer business exclusively to its stores.  Relator alleges that Defendant knowingly solicited and provided "remuneration" (*i.e.*, 10-percent cash discounts and discounted drug prices) to a "person" (Federal Beneficiaries) to induce them to "refer" their covered Part D prescriptions exclusively to its stores.

40.     The Social Security Act, 42 U.S.C. § 1320a-7a(a)(5) prohibits pharmacies from offering remuneration[1] to a Federal Beneficiary with the intention of inducing the referral of business that is paid for by a Federal healthcare program in whole or in part.

41.     The Medicare and Medicaid Patient Protection Act of 1987, 42 U.S.C. § 1320a-7b(b) ("Anti-Kickback Statute"), provides criminal penalties of no more than $25,000 or five years in jail or both for the following:

> (1) whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind—
>
>> (A)    in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment

---

[1]      The Social Security Act, 42 U.S.C. § 1320a-7a(a)(5), prohibits the offering or transfer of "remuneration", which has been interpreted to mean "anything of value." Office of Inspector General, Special Advisory Bulletin, "Offering Gifts and Other Inducements to Beneficiaries," 67 Fed. Reg. 55,855 (Aug. 30, 2002) (hereinafter "OIG Special Advisory").

may be made in whole or in part under a Federal health care program. . . .

(B)      in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program

\*   \*   \*

(2) whoever knowingly and willfully offers and pays any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

(A)      to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

(B)      to purchase, lease, order, or arrange for or recommend purchasing purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program.

42 U.S.C. § 1320a-7b(b).

42.     A "federal health care program" is defined at 42 U.S.C. § 1320a-7b(f) as any plan or program providing health benefits funded, whether directly or indirectly, by the United States Government.  Under Federal case law, the Anti-Kickback Statute is violated if even "one purpose" of a discount is in exchange for or to induce the referral of patients or to order or purchase items or services.

43.     The Anti-Kickback Statute applies to the sale of covered Medicare Part D prescription drugs to Federal Beneficiaries.  The statute, as interpreted by OIG, bars the offering of remuneration to Federal Beneficiaries where the person offering the remuneration knows or should know that the remuneration is likely to influence the

19

beneficiary to order or receive items or services from a particular provider. The "should know" standard is met when a provider acts with deliberate ignorance or reckless disregard, and there is no need to provide specific intent. 42 C.F.R. § 1003.101. According to OIG's Special Advisory:

> The "inducement" element of the offense is met by any offer of valuable (i.e., not inexpensive) goods and services as part of a marketing or promotional activity, regardless of whether the marketing or promotional activity is active or passive. For example, even if a provider does not directly advertise or promote the availability of a benefit to beneficiaries, there may be indirect marketing or promotional efforts or informal channels of information dissemination, such as "word of mouth" promotion by practitioners or patient support groups. In addition, the OIG considers the provision of free goods or services to existing customers who have an ongoing relationship with a provider likely to influence those customers' future purchases.

44.     Federal regulations identify narrow "safe harbors" from Anti-Kickback Statute liability. There are 10 statutory safe harbor provisions, 42 U.S.C. § 1320a-7b(b)(3)(A)-(J), and 25 regulatory safe harbors, 42 C.F.R. § 1001.952(a)-(y).  No safe harbor applies to the conduct alleged herein.

45.     A kickback in violation of the Anti-Kickback Statute violates the FCA. The Patient Protection and Affordability Care Act ("PPACA"), Pub. L. No. 111-148, 124 Stat. 119 (H.R. 3590), which was signed into law on March 23, 2010, specifically makes a violation of the Anti-Kickback Statute actionable under the FCA.  PPACA amended the Anti-Kickback Statute to provide that a "claim that includes items or services resulting from a violation [of the Anti-Kickback Statute] constitutes a false or fraudulent claim" under FCA.  H.R. 3590, § 6402(f)(1).  Moreover, it also clarified that actual knowledge of the Anti-Kickback Statute or specific intent to commit an Anti-Kickback Statute violation is not required for liability.  H.R. 3590, § 6402(f)(2).

46.     The federal-state Medicaid program in each state requires providers to comply with all Medicaid requirements in Federal laws.  This includes, as a condition of payment, compliance with the Anti-Kickback Statute.  The States have enacted anti-kickback statutes, the provisions of which mirror the Anti-Kickback Act.  Relator asserts claims under these State anti-kickback laws.

### C. Insurance Frauds Prevention Acts.

47.     The California Insurance Frauds Prevention Act ("CIFPA"), Cal. Ins. Code § 1871 *et seq.*, and the Illinois Insurance Claims Fraud Prevention Act ("IICFPA"), 740 Ill. Comp. Stat. Ann. § 92 *et seq.* are statutes designed to root out and put a stop to fraudulent activities in the insurance arena.  Both statutes contain a *qui tam* provision, similar to that contained in the Federal and various state False Claims Acts.  The statutes are premised on the idea that the costs of insurance fraud are ultimately passed on to consumers in the form of increased premiums, and the *qui tam* provisions are designed to promote more effective investigation, discovery, and prosecution of insurance frauds. *See* CAL. INS. CODE § 1871(a).  The California statute explicitly references heath care fraud as one of the areas the statute is intended to target, finding that "[h]ealth care fraud causes losses in premium dollars and increases health care costs unnecessarily." *Id.* at § 1871(h)

48.     Defendant's fraudulent scheme as alleged by Relator herein violates the CIFPA and the IICFPA for claims submitted to private insurers.

49.     **California Insurance Frauds Prevention Act**.  CIFPA creates civil liability for "[e]very person who violates any provision of this section or Section 549, 550, or 551 of the Penal Code shall be subject, in addition to any other penalties that may

be prescribed by law, to a civil penalty of not less than five thousand dollars ($5,000) nor more than ten thousand dollars ($10,000), plus an assessment of not more than three times the amount of each claim for compensation, as defined in Section 3207 of the Labor Code or pursuant to a contract of insurance." CAL. INS. CODE § 1871(b).

50.    CAL. INS. CODE Section 1871(a) provides that "It is unlawful to knowingly employ runners, cappers, steerers, or other persons to procure clients or patients or to perform or obtain services or benefits pursuant to Division 4... of the Labor Code or to procure clients or patients to perform or obtain services under a contract of insurance or that will be the basis for a claim against an insured individual or his or her insurer."

51.    CAL. PENAL CODE § 550(b) states:

It is unlawful to do, or to knowingly assist or conspire with any person to do, any of the following:

(1)    Present or cause to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.

(2)    Prepare or make any written or oral statement that is intended to be presented to any insurer or any insurance claimant in connection with, or in support of or opposition to, any claim or payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.

(3)    Conceal, or knowingly fail to disclose the occurrence of, an event that affects any person's initial or continued right or entitlement to any insurance benefit or payment, or the amount of any benefit or payment to which the person is entitled.

(4)    Prepare or make any written or oral statement, intended to be presented to any insurer or producer

22

for the purpose of obtaining a motor vehicle
insurance policy, that the person to be the insured
resides or is domiciled in this state when, in fact,
that person resides or is domiciled in a state other
than this state.

52.     The statute contains a *qui tam* provision that states "[a]ny interested person, including an insurer, may bring a civil action for violation of this section for the person and for the State of California…" CAL. INS. CODE § 1871.7(e)(1)

53.     **Illinois Insurance Claims Fraud Prevention Act**. IICFPA states "[a] person who violates any provision of this Act, Section 17-8.5 or Section 10.5 of the Criminal Code of 1961 or the Criminal Code of 2012, or Article 46 of the Criminal Code of 1961 shall be subject… to a civil penalty…"). 740 ILL. COMP. STAT. ANN. 92/5(b).

54.     Section 92/5 states "it is unlawful to knowingly offer or pay any remuneration directly or indirectly, in cash or in kind, to induce any person to procure clients or patients to obtain services or benefits under a contract or insurance or that will be the basis for a claim against an insured person or the person's insurer…". 740 ILL. COMP. STAT. ANN. § 92/5.

55.     ILL. CRIM. CODE § 17-10.5(a) states:

(1)     A person commits insurance fraud when he or she knowingly obtains, attempts to obtain, or causes to be obtained, by deception, control over the property of an insurance company or self-insured entity by the making of a false claim or by causing a false claim to be made on any policy of insurance issued by an insurance company or by the making of a false claim or by causing a false claim to be made to a self-insured entity, intending to deprive an insurance company or self-insured entity permanently of the use and benefit of that property.

(2)     A person commits health care benefits fraud against a provider, other than a governmental unit or agency,

23

when he or she knowingly obtains or attempts to obtain, by deception, health care benefits and that obtaining or attempt to obtain health care benefits does not involve control over property of the provider.

56.    "Deception," as further defined by statute, means knowingly to:

(1)    Create or confirm another's impression which is false and which the offender does not believe to be true; or

(2)    Fail to correct a false impression which the offender previously has created or confirmed; or

(3)    Prevent another from acquiring information pertinent to the disposition of the property involved; or

(4)    Sell or otherwise transfer or encumber property, failing to disclose a lien, adverse claim, or other legal impediment to the enjoyment of the property, whether such impediment is or is not valid, or is or is not a matter of official record; or

(5)    Promise performance which the offender does not intend to perform or knows will not be performed.

720 ILL. COMP. STAT. ANN. § 5/15-4.

57.    Under the IICFPA, "[a]n interested person, including an insurer, may bring a civil action for a violation of these Act for the person and for the State of Illinois…." 740 ILL. COMP. STAT. ANN. § 92/15(a).

## V.    MEDICARE PART D, MEDICAID AND OTHER FEDERAL PAYER PROGRAMS.

### A. Medicare Part D Requirements.

58.    Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.* established Health Insurance for the Aged and Disabled Program ("Medicare"). The

Secretary of the United States Department of Health and Human Services ("HHS") administers Medicare through CMS.

59.     The Medicare Program is composed of several parts. Medicare Part A provides basic insurance for the costs of hospitalization and post-hospitalization care. 42 U.S.C. § 1395c. Medicare Part B is a federally subsidized, voluntary insurance program that covers certain non-hospital medical services and products. 42 U.S.C. §§ 1395(k), 1395(I), and 1395(s). Medicare Part D was added to the Medicare laws with the Medicare Prescription Drug, Improvement and Modernization Act of 2003. 42 U.S.C. §1395w (effective 2006). Part D provides voluntary prescription drug benefits for qualified seniors and disabled persons. On January 28, 2005, CMS published a final rule to implement the Part D program. Medicare Program, Medicare Prescription Drug Benefit, 70 Fed. Reg. 4193 (Jan. 28, 2005) ("Final Rule").

60.     Prior to the implementation of Part D, Medicare permitted Federal Beneficiaries to enroll in a Medicare-approved discount card program from May 2004 through December 2005. Effective January 1, 2006, Part D provided all Federal Beneficiaries with subsidized drug coverage and reimbursement for prescription drugs dispensed on an outpatient basis. Any individual entitled to coverage under Part A or enrolled in Part B are eligible to obtain Part D coverage. 42 U.S.C. § 1395w-101. In 2007 alone, CMS spent over $49 billion in Part D expenditures. By January 2008, over 25 million Federal Beneficiaries had enrolled in the Part D program.

61.     Part D coverage is voluntary. Part D coverage includes all covered Part D drugs, which are defined as "(A) a drug that may be dispensed only upon a prescription and that is described in subparagraph (A)(i), (A)(ii), or (A)(iii) of section 1927(k)(2); or

(B) a biological product described in clauses (i) through (iii) of subparagraph (B) of such section or insulin described in subparagraph (C) of such section and medical supplies associated with the injection of insulin (as defined in regulations of the Secretary), and such term includes a vaccine licensed under section 351 of the Public Health Service Act (and, for vaccinations administered on or after January 1, 2008, its administration) and any use of a covered part D drug for a medically accepted indication (as defined in paragraph (4))." 42 U.S.C. § 1395w-102(e).

62.     Federal Beneficiaries who elect Part D coverage must enroll in a qualified prescription drug plan ("PDP") or an existing Medicare Advantage ("MA") plan with prescription drug coverage ("MA-PD").   Part D coverage is administered through the plans, and each plan must enter into a contract with CMS to provide Part D covered drugs.   Under Part D, CMS contracts for and subsidizes insurance plans offered by PDP sponsors and MA organizations (collectively, "Plan Sponsors").   To qualify for CMS payments under Medicare Part D, CMS requires Plan Sponsors to go through an application process, certify compliance with laws and regulations governing Part D in its contracts and bids, and meet stated reporting requirements.   42 C.F.R. §§ 423.504.

63.     Part D Plan Sponsors must certify compliance with "Federal laws and regulations designed to prevent fraud, waste, and abuse, including, but not limited to applicable provisions of criminal law, the False Claims Act (31 U.S.C. § 3729 *et seq.*), and the anti-kickback statute (section 1128B(b) of the Act)." 42 C.F.R. § 423.505(h).

64.     CMS also requires downstream entities and providers, including contract pharmacies, that provide healthcare goods and services to Federal Beneficiaries under Part D to certify that "any services or other activity performed . . . in accordance with a

contract or written agreement are consistent and comply with the Part D sponsor's contractual obligations," and that they have complied with "all applicable Federal laws, regulations, and CMS instructions." 42 C.F.R. § 423.505(i)(3)(iii) and (v).

65.    CMS pays Plan Sponsors in the form of advance monthly payments (consisting of the Plan Sponsor's standardized bid, risk adjusted for health status, minus the beneficiary monthly premium), estimated reinsurance subsidies, estimated low-income subsidies (low-income cost sharing and premiums), and estimated gap discount payments. After the end of the payment year, CMS reconciles the actual amounts of low-income cost sharing subsidies, reinsurance amounts, and gap discount amounts reported against the amount paid as a part of the prospective monthly payments. Risk sharing amounts (if applicable) are determined after all other reconciliations have been completed.

66.    Plan Sponsors negotiate prices directly with drug manufacturers, wholesalers, and pharmacies for covered Part D drugs.  Federal Beneficiaries enrolled in Part D typically obtain prescription drugs from pharmacies, such as those operated by Defendant.  Pharmacy reimbursement under Part D is based on the lower of (a) the negotiated price for a covered drug agreed upon by the Plan Sponsor and the pharmacy, or (b) the pharmacy's usual and customary price for the drug.

67.    The Final Rule published on January 28, 2005 defined negotiated prices as "prices for covered Part D drugs that – (1) Are available to beneficiaries at the point of sale at network pharmacies; (2) Are reduced by those discounts, direct and indirect subsidies, rebates, other price concessions, and direct or indirect remunerations that the Part D sponsor has elected to pass through to Part D enrollees at the point of sale; and (3)

27

Includes any dispensing fees." 70 Fed. Reg. 4194, 4534 (Jan. 28, 2005) (codified at 42 C.F.R. 423.100 (Oct. 1, 2005)).

68.     On October 1, 2009, CMS revised the definition of "negotiated prices" to "prices for covered Part D drugs that (1) The Part D sponsor . . . and the network dispensing pharmacy . . . have negotiated as the amount such network entity will receive, in total, for a particular drug; (2) Are reduced by those discounts, direct or indirect subsidies, rebates, and other price concessions, and direct or indirect remuneration that the Part D sponsor has elected to pass through to Part D enrollees at the point of sale; and (3) Includes any dispensing fees." 42 C.F.R. § 423.100 (Oct. 1, 2009).  The reason for the change was "to ensure that negotiated prices are based upon the actual drug price paid at the point-of-sale and do not include any of the administrative fees paid by Part D sponsors to their intermediary contracting organizations because higher negotiated prices advance beneficiaries through the phases of the Part D benefit more quickly such that a greater number of beneficiaries reach the coverage gap phase of the benefit." 74 Fed. Reg. 1494, 1505 (Jan. 12, 2009). The definition of "negotiated prices" has not changed since October 1, 2009. *See* 42 C.F.R. 423.100 (Oct. 1, 2010).

69.     CMS requires Plan Sponsors to make available uniform negotiated prices to all beneficiaries "for a particular covered Part D drug when purchased from the same pharmacy.  In other words, the negotiated price for a particular covered Part D drug purchased at a particular pharmacy must always be the same regardless of what phase of the Part D benefit an enrollee is in."  Prescription Drug Benefit Manual, Ch. 5: Benefits and Beneficiary Protections, at 20.6.

1. **CMS Limits Pharmacy Reimbursement for Covered Part D Drugs to the Lower of the Negotiated Price or the Usual and Customary Price at the Point of Sale.**

70.     Under Part D, Plan Sponsors are required to reimburse network retail pharmacies at the *lower* of (a) the negotiated price or (b) the contracting pharmacy's usual and customary price for the Part D covered drug at the point of sale.  Since 2005, CMS repeatedly emphasized this requirement as it relates to retail pharmacies.

71.     CMS's Final Rule implementing the Medicare Prescription Drug Benefit states that "we anticipate posting the maximum negotiated prices for prescription drugs on the website with the understanding that beneficiaries will pay the lower of the negotiated or usual and customary price at the point of sale."  70 Fed. Reg. 4194, 4219 (Jan. 28, 2005).

72.     On October 11, 2006, CMS issued written instructions to all Part D Plan Sponsors concerning Medicare's policy with respect to one-time lower cash prices offered to Federal Beneficiaries during a coverage gap where the beneficiary is responsible for 100 percent cost-sharing.  It stated that:

> Although we expect it to happen rarely, an individual may be able to obtain a lower price at a network pharmacy than that which his or her plan charges (the plan's negotiated price) in any applicable coverage gap or deductible. This may be possible if the pharmacy is offering a "special" price or other discount for all customers, or if the beneficiary is using a discount card, and the beneficiary is in any applicable coverage gap or deductible phase of his or her Part D benefit and is able to receive a better cash price for a covered Part D drug at a network pharmacy than the plan offers via its negotiated price.  In this situation, he or she may purchase that covered Part D drug without using his or her Part D benefit or a supplemental card.  The enrollee's purchase price for the discounted drug will count toward total drug spend under his or her Part D benefit and TrOOP balance provided the Part D plan finds out about it.

29

CMS Lower Cash Price Policy, at 1 (Oct. 11, 2006).

73.    The CMS instruction makes clear that the lower cash price policy does not apply where a pharmacy offers a lower price throughout a benefit year.  A pharmacy that offers Federal Beneficiaries a lower price throughout the benefit year establishes a "usual and customary" price that automatically takes the place of the higher negotiated price, and Plan Sponsors will reimburse claims based on the lower "usual and customary" price. CMS specifically applied the reimbursement instruction to Wal-Mart's $4 Prescription Program:

> We note that in cases where a pharmacy offers a lower price to its customers throughout a benefit year, this would not constitute a "lower cash price" situation that is the subject of this guidance. For example, Wal-Mart recently introduced a program offering a reduced price for certain generics to its customers. The low Wal-Mart price on these specific generic drugs is considered Wal-Mart's "usual and customary" price, and is not considered a one-time "lower cash" price. Part D sponsors consider this lower amount to be "usual and customary" and will reimburse Wal-Mart on the basis of this price.  To illustrate, suppose a Plan's usual negotiated price for a specific drug is $10 with a beneficiary copay of 25% for a generic drug. Suppose Wal-Mart offers the same generic drug throughout the benefit for $4. The Plan considers the $4 to take the place of the $10 negotiated price. The $4 is not considered a lower cash price, because it is not a one-time special price. The Plan will adjudicate Wal-Mart's claim for $4 and the beneficiary will pay only a $1 copay, rather than a $2.50 copay. This means that both the Plan and the beneficiary are benefiting from the Wal-Mart "usual and customary" price, and the discounted Wal-Mart price of the drug is actually offered within the Plan's Part D benefit design. Therefore, the beneficiary can access this discount at any point in the benefit year, the claim will be adjudicated through the Plan's systems, and the beneficiary will not need to send  documentation to the plan to have the lower cash price count toward TrOOP.

CMS Lower Cash Price Policy, n.1 (Oct. 11, 2006).

74.     On or about December 15, 2006, CMS released the final chapter for the Prescription Drug Benefit Manual on the Coordination of Benefits, which incorporated verbatim the CMS reimbursement instruction set forth above.  In it, CMS cautioned entities offering discount card or other discounted drug pricing arrangements, as alleged herein against Defendant, to comply with all relevant fraud and abuse laws, including, when applicable, the Federal anti-kickback statute and the civil monetary penalty law prohibiting inducements to beneficiaries.  Medicare Prescription Drug Benefit Manual, Ch. 14, at 50.4.2 n.2 (published 2006).  CMS's reimbursement instruction for Part D has been in effect since 2006 and is unchanged.  Medicare Prescription Drug Benefit Manual, Ch. 14, at 50.4.2 n.2 (Rev. 12, Mar. 19, 2010).

75.     In a related context, the final rule for the Discount Drug Card and Transitional Assistance Program requires "network . . . pharmacies [to] provide *the lower of the negotiated price or usual and customary price* when a covered discount card drug for a negotiated price is available at the point of sale."  42 C.F.R. § 403.806(d)(7) (emphasis added).  *See* 42 C.F.R. § 403.802 (defining a "covered discount drug card drug" as, among other things, "a drug that may be dispensed only upon a prescription . . .").

76.     These and other CMS authorities establish that, since 2005, Part D implementing regulations and CMS's reimbursement instructions permit a contracted pharmacy to sell covered Part D drugs to Federal Beneficiaries at prices lower than the negotiated prices of Plan Sponsors.  The pharmacy establishes a "usual and customary" price for the covered drug if offered throughout the benefit year, and the pharmacy's reimbursement cannot exceed the lower usual and customary price.

**2. Defendant Required Pharmacies Enrolled in Its Pharmacy Benefit Management Company to Adhere to CMS's Part D Reimbursement Policy.**

77.    Defendant's wholly-owned pharmacy benefit management company, Walgreens Health Initiatives, Inc. ("WHI"), expressly recognized and required contracted network pharmacies to limit reimbursement for covered Part D drugs to the lower of the negotiated/contract price or usual and customary pricing at the point of sale. This requirement purportedly applied to all contracted pharmacies, including Defendant's retail locations. Based on Relator's experience, Defendant's pharmacies never complied with this requirement.

78.    As documented by the WHI Pharmacy Manual, Defendant knew in December 2006 that reimbursement for covered Part D drugs was limited to the lower of the negotiated price or the pharmacy's usual and customary price available to Federal Beneficiaries. The WHI Pharmacy Manual, dated December 8, 2005, identifies as a program specification of participating pharmacies:

**C.    Reimbursement**

\*    \*    \*

**4.    Network Participating in Medicare Programs**

\*    \*    \*

(b)    During the term of WHI Medicare Part D Plans, effective January 1, 2006 or the date that any WHI Part D Plan begins operation, Network pharmacies will dispense Covered Part D Drugs (as defined in 42 C.F.R. §423.100) to Medicare Enrollees in accord with the terms and conditions of this Manual and Pharmacy Network Agreement and will be

32

monitored by WHI and the applicable WHI Part D
Plan Sponsor on an ongoing basis.

79.     Under the heading "General Claim Submission Information," the WHI

Pharmacy manual states:

A.     **Submission of Prescription Claims**

*     *     *

6.     Medicare Discount Drug Card.    For each
Prescription Order for Covered Discount Card
Drugs dispensed to Medicare Enrollees,
participating pharmacies will charge Medicare
Enrollees the prescription charge specified through
the POS System (the "Medicare Prescription
Charge"). The Medicare Prescription Charge will be
one hundred percent (100%) of the negotiated rate
agreed upon in writing by the parties, reduced by
any applicable manufacturer rebates and any
applicable Transitional Assistance Funds. **The
Medicare Prescription Charge will be the lower
of the negotiated rate or usual and customary
price when a Covered Discount Card Drug
subject to a negotiated rate is available at the
point of sale. For Products and Services Inside
the Scope of Endorsement, participating
pharmacies will not charge Medicare Enrollees
any fees in addition to the applicable
Prescription Charge.**

7.     Medicare Part D. For each Prescription Order for
Covered Part D Drugs dispensed to Medicare
Enrollees pursuant to this Agreement, Pharmacy
will charge Medicare Enrollees, including Medicare
Subsidy Eligible Individuals, the correct Cost
Sharing Amount specified through the POS. As
specified through the POS, the Cost Sharing
Amount will be one hundred percent (100%) of the
Prescription Charge, reduced by any applicable Part
D Plan Payment. Claims submitted by Pharmacy for
reimbursement of Part D Plan Payments and any
rebates the applicable WHI Part D Plan elects to
pass to the beneficiary at the point of sale, if any,
will be paid by WHI in accordance with the

33

payment terms set forth in the Pharmacy Network Agreement. **As specified through the POS, at the point of sale both the Cost Sharing Amount and the Part D Plan Payment will be calculated using the lower of the negotiated rate and Pharmacy's usual and customary price and the terms and conditions set forth in the Pharmacy Network Agreement.** At the point of sale, Pharmacy will inform Medicare Enrollees of any differential between the price of a prescribed Covered Part D Drug and the price of the lowest priced generic Covered Part D Drug that is therapeutically equivalent and bioequivalent and available at the Pharmacy location. Pharmacy will comply with standards for pharmacy practice as established by the State in which each Pharmacy is located.

8.    In no event shall Pharmacy bill, charge, collect a deposit from, have any recourse against, or otherwise seek payment from any Medicare Enrollee for any Prescription Charge, other than the Cost Sharing Amount, returned checks and collections costs, and any similar fees in accordance with applicable laws, including as required under 42 CRF 423.505(g)(i).

80.    Under the heading "Pricing," the WHI Pharmacy Manual states:

2.    Medicare. As specified through the POS System,[2] at the point of sale: (i) the Medicare Prescription Charge will be the lower of the negotiated rate and Pharmacy's usual and customary price;

81.    An earlier version of the WHI Pharmacy Manual, effective 2003, did not include these reimbursement limitations for Part D.  Later versions of the WHI Pharmacy Manual, including the 2011 version, excludes this language, but requires participating network pharmacies to report their usual and customary price for covered Part D drugs in

---

[2]    The WHI Manual defines "POS System" as "the on-line or real time point-of-sale telecommunication system used to communicate information regarding Covered Drugs, Eligible Members, claims, drug utilization, Copayments, or other amounts to be collected from an Eligible Member by Pharmacy and the amounts payable to Pharmacy."

NCPDP Standard Universal Claim Forms submitted to WHI, the claims processor for the drugs.

## B. Medicaid Program Requirements.

82.     Title XIX of the Social Security Act ("Medicaid" or "Medicaid Program") authorizes grants to states for medical assistance for low-income people who are age 65 and older, blind, disabled, or members of families with dependent children or qualified pregnant women or children. 42 U.S.C. § 1396; 42 C.F.R. § 430.0; *see* 42 U.S.C. §§ 1396-1396v.  As a joint federal and state public assistance program, Medicaid is jointly funded by the federal government and participating states. *Id.*

83.     The federal government administers Medicaid through CMS, which pays to the State the federal portion of the expenditures made by the State to providers, and ensures that the State complies with the minimum federal standards in the administration of the Medicaid Program. 42 U.S.C. §§ 1396, 1396a, and 1396b.  The amount of Federal funding in a State's program (Federal Financial Participation) is determined by a statutory formula set forth in 42 U.S.C. § 1396a.

84.     Federal law also requires participating states to establish a "State Plan" for providing medical assistance to qualified beneficiaries. 42 U.S.C. § 1396a(a)-(b); 42 C.F.R. § 430(A)-(B); *see also* CMS State Medicaid Manual § 13025.

85.     For example, the State of New York has elected to participate in the Medicaid Program, has established a State plan under the Medicaid Program, and has promulgated regulations that implement the State plan. *See* N.Y. Soc. Serv. L. § 363 *et. seq.*; 10 N.Y.C.R.R. Parts 85-86; 18 N.Y.C.R.R. Part 360. The New York State Department of Health is the sole Medicaid agency that has contracted with HHS to

administer or supervise the Medicaid Program in New York State. N.Y. Pub. Health L. § 201.1(v); *see* 42 U.S.C. § 1396a(a)(5); 42 C.F.R. § 431.10(b).

86.    Individuals or entities that provide services to Medicaid beneficiaries in New York submit claims for payment to the Medicaid agency or its local delegate agency. *See* 42 C.F.R. § 430.0. Payments are made based on types and ranges of services, payment levels for services, and administrative and operating procedures established by the State in accordance with Federal laws, statutes and rules. *Id.*

### 1.    State Reimbursement Requirements.

87.    The federal Medicaid statute allows for reimbursement for the cost of "covered outpatient drugs," which are prescription drugs that are, *inter alia*, approved by the Food and Drug Administration for safety and effectiveness. 42 U.S.C. § 1396r-8. Medicaid also establishes minimum requirements for states concerning the treatment of pharmacy reimbursement limits. *Id.*

88.    Adhering to the Medicaid minimum requirements, States must establish their own pharmacy reimbursement standards for prescription drugs, as part of the State Plan submitted to CMS. 42 C.F.R. § 447.518(a).

89.    States utilize the following data points in setting reimbursement limitations:

- **Federal Upper Limit ("FUL")**, a federally prescribed maximum reimbursement for a specific drug set annually by CMS.

- **Maximum Allowable Cost ("MAC")**, a maximum reimbursement cost set by each State.

- **Estimated Acquisition Cost ("EAC")**, an amount generally based on the average price a pharmacy pays for a given drug.

- **Usual and Customary Price**, which is consistent with CMS's definition.

- **Average Wholesale Price ("AWP")**, the average price at which a drug is sold to pharmacies, as reported by the drug supplier (i.e. manufacturer or distributor) to a commercial publisher.

- **Wholesale Acquisition Cost ("WAC")**, the supplier (i.e. manufacturer or distributor) reported list price of a drug before any rebates, discounts, allowances or other price concessions are offered.

90.     As a general rule, reimbursement may not exceed the pharmacies' usual and customary price. States commonly limit pharmacy reimbursement for Medicaid covered drugs to the *lower of* the FUL, MAC, EAC, and the pharmacies' usual and customary price.     Individual State pharmacy reimbursement requirements are summarized in **Exhibit A** to the First Amended Complaint.

### 2.  State Claims Submission Overview.

91.     CMS grants quarterly awards to States with approved State plans to cover the Federal share of Medicaid expenditures.  42 C.F.R. § 430.30(a).  The amount a State receives at the beginning of a given quarter is based on an estimate made by CMS using information submitted to the United States by the State Medicaid agency.  42 U.S.C. § 1396b(d)(1); 42 C.F.R. § 430.30(a).

92.     Once the grant award is made, the State draws Federal funds as needed to pay for the Federal share of disbursements.  42 C.F.R. § 430.30(d)(3).  This draw is made through a commercial bank and the Federal Reserve system, against a continuing letter of credit.  *Id.* at § 430.30(d)(4).  The State then pays the portion of the claim not covered by the federal share.

93.     Each state chooses a "delivery system" for health care benefit resources. By way of example, the two most often utilized delivery systems are (1) fee for service ("FFS"), where health care providers are paid for each service provided to a Medicaid

37

beneficiary, and (2) managed care, where the state contracts with a managed care organization ("MCO") to deliver most or all Medicaid services to beneficiaries in exchange for a fee.  Some States have implemented alternative models, including integrated care models that provide Medicaid and Medicare benefits through a single delivery system to dual eligible enrollees and self-directed services that allow beneficiaries to manage all aspects of service delivery.  Regardless of the delivery system selected, States are required to comply with the reimbursement limitations described above with respect to claims submitted by healthcare providers, including pharmacies.

94.     Defendant's conduct violates Sections 3729(a)(1)(A) and (a)(1)(B) of the FCA, and similar state statutory provisions.   When Defendant submits a false reimbursement claim to a State Medicaid program through, for example, the FFS delivery system, for a covered drug in violation of the requirement that pharmacy reimbursement not exceed the usual and customary, it submits a false claim to the State and also causes the State to present the false claim to the United States drawing down on federal funds for payment.  Likewise, when Defendant submits a false reimbursement claim through the MCO delivery system, it causes false claims to be submitted both the State and the United States.

### C.  Other Federal Payer Programs.

76.     The Federal government also provides reimbursement for medical care under other health care programs.

77.     The Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS") (presently entitled "TRICARE"), 10 U.S.C. §§ 1071-1106, is a federally-funded program administered by the Department of Defense. TRICARE/CHAMPUS

provides medical benefits to certain active duty service members and their spouses and unmarried children, certain retired service members and their spouses and unmarried children, and reservists called to duty and their spouses and unmarried children. 32 C.F.R. § 199 *et seq.* TRICARE pays for its beneficiaries' medical procedures alleged herein.

78.    CHAMPVA is a healthcare program administered by the United States Department of Veterans Affairs for families of veterans with 100-percent service-connected disabilities. CHAMPVA pays for its beneficiaries' medical procedures alleged herein.

79.    The Federal Employees Health Benefits Program ("FEHBP") provides health care coverage for qualified federal employees and their dependants. FEHBP pays for its beneficiaries' medical procedures alleged herein.

## VI.    **DEFENDANT'S WRONGFUL CONDUCT.**

80.    Relator Marc D. Baker is a licensed pharmacist in the State of Florida. He worked for Defendant as a Pharmacy Manager from April 2001 until December 2011. Throughout his employment with Defendant, Mr. Baker performed the responsibilities of a Staff Pharmacist, such as processing and verifying prescriptions, managing patient information, and patient consultations.

81.    By virtue of his position and responsibilities with Defendant as a Pharmacy Manager for more than ten years, Relator was ideally situated to investigate and uncover the fraudulent conduct alleged in the Complaint. As a Pharmacy Manager, he routinely interacted with staff pharmacists and managers in the Walgreens community and has personal knowledge of the way in which defendant's pharmacies operate. Based

on his experience, Relator has personal knowledge that Defendant has uniform operating procedures for its retail pharmacies nationwide.  Defendant's pharmacies also use the same computer systems (StoreNet and Intercom Plus) to process transactions.  This has conferred upon Relator direct and independent knowledge of Defendant's fraudulent conduct as to specific patients and has enabled him to discover and investigate the systemic and illegal practices of Defendant, as alleged herein.

### A. Defendant's PSC Program.

82.     On January 1, 2006, Medicare Part D coverage went into effect, making tens of millions of Federal Beneficiaries eligible for prescription drug coverage under Part D.  A significant percentage of these Federal Beneficiaries were existing customers of Defendant's stores, and Defendant sought to retain their business as a network pharmacy chain accepting Part D plans.

83.     In September 2006, Wal-Mart, a key competitor of Defendant, launched a $4 Prescription Program, a deeply discounted generic drug program offered directly to Federal Beneficiaries for Part D covered drugs at prices substantially lower than the negotiated prices available at Defendant's stores.  Wal-Mart's $4 Prescription Program was launched in Tampa, Florida and, within months, expanded to 49 states.  Wal-Mart's formulary of low-priced generics, which initially included approximately 140 drugs (totaling more than 300 formulations), was matched by Target and partially by Kmart (which offers 90-day supplies at $15).  Many non-pharmacy chains, which were able to absorb lower generic margins because pharmacy sales represent a low percentage of their total sales and gross profits, followed suit.

84.     Wal-Mart's $4 Prescription Program offers all pharmacy customers, including those with private insurance, Federal payer insurance, and the uninsured, a 30-day supply of commonly prescribed generic drugs for $4, and a 90-day supply for $10. According to Wal-Mart, all insurance plans, including Federal payers, are accepted and customers need not fill out any additional paperwork.  Wal-Mart's Fact Sheet states:

      a.     "Especially important to the Medicare recipients, the $4 generic prescription program will help alleviate a major challenge for those who have fallen into the coverage gap in their Medicare Part D prescription drug plans, also known as the 'doughnut hole.'  These seniors now find themselves responsible for paying 100 percent of prescription drug costs between $2,250 and $5,100."

      b.     "We estimate that the program will save state Medicaid programs hundreds of thousands of dollars annually."

      c.     "Medicaid patients will see no change with this program.   Their co-pays will remain the same, and there will be savings to the state and taxpayers."

85.     Unwilling to absorb reduced margins on its generic drugs, Defendant initially refused to price match Wal-Mart.  Defendant issued a "Statement on Wal-Mart's Promotion Drug Pricing" in October 2006, declaring that it would not match Wal-Mart's promotion.  Defendant's Statement professed that "Seniors covered under Medicare Part D prescription insurance on average will pay more at Wal-Mart for these medications than they would at Walgreens."  Following the issuance of the Statement, Defendant's stock dropped 11-percent.

86.     Concerned with the loss of pharmacy business, which historically accounts for 65-percent of Defendant's annual sales, as well as in-store traffic, Defendant developed the Prescription Savings Club Program ("PSC Program"), which it test-marketed in late-2006 and launched in the fall of 2007.

87.     The PSC Program is a non-networked discount prescription buying program with discounts on more than 8,000 brand-name and generic medications. Enrollment is on an annual basis in the amount of $20 for an individual, or $35 for a family. To obtain the benefits of the Program, *e.g.*, discounts on cash prices and low cost prescription drugs, customers must use the card at Defendant's stores.[3]

88.     PSC Program members receive discounts and rebates on formulary drugs, seasonal flu vaccinations, and nebulizer devices and related supplies. PSC members receive 90-day supplies of more than 400 generic drugs for $12, discounts on prescriptions drugs, discounts on pet medications, and 10-percent cash discounts on all purchases of Walgreens-branded products, such as over-the-counter medications, baby care, household items, consumables, and photofinishing. The drug savings depend on the number of prescriptions, the days supply (for example, 30 day supply versus 90 day supply), and whether the drug is brand or generic. Defendant corporate documents state that the average savings on a purchase of a 90-day supply of a generic drug purchased at $12 is $44.71, and the average savings for commonly prescribed quantities of branded drugs is $22.71. Defendant states that the overall savings for a 30-day supply is 5.3-

---

[3]     Eligible pharmacies include Duane Reade, a pharmacy chain in metropolitan New York owned by Defendant with more than 253 stores in commercial and residential neighborhoods throughout New York.

percent for generic drugs and 16.8-percent for generics; and the overall average savings for a 90-day supply is 5.3-percent for brand name drugs and 26-percent for generics.

89.     Defendant's internal documents acknowledge that enrolling Federal Beneficiaries in the PSC Program would (a) violate CMS guidelines prohibiting pharmacies from offering a non-networked discount program to Federal Beneficiaries as an incentive to purchase covered Part D drugs at its stores and (b) require Defendant to reduce the Part D reimbursement prices negotiated with Part D Plan Sponsors to the lower usual and customary prices established by its PSC Program.  For example, a May 19, 2011 e-mail from Rebecca Sieracki, Defendant's Customer Service Representative for Card Programs, stated:

> ***CMS (Centers for Medicare/Medicaid Services) has strict guidelines that prohibit their members from receiving discounts from a non-networked discount/rebate program.  Since our program is valid only at Walgreen's pharmacies, we would be violating those guidelines.***  Therefore, we as a retailer must be careful without programs to prevent potential legal issues with CMS.  When a person receives a public benefit (such as Medicare Part A, B, or D) she falls into a different category of patient, one where we may not offer her incentives to shop in our store.

90.     From the inception of the Program, Defendant has knowingly, intentionally, and aggressively marketed the PSC Program to Federal Beneficiaries, millions of whom have been wrongfully enrolled.  By targeting and enrolling Federal Beneficiaries in the PSC Program, Defendant has steered their Federal payer prescription business exclusively to its pharmacies.

91.     There are 2.5 million active PSC Program memberships. This number excludes former and canceled memberships,[4] Defendant's employees (approximately 244,000), and individuals enrolled under a family membership. Based on Relator's direct and independent knowledge, including patient information on file at Defendant's stores at the time of enrollment, substantially more than half of the current PSC Program enrollees are Federal Beneficiaries. A random sample of 100 current PSC Program members evidenced that 58% of enrollees are Federal Beneficiaries. Since the inception of the PSC Program in 2006, Defendant has knowingly and intentionally enrolled more than 5 million Federal Beneficiaries in the program – even though the payer/insurance and prescription information on file in Defendant's computer system at time of enrollment confirmed the applicants' status as Federal Beneficiaries.

92.     As a result, Defendant has illegally steered Federal Beneficiaries to its pharmacies to obtain their federal payer program business for prescription drugs paid for exclusively by the United States. Relator has documented substantial Federal payer prescription sales under the PSC Program tracing to the Federal Beneficiaries.

93.     The Federal Beneficiaries wrongfully enrolled in the PSC Program by Defendant received illegal discounts on prescriptions drug purchases, pet medications, and 10-percent cash discounts on all purchases of Walgreens-branded products (such as over-the-counter medications, baby care, household items, consumables, and photofinishing). Defendant electronically tracks the discounts for each member enrolled in the PSC Program. Based on Defendant's marketing representation that the average savings on a purchase of a 90-day supply of a generic drug purchased at $12 is $44.71,

---

[4]     Based on Defendant's data, an average of 35,000 patients enroll in the PSC Program per week (1,800,000 annually) chain-wide.

and the average savings for commonly prescribed quantities of branded drugs is $22.71, the average cash discount to individual Federal Beneficiaries attributed just to drug pricing substantially exceeds $50 during the course of a given benefit year. According to CMS, "Medicare beneficiaries have an average of 28 prescriptions in a year, while those beneficiaries who describe themselves to be in poor health have 45 prescriptions in a year. . . .".  CMS, Fact Sheet-Final Medicare Part D Data Regulation (CMS-4119-F), n. 1 (May 22, 2008).

### B. Defendant Used Illegal Marketing and Promotional Tactics to Enroll Ineligible Federal Beneficiaries in the PSC Program.

94.      Defendant trains its employees to market and promote the PSC Program aggressively to patients, including to Federal Beneficiaries, at the point of sale, through promotional events and in advertising.  By way of example, Defendant instructs its employees to make the following representations to patients about the PSC Program:

   a.      "Good for people of all ages."

   b.      "Includes over 7,000 name brand and generic medications in ALL major drug categories and covers health conditions like allergy, antibiotics, antifungal, antiviral treatments, arthritis and pain, asthma and COPD blood pressure and heart health, cholesterol, cough and cold, diabetes, eye care, gastrointestinal health, infectious treatments, mental health, skin conditions, thyroid conditions, vitamins & nutritional health, women's health and more!"

   c.      "All generics are included on the PSC formulary."

   d.      "Over 400 generics priced at $12 for a 90-day supply.  That's less than $1 a week ($12 ÷ 90 [days] x 7 [days in a week] = $.93 a week)."

45

   e.  "10% reward on purchases of Walgreens brand products that can be used on future purchases.  Rewards can even be managed online."

   f.  "Insulin and diabetes care supplies covered with a prescription."

   g.  "Can be used for pets that need prescription medications."

   h.  "No medical exams, no exclusions for pre-conditions, no prior authorizations required."

   i.  "Can be used at any Walgreens retail pharmacy nationwide."

95. Defendant also provides its employees with "talking points directed toward patients," including, for example, that if "your insurance does not cover the medications you are currently taking, our new Rx Savings Club may be for you;" that employees should "give your customer the Prescription Savings Price before charging customer cash price.  By giving the lower price first, the customer will have instant interest in the possibility of saving money;" that "[o]ver 400 generic medications are priced at Less than $1 per week for a 3 month supply;" that "[i]n addition to rx savings, this program also allows you to earn a 10% reward on Walgreens brand products – from toothpaste to OTC medications and on some of our photo finishing services;" and that Defendant "can provide you with the savings associated with the medications you are currently taking."

96. Defendant, by and through its employees, directly solicits Federal Beneficiaries to enroll in the PSC Program in the store when its employees are filling prescriptions under Part D.  When a Federal Beneficiary fills a prescription at one of Defendant's pharmacies, Defendant provides the beneficiary with a leaflet that solicits enrollment in the PSC Program by promoting substantial monetary savings by enrolling

in the program.   The following examples illustrate Defendant's direct solicitation of

Federal Beneficiaries for enrollment in the PSC Program:

         a.        On October 18, 2011, Patient 497[5] filled a covered Part D drug

(Gabapentin 800 mg Tablets) with prescription number 0102116-09170 at

Defendant's retail pharmacy located at 12600 Tamiami Trail, North Port, Florida

34286. Patient 497 paid $342.92 for the prescription, which is Defendant's cash

price for the drug.   Defendant's patient records for Patient 497 at the time

establish that she was a Federal Beneficiary of PDP Sponsor SIMP Medicare Part

D. Defendant's computer system generated a code that the refill on the

prescription was too soon under the Federal Beneficiary's Part D coverage plan

and notifying Patient 497 that the "Prescription Savings Club could save you

$144.27" on the prescription if she enrolled.

         b.        On November 3, 2011, Patient 516 filled a covered Part D drug

(Metroprolol ER Succinate 50 mg Tablets) with prescription number 0103473-

09170 at the Defendant's retail pharmacy located at 12600 Tamiami Trail, North

Port, Florida 34286. Patient 516 paid $104.37 for the prescription, which is

Defendant's cash price for the drug.   Defendant's patient records for Patient 516

at the time establish that she was a Federal Beneficiary of PDP Sponsor AARP

Medicare Part D.   Defendant's computer system generated a drug utilization

review error code under the Federal Beneficiary's Part D coverage plan and

notified Patient 516 that the "Prescription Savings Club could save you $22.40"

on the prescription if she enrolled.

---

[5]     Patient names, dates of birth, and addresses have been omitted from the patient
exemplars included herein.

c.    On October 7, 2011, Patient 483 filled a covered Part D drug (Anagrelide 0.5 mg capsules) with prescription number 0101281-09170 at the Defendant's retail pharmacy located at 12600 Tamiami Trail, North Port, Florida 34286. Patient 483 paid $455.79 for the prescription, which is Defendant's cash price for the drug.   Defendant's patient records for Patient 483 at the time establish that she was a Federal Beneficiary of PDP Sponsor AARP Medicare Part D.  Defendant's computer system generated a drug utilization review error code under the Federal Beneficiary's Part D coverage plan and notified Patient 483 that the "Prescription Savings Club could save you $243.53" on the prescription if she enrolled.

d.    On November 3, 2011, Patient 514 filled a covered Part D drug (Trazondone 100 mg Tablets) with prescription number 0103496-09170 at the Defendant's retail pharmacy located at 12600 Tamiami Trail, North Port, Florida 34286. Patient 514 paid $55.41 for the prescription, which is Defendant's cash price for the drug.   Defendant's patient records for Patient 514 at the time establish that she was a Federal Beneficiary of PDP Sponsor RXAM Medicare Part D.  Defendant's computer system generated a refill too soon code under the Federal Beneficiary's Part D coverage plan and notified Patient 514 that she could "Pay just $12 for a 90-day supply as a Prescription Savings Club member" if she enrolled, and to "Talk to your pharmacist NOW and learn how much you'll SAVE."

e.    On November 3, 2011, Patient 514 filled a covered Part D drug (Bupropion XL 300 mg Tablets) with prescription number 0103494-09170 at the

Defendant's retail pharmacy located at 12600 Tamiami Trail, North Port, Florida 34286. Patient 514 paid $370.77 for the prescription, which is Defendant's cash price for the drug. Defendant's patient records for Patient 514 at the time establish that she was a Federal Beneficiary of PDP Sponsor RXAM Medicare Part D. Defendant's computer system generated a refill too soon code under the Federal Beneficiary's Part D coverage plan and notified Patient 514 that the "Prescription Savings Club could save you $12.80!" if she enrolled in the program.

f.      On November 4, 2011, Patient 509 filled a covered Part D drug (Cialis 20 mg tablets) with prescription number 0103550-09170 at the Defendant's Pharmacy located at 12600 Tamiami Trail, North Port, Florida 34286. Patient 509 paid $97.04 for the prescription, which is Defendant's cash price for the drug. Defendant's patient records for Patient 509 at the time establish that he was a Federal Beneficiary of Tricare. Defendant's computer system generated a refill too soon code under the Federal Beneficiary's Tricare coverage plan and notified Patient 509 that the "Prescription Savings Club could save you $5.05!" if he enrolled in the program.

g.      On May 31, 2011, Patient 526 filled a prescription for Lorazepam 0.5 mg tablets with prescription number 0087180-09170 at the Defendant's retail pharmacy located at 12600 Tamiami Trail, North Port, Florida 34286. Patient 526 paid $16.69 for the prescription, which is Defendant's cash price for the drug. Defendant's patient records at the time establish that Patient 526 was a Federal Beneficiary of PRSB Medicare Part D. Defendant's computer system generated a

49

drug not covered code under the Federal Beneficiary's coverage plan and notified Patient 526 that the "Prescription Savings Club could save you $6.72!" if he enrolled in the program.

h.      On May 31, 2011, Patient 554 filled a prescription for Fluocinonide 0.05% Cream 30GM with prescription number 0093098-09170 at the Defendant's retail pharmacy located at 12600 Tamiami Trail, North Port, Florida 34286. Patient 554 paid $17.99, which is Defendant's cash price for the drug. Defendant's patient records at the time establish that Patient 554 was a Federal Beneficiary of OPTFL Medicare Part D. Defendant's computer system generated a drug not covered code under the Federal Beneficiary's coverage plan and notified Patient 554 that she could "pay just $12 for a 90-day supply as a Prescription Savings Club member."

i.      On March 18, 2011, Patient 537 filled his prescription for Promethazine DM Syrup with prescription number 0087098-09710 at the Defendant's retail pharmacy located at 12600 Tamiami Trail, North Port, Florida 34286. Patient 537 paid $11.99, which is Defendant's cash price for the drug. Defendant's patient records at the time establish that Patient 537 was a Federal Beneficiary of AARP Medicare Part D. Defendant's computer system generated a drug not covered code under the Federal Beneficiary's coverage plan and notified Patient 537 that the "Prescription Savings Club could save you $2.02!"

j.      On March 11, 2011, Patient 539 filled her prescription for Lorazepam 1MG Tablets at the Defendant's retail pharmacy for Fluocinonide 0.05% Cream 30GM with prescription number 0085408-09170 at the Defendant's

retail pharmacy located at 12600 Tamiami Trail, North Port, Florida 34286. Patient 539 paid $47.99, which is Defendant's cash price for the drug. Defendant's patient records at the time establish that Patient 539 was a Federal Beneficiary of AARP Medicare Part D. Defendant's computer system generated a drug not covered code under the Federal Beneficiary's coverage plan and notified Patient 539 that the "Prescription Savings Club could save you $30.00!"

       k.      On December 2, 2010, Patient 351 filled his prescription for Clonidine 0.1 MG/24H TS Patches with prescription number 0077284-09170 at the Defendant's retail pharmacy located at 12600 Tamiami Trail, North Port, Florida 34286. Patient 351 paid $86.99, which is Defendant's cash price for the drug. Defendant's patient records at the time establish that Patient 351 was a Federal Beneficiary of WELLC Medicare Part D. Defendant's computer system generated a drug not covered code under the Federal Beneficiary's coverage plan and notified Patient 351 that the "Prescription Savings Club could save you $17.00!"

       l.      On February 10, 2011, Patient 518 filled her prescription for Clonazepam 1MG Tablets with prescription number 0083482-09170 at the Defendant's retail pharmacy located at 12600 Tamiami Trail, North Port, Florida 34286. Patient 518 paid $38.99, which is Defendant's cash price for the drug. Defendant's patient records at the time establish that Patient 518 was a Federal Beneficiary of AARP Medicare Part D. Defendant's computer system generated a drug not covered code under the Federal Beneficiary's coverage plan and notified Patient 518 that the "Prescription Savings Club could save you $16.25!"

## C. The Enrollment Process for Federal Beneficiaries Wrongfully Induced to Join the PSC Program.

97.     PSC Program enrollment is completed by Defendant's pharmacists in person through its two company-wide network computer systems, StoreNet and Intercom Plus. Both computer systems are controlled and maintained by Defendant's corporate division, and provide all of Defendant's pharmacies with access to a nationwide database of patient specific information, including biographical data, prescription histories, and whether the patient is eligible for coverage under a Federal or State government health care program.

98.     Defendant instructs pharmacists to fill out the enrollment application, which asks for customer information, as well as the employee identification number of the employee who encouraged the patient to enroll in the program, and to print out the temporary membership card for the new member. For patients with a prescription, the membership fee is added to the transaction when the pharmacist scans the bar code of the prescription. This prompts the system to ask members to confirm that they do not belong to a "publicly funded program;" confirm whether they would like to receive promotional materials; and to sign the PIN pad. Pharmacists also can locate and update members' information, along with renewing and cancelling memberships.

99.     Patients also can enroll in the PSC program by logging onto Defendant's website at Walgreens.com, which advertises the PSC Program under the heading "Popular Pharmacy Services." Defendant invites patients to "[s]ave on more than 9,000 brand names medications and see available generic equivalents." Upon selecting the PSC Program, patients are directed to membership homepage, which enables users to check

drug prices under the PSC Program and permits members and nonmembers to join or renew a membership.

100.   By clicking the "join now" button, Defendant provides the patient with the option of purchasing an individual membership for $20, a family membership for $35, or to renew a membership at the same prices.   The patient is then required to create an account with Defendant, providing first and last name, date of birth, email address, and password.   After creating an account, the patient is required to provide an address, phone number, gender, and date of birth.   The purpose of requiring a date of birth is to "keep your records complete and provide you with accurate health info."   Defendant provides members with temporary PSC cards, pending receipt of the permanent card through the mail.

### D. Defendant Has Mandatory Enrollment Minimums and Awards Bonuses for Enrolling PSC Program Members, Including Federal Beneficiaries.

101.   Defendant pressures its pharmacists and pharmacist technicians to aggressively promote the PSC Program to ineligible Federal Beneficiaries by, for example, imposing mandatory minimums on each pharmacy location for the number of daily (at least one per day) and weekly enrollments that are expected.   Defendant circulates e-mails to its pharmacies tracking enrollment data for every store within each company-defined District, praising employees and stores that have enrolled the most members, and identifying underperforming locations that fail to meet expected goals. Examples of such e-mails include the following statements:

a.   "Just like the vitamin . . . One A Day!!!"

b.   "Remember 1 a day is all you need!!!"

    c.   "Remember all you need is one a day to stay in the GREEN!!!!"

102.   Defendant keeps a running tally of the number of PSC Program enrollments – by store, district, operation, and chain -- on a daily and weekly basis, and circulates e-mails to each of its pharmacies.   For example, on September 7, 2011, the email recounting the daily tally in District 53 (Relator's former district) stated: "Thank you to our top 4 stores and the 8 that made goal.   The rest of us (and I'm one of us) need to have a chat with the pharmacy staff."   The e-mails exhort staff to market the PSC Program and single out specific pharmacies that fail to meet the mandatory minimums for enrollment.   For example, one such e-mail stated that "[t]his is a really hard month, I hope you are all trying new ways to sell. . . . Check with your pharmacy staff to make sure they are promoting the card."

103.   Defendant targets store and pharmacy managers who fail to meet PSC Program mandatory enrollment minimums.   Defendant requires pharmacy managers at these stores to attend a District wide conference call to explain the reasons why the mandatory minimum was not met.   Relator's store, Store Number 9170, was routinely identified in company e-mails as failing to meet mandatory enrollment minimums because the store has a high level of Federal Beneficiaries due to its location, and Relator refused to promote the PSC Program to them.   Relator was required to participate in the conference calls.

104.   As the daily and weekly tallies show, Defendant routinely enrolls more than 5,000 new members each day and over 30,000 new members each week.   For example, Defendant reportedly enrolled 5,031 new members on April 19, 2011; 5,062 new members on April 20, 2011; 5,073 new members on April 25, 2011; 5,035 new

members on May 2, 2011; 5,142 new members on May 3, 2011; 5,004 new members on May 4, 2011; 5,087 new members on May 9, 2011; 5,087 new members on May 9, 2011; 5,071 new members on May 10, 2011; and 5,036 new members on May 11, 2011. Examples of Walgreens weekly totals include, 31,301 new members for the week ending April 23, 2011; 31,306 new members for the week ending May 7, 2011; 31,381 new members for the week ending May 14, 2011; and 31,417 new members for the week ending May 28, 2011.   Aggregate store, district, and chain data on PSC Program enrollments was circulated via email to each pharmacy.

105.    In addition to daily and weekly mandatory enrollment minimums, Defendant pays bonuses to its employees based on the number of patients, including Federal Beneficiaries, enrolled in the PSC Program.  For pharmacists, Defendant focuses on PSC program enrollments as one of the key factors in determining a pharmacist's annual compensation (bonus).  For technicians, Defendant awards bonuses (referred to as "PM Dollars") in the amount of $1 per each new enrollment.   Technician bonuses are tallied and circulated on a weekly basis by email to each pharmacy.  Defendant has paid an average of $17,000 to its employees in weekly bonuses, and over $1,000,000 annually in bonuses for PSC Program enrollments.   Examples of weekly technician bonuses include the following:

> a.  For the week ending April 23, 2011, Defendant awarded its technicians $17,235 in bonuses for PSC program enrollments.
>
> b.  For the week ending May 7, 2011, Defendant awarded its technicians $17,242 in bonuses for PSC program enrollments.

c. For the week ending May 14, 2011, Defendant awarded its technicians $17,332 in bonuses for PSC program enrollments.

d. For the week ending May 21, 2011, Defendant awarded its technicians $17,260 in bonuses for PSC program enrollments.

e. For the week ending May 28, 2011, Defendant awarded its technicians $16,966 in bonuses for PSC program enrollments.

f. For the week ending August 20, 2011, Defendant awarded its technicians $17,537 in bonuses for PSC program enrollments.

**E.  Defendant Failed to Use Patient Screening Programs Available on its Nationwide Computer Network to Block Federal Beneficiaries.**

106.    Defendant's nationwide computer network system has patient screening programs in place and available to all retail pharmacy locations to identify and prevent duplicative coverage for Federal Beneficiaries, as required by Part D.  Defendant's screening programs are operationally capable of identifying and preventing Federal Beneficiaries from enrolling in the PSC Program.  The computer programs are also capable of preventing Defendant from submitting false claims to Plan Sponsors for payment of covered Part D drugs purchased by Federal Beneficiaries at the high negotiated prices, instead of Defendant's lower usual and customary prices.  In order to facilitate enrollment by Federal Beneficiaries in the PSC Program, Defendant failed to use these computer screening programs.

107.    Intercom Plus is a computer system that networks each of Defendant's pharmacies throughout the United States with its central servers.  Defendant regularly uses Intercom Plus to impose patient chart consultation blocks (also referred to as "CAP Blocks"), which Defendant creates at a network server level.  Defendant has the ability to

56

search patient files in Intercom Plus for specific information, including primary insurance or age, and impose a CAP Block on patients that satisfy the given criteria.  The CAP Block prevents Defendant's pharmacists from completing the sale of covered Part D drugs, absent a manual override.

108.    Defendant routinely utilizes CAP Blocks to target patients for specific actions by pharmacists, including, for example, the imposition of CAP Blocks on patient files to identify patients that are turning 65-years-old to solicit them for Medicare Part D enrollment.  Defendant has stated that:

> All patients who are 64.9 years old will receive a CAP block to offer a Medicare Part D session.  These patients have the opportunity to choose their first MPD plan (rather than choose to "switch") and with our help, can choose a plan that includes Walgreens in the network.

> **Hello Mr./Mrs.---I'm _____ your pharmacist X.   I see that you have a birthday coming up and will be eligible for Medicare Part D.  We are conducting Medicare Part D review sessions after October 15th, would you like me to schedule a session?   The sessions take about 20 minutes.**

109.    Defendant's computer system is readily capable of preventing pharmacists from selling Federal Beneficiaries covered Part D drugs under the PSC Program by using CAP Blocking.  Defendant knowingly and intentionally enrolled and sold covered Part D drugs to Federal Beneficiaries in the PSC Program, but has refused to use these computer screening tools to prevent the illegal enrollments.

**F.  Defendant Knowingly Violated the Anti-Kickback Statute by Steering Federal Beneficiaries Exclusively to Its Pharmacies and Ignored Relator's Concerns.**

110.    Relator participated in internal meetings and conversations that illustrate Defendant's knowledge and willful ignorance of its unlawful conduct in promoting the

PSC program to Federal Beneficiaries and enrolling them in it.   The conversations between Relator and Defendant's management are representative of Defendant's approach to the problem of enrolling Federal Beneficiaries; namely, Defendant pressured its pharmacists to meet mandatory enrollment minimums by marketing the PSC Program to Federal Beneficiaries, but was recklessly and deliberately indifferent to the fact that Federal Beneficiaries were receiving unlawful remuneration under the program.

111.   Hugh R. Morrow, District Pharmacy Supervisor, Sarasota District Number 53, praised stores that met the mandatory enrollment minimums by enrolling Federal Beneficiaries, and instructed the pharmacy managers of underperforming stores that they needed to satisfy the mandatory minimums.   During a meeting of Defendant pharmacy managers approximately two years ago, Relator twice asked Mr. Morrow to address the fact that pharmacy managers in some stores refused to market or sell the PSC Program to Federal Beneficiaries, but pharmacy managers at other stores routinely enrolled beneficiaries knowing at the time that it violated the law.   Relator twice addressed this question to Mr. Morrow directly, but Mr. Morrow ignored the question and Relator's concerns.   A pharmacy manager sitting next to Relator commented that "I guess we won't get an answer."

112.   Within the past year, Mr. Morrow e-mailed the store manager at Relator's store, Ms. Albright, to chastise her for the low sales of the PSC Program at the store.   Ms. Albright informed Relator of the e-mail.   She told Relator that Mr. Morrow argued in the e-mail that Defendant's other stores in the District with similar volume to Relator's store met mandatory sales minimums for the PSC Program.   At the request of Relator, Ms. Albright replied to the e-mail to Mr. Morrow, asking him to investigate whether PSC

Program enrollments at the other stores he identified included Federal Beneficiaries into the program and, if so, to take corrective action. Relator discussed with Ms. Albright on numerous occasions thereafter to confirm whether Mr. Morrow responded to the reply e-mail requesting an investigation. He did not. The e-mail was ignored, and Relator was never informed of any investigation by Defendant to verify the illegal enrollments of Federal Beneficiaries.

113. Defendant's corporate level knowledge that enrolling Federal Beneficiaries in the PSC Program violated the Anti-Kickback Statute is illustrated by a sequence of internal emails initiated by Relator. Defendant told Relator that enrolling Federal Beneficiaries in the PSC Program is illegal because the program gives the beneficiaries discounts and it steers Federal payer business exclusively to Walgreens due to the non-networked feature. On May 19, 2011, Relator e-mailed Mr. Morrow to ask for an explanation as to why Federal Beneficiaries cannot be enrolled in the PSC Program. Mr. Morrow did not reply to the e-mail. Instead, he forwarded the e-mail to Jay Bernstein, Defendant's Manager, Wellness Card Programs, and Manager, Product Development. Mr. Bernstein did not respond to the request. He forwarded the request Rebecca Sieracki, Defendant's Customer Service Representative for Card Programs, who replied via email on May 19, 2011 stating:

> CMS (Centers for Medicare/Medicaid Services) has strict guidelines that prohibit their members from receiving discounts from a non-networked discount/rebate program. Since our program is valid only at Walgreen's pharmacies, we would be violating those guidelines. Therefore, we as a retailer must be careful with our programs to prevent potential legal issues with CMS. When a person receives a public benefit (such as Medicare Part A, B, or D) she falls into a different category of patient, one where we may not offer her incentives to shop in our store.

114.     Even with this clear statement from Defendant's corporate representative with responsibility for the PSC Program, Relator continued to receive criticism for expressing concerns about Defendant's widespread enrollment of Federal Beneficiaries. For example, during his annual performance review on August 15, 2011, Mr. Morrow told Relator that he needed to stop criticizing company decisions and communicating negative comments.   Relator interpreted this to be a reference by Mr. Morrow that Relator's criticism of Defendant's enrollment of Federal Beneficiaries into the PSC Program would not be viewed positively by the company.

### G. Information from Defendant's Computer System Shows That the Majority of PSC Program Members are Federal Beneficiaries.

115.     Defendant has knowingly and intentionally enrolled more than 5,000,000 Federal Beneficiaries since 2006.  Approximately 2,500,000 patients enroll in the PSC Program annually.   Based on Relator's direct and independent knowledge and investigation, substantially more than 50-percent of PSC Program members in his district in Florida are Federal Beneficiaries.  Moreover, a random sample of 100 PSC Program members shows that 58-percent of PSC Program members nationwide are Federal Beneficiaries.   Significantly, based on the prescription history and payer/insurance information *on file* at Defendant's stores at the time of enrollment, Walgreens knew at the time of enrollment that the individuals were Federal Beneficiaries.

### H. Defendant Directed its Employees Not to Promote and to Destroy Free Discount Drug Cards to Maximize PSC Program Enrollments.

116.     As a way to further increase PSC Program enrollments, Defendant instructed employees not to promote and to destroy patient assistance drug cards that give needy patients access to deeply discounted drugs.  One such instruction came on October

60

20, 2011, when a pharmacy manager e-mailed Mr. Morrow to report that a representative from a patient assistance program offered a discount card to a customer "who cannot afford our WCARD.  I told [sic] that we cannot offer customers discount cards."  Mr. Morrow forwarded the e-mail to all store managers and pharmacy managers in District 53 stating that "under no circumstances should we be promoting this discount card!"  In a follow-up email, Mr. Morrow recommended that the store and pharmacy managers look for the patient assistance discount cards and throw them out.

> **I. Defendant's Unlawful Scheme Resulted in Billions of Medicare Part D Overcharges for Covered Drugs in Clear Violation of CMS Requirements.**

117.   As designed and intended by Defendant, concealing widespread Federal Beneficiary enrollments in the PSC Program from Plan Sponsors and CMS allowed it not only to steer the Federal payer business of Federal Beneficiaries exclusively to its pharmacies, but it also bypassed the Part D requirement that participating pharmacies' reimbursement be limited to the lower of (a) the Plan Sponsor's negotiated price and (b) the pharmacy's usual and customary price for covered Part D drugs.  An internal (non-public) blog hosted by Mark A. Wagner, President – Community Management for Walgreens (available only on Walgreens' StoreNet computer system), describes the company's knowledge of CMS's requirements and motivation to conceal from CMS and PDP sponsors the enrollment of Federal Beneficiaries in the PSC Program (a.k.a., the "W Card"):

> The reason we went with the WCARD instead of matching Walmart's $4 generics is because *if you lower your Cash price you also have to lower what you charge insurance companies, workers comp, and the government to the same price.*

118.    Through its enrollment of millions of Federal Beneficiaries in the PSC Program, Defendant's offering covered Part D drugs at prices lower than Plan Sponsor's negotiated prices to Federal Beneficiaries has the consequence of establishing these low prices as the usual and customary charge for those drugs.  Defendant was therefore required to limit its reimbursement to the lower price not only for the covered drug prescriptions of Part D beneficiaries enrolled in the PSC Program, but also all other Part D beneficiaries of the same Plan Sponsors.  Similar to Wal-Mart's program, and as expressly stated in CMS's Part D manual, offering a Federal Beneficiary a lower price at the point of sale throughout the benefit year establishes that lower price as usual and customary.

119.    Whereas Wal-Mart and other pharmacy drug discount programs were transparent in admitting Federal Beneficiaries with the consequence that the pharmacies' reimbursement was limited to the lower usual and customary price for covered Part D drugs, Defendant secretly enrolled millions of beneficiaries to falsely inflate its reimbursement for covered drugs.   Based on specific prescription and claim reimbursement data for Federal Beneficiaries enrolled in the PSC Program obtained by Relator, the Part D negotiated prices substantially exceeded Defendant's usual and customary price that it offered Federal Beneficiaries for the same drugs, as illustrated by the following examples:

a.    On October 27, 2009, Patient 395 filled a covered Part D drug (Metformin ER 500mg 24 hour Tablets, 180 quantity) with prescription number 1796327-7350 at Defendant's pharmacy located at 12145 San Jose Boulevard, Jacksonville, Florida.  The price was $48.93

62

for the prescription under his Part D plan (UHCMPD).   Patient 395, a known Federal Beneficiary as documented on Defendant's computer system, was a member of the PSC Program (Card No. 0015552740501). On May 13, 2011, Patient 395 filled another prescription for the same drug, dose, and quantity (Metformin ER 500mg 24 hour Tablets) at the same pharmacy.   The price was $12.00 for the prescription which was filled under the PSC Program, and not his Part D plan.   On August 23, 2011, Patient 395 filled another prescription for the same drug, dose, and quantity (Metformin ER 500mg 24 hour Tablets) at the same pharmacy. The price was $12.00 for the prescription, which was filled under the PSC Program and not his Part D plan.

      b.      On October 27, 2010, Patient 395 filled a covered Part D drug (Metoprolol ER Succinate 100mg Tablets, 90 quantity) with prescription number 1848647-7350 at Defendant's pharmacy located at 12145 San Jose Boulevard, Jacksonville, Florida.   The price was $114.88 for the prescription under his Part D plan (AARPMPD).   Patient 395, a known Federal Beneficiary as documented on Defendant's computer system, was a member of the PSC Program (Card No. 0015552740501). On July 26, 2011, Patient 395 filled another prescription for the same drug, dose, and quantity (Metoprolol ER Succinate 100mg Tablets) at the same pharmacy.   The price was $97.59 for the prescription, which was filled under the PSC Program and not his Part D plan.

c.      On June 22, 2010, Patient 273 filled a covered Part D drug (Citalopram 20mg Tablets, 90 quantity) with prescription number 640885-6372 at Defendant's pharmacy located at 780 North Glynn, Fayetteville, Georgia.  The price was $18.00 for the prescription under her Part D plan (UHCMPD).  Patient 273, a known Federal Beneficiary as documented on Defendant's computer system, was a member of the PSC Program (Card No. 003969239100).  On September 21, 2010, Patient 273 filled another prescription for the same drug, dose, and quantity at the same pharmacy. The price was $12.00 for the prescription which was filled under the PSC Program, and not her Part D plan.  On December 21, 2010, March 22, 2011, and June 21, 2011, Patient 273 filled prescriptions for the same drug, dose, and quantity at the same pharmacy, and the price was $12.00 for each prescription filled under the PSC Program, and not her Part D plan.

d.      On January 15, 2010, Patient 273 filled a covered Part D drug (Clonidine 0.2mg Tablets, 180 quantity) with prescription number 612262-6372 at Defendant's pharmacy located at 780 North Glynn, Fayetteville, Georgia.  The price was $18.00 for the prescription under her Part D plan (UHCMPD).  Patient 273, a known Federal Beneficiary as documented on Defendant's computer system, was a member of the PSC Program (Card No. 003969239100).  On April 29, 2010, and July 31, 2010, Patient 273 filled prescriptions for the same drug, dose, and quantity at the same pharmacy, and the price was $18.00 for each prescription

filled under her Part D plan coverage. On October 30, 2010, January 7, 2011, April 13, 2011, and July 14, 2011, Patient 273 filled prescriptions for the same drug, dose, and quantity at the same pharmacy, and the price was $12.00 for each prescription filled under the PSC Program and not her Part D plan.

      e.     On November 1, 2010, Patient 192 filled a covered Part D drug (Carvedilol 6.25mg Tablets, 180 quantity) with prescription number 1477474-10204 at Defendant's Pharmacy located at 2200 9th Street North, Naples, Florida. Based on payer information in Defendant's computer system, Patient 192 was a Part D beneficiary of PAIDMD, as well as a beneficiary of other Federal payers (including Tricare) at the time. Patient 192, a known Federal Beneficiary as documented on Defendant's computer system, was a member of the PSC Program (Card No. 001468440500). Defendant filled the prescription for Carvedilol under the PSC Program at a price of $12.00. On January 28, 2011, Patient 192 filled a prescription for the same drug, dose, and quantity at the same pharmacy. The price was $24.00 for the prescription, which was filled under his Part D Plan Sponsor, PAIDMD. On April 7, 2011, Patient 192 filled a prescription for the same drug, dose, and quantity at the same pharmacy. The price was again $24.00 for the prescription, which was filled under his Part D Plan Sponsor, PAIDMD.

      f.     On November 18, 2009, Patient 192 filled a covered Part D drug (Pravastatin 40mg Tablets, 90 quantity) with prescription number

1411680-10204 at Defendant's pharmacy located at 2200 9th Street North, Naples, Florida. Based on payer information in Defendant's computer system, Patient 192 was a Part D beneficiary of PAIDMD, as well as a beneficiary of other Federal payers (including Tricare) at the time. Patient 192, a known Federal Beneficiary as documented on Defendant's computer system, was a member of the PSC Program (Card No. 001468440500). Defendant filled the prescription for Pravastatin under the PSC Program at a price of $12.00. On January 10, 2010, Patient 192 filled a prescription for the same drug and dose (quantity 180) at the same pharmacy. The price was $24.00 for the prescription, which was filled under the PSC Program. On February 13, 2011, Patient 192 filled a prescription for the same drug and dose (quantity 90) at the same pharmacy. The price was $12.00 for the prescription, which was filled under the PSC Program. On May 12, 2010, Patient 192 filled a prescription for the same drug and dose (quantity 180) at the same pharmacy (prescription number 1450317-10204). The price was $45.00 for the prescription, which was filled under his Part D coverage, PAIDMD. On September 27, 2010, Patient 192 filled a prescription for the same drug and dose (quantity 180) at the same pharmacy (prescription number 1450317-10204). The price was $45.00 for the prescription, which was filled under his Part D coverage, PAIDMD.

g.    On October 25, 2009, Patient 474 filled a covered Part D drug (Metformin 1000mg Tablets, 180 quantity) with prescription number

875442-3808 at Defendant's pharmacy located at 901 22nd Avenue South, St. Petersburg, Florida.   Based on payer information in Defendant's computer system, Patient 474 was a Part D beneficiary of HUMNAMPD, as well as a beneficiary of other Federal payers at the time.   Patient 474, a known Federal Beneficiary as documented on Defendant's computer system, was a member of the PSC Program (Card No. 0002370161200). Defendant filled the prescription for Metformin under the PSC Program at a price of $10.99.   On February 3, 2010, Patient 474 re-filled the prescription for the same drug, dose, and quantity at the same pharmacy. The price was $14.31 for the prescription, which was filled under her Part D plan, HUMNAMPD.

        h.      On March 1, 2010, Patient 255 filled a covered Part D drug (Lisinopril 10mg Tablets, 90 quantity) with prescription number 1216368-2206 at Defendant's pharmacy located at 300 East Jackson Street, Macomb, Illinois.   Based on payer information in Defendant's computer system, Patient 255 was a Part D beneficiary of HAMPMPD, as well as a beneficiary of other Federal payers at the time.   Patient 255, a known Federal Beneficiary as documented on Defendant's computer system, was a member of the PSC Program.   Defendant filled the prescription for Lisinopril under the PSC Program at a price of $12.00.   On June 4, 2010, Patient 255 re-filled the prescription for the same drug, dose, and quantity at the same pharmacy. The price was $20.00 for the prescription, which was filled under her Part D plan, HAMPMPD.

     i.  On December 13, 2009, Patient 426 filled a covered Part D drug (Lisinopril 20mg Tablets, 90 quantity) with prescription number 302871-6592 at Defendant's pharmacy located at 1560 Warwick Avenue, Warwick, Rhode Island 02889. Based on payer information in Defendant's computer system, Patient 426 was a Part D beneficiary of AARPMPD, as well as a beneficiary of other Federal payers at the time. Patient 426, a known Federal Beneficiary as documented on Defendant's computer system, was a member of the PSC Program (Card No. 002879709400). Defendant filled the prescription for Lisinopril under the PSC Program at a price of $12.00. On March 1, 2010, Patient 426 re-filled the prescription for the same drug, dose, and quantity at the same pharmacy. The price was $15.00 for the prescription, which was filled under her Part D plan, AARPMPD.

120. Relator has direct and independent knowledge of Defendant's systemic overbilling of Part D covered drugs. To document Defendant's overbilling scheme, Relator gathered prescription and reimbursement claims data, including patient histories, for more than 3,000 patient prescriptions for 475 patients nationwide from Defendant's internal computer systems, StoreNet and Intercom Plus. The information includes patient names, phone numbers, addresses, dates of birth, sex, language, third party payer information and identification, PSC program membership, designations of primary plan, drug names and strengths, average wholesale prices, quantities, transaction dates, store locations, plan payment information, co-payments, customer prices, claim reference numbers, claim numbers, and payment types.

121.    Relator also obtained drug acquisition information for specific covered Part D drugs based on data gathered by Defendant at the corporate level, including drug names, strengths, quantities, and manufacturers; acquisition costs; store numbers; effective dates; and last cost and retail changes.

122.    Based on Defendant's prescription and reimbursement claims data, as well as drug acquisition information, Relator has identified specific overbilled drugs in particular claims, the amount overbilled for each drug, the date of overbilling, and payer information.  The Overbilled Drugs challenged include, but are not limited to, Lisinopril, Metformin HCL, Metoprolol Tartrate, Warfarin Sodium, Lovastatin, Carvedilol, Citalopram Hydrobromide, Pravastatin Sodium, and Spironolactone.   The Overbilled Drugs are illustrative.  Relator challenges all drugs sold under the PSC Program.  In 2008 alone, for example, Defendant overbilled Part D more than $215 million for the Overbilled Drugs:

| RANK BY FILL | BRAND NAME | TOTAL FILLS | TOTAL GROSS DRUG COST | RANK BY COST | Walgreens Scripts | Average Overbill per Transaction | $ Overbilled |
|---|---|---|---|---|---|---|---|
| 26 | CARVEDILOL | 6,931,551 | $168,492,704.51 | 96 | 1,316,994.69 | $18.67 | $24,588,290.86 |
| 35 | CITALOPRAM HYDROBROMIDE | 5,979,371 | $81,198,577.93 | 173 | 1,136,080.49 | $7.93 | $9,009,118.29 |
| 1 | LISINOPRIL | 28,462,990 | $345,049,130.75 | 47 | 5,407,968.10 | $8.60 | $46,508,525.66 |
| 18 | LOVASTATIN | 8,260,656 | $249,199,586.68 | 65 | 1,569,524.64 | $12.95 | $20,325,344.09 |
| 11 | METFORMIN HCL | 15,751,296 | $248,314,732.91 | 66 | 2,992,746.24 | $15.79 | $47,255,463.13 |
| 12 | METOPROLOL TARTRATE | 15,468,402 | $108,583,184.19 | 142 | 2,938,996.38 | $3.86 | $11,344,526.03 |
| 47 | PRAVASTATIN SODIUM | 4,883,776 | $152,255,209.47 | 101 | 927,917.44 | $17.25 | $16,006,575.84 |
| 72 | SPIRONOLACTONE | 3,745,669 | $55,473,533.58 | 233 | 711,677.11 | $15.42 | $10,974,061.04 |
| 15 | WARFARIN SODIUM | 13,822,768 | $194,910,416.94 | 78 | 2,626,325.92 | $11.08 | $29,099,691.19 |
| | Total | 130740628 | $2,297,602,427.26 | | 19,628,231.01 | | $215,111,596.12 |

## J. Defendant's Fraudulent Scheme Also Resulted in False Claims for Payment for Overbilled Influenza Vaccines.

123.    Defendant administers approximately 7 million influenza vaccination shots to patients each year.  Based on Relator's direct and independent knowledge, approximately 80-percent of those patients are Federal Beneficiaries.  CMS's

reimbursement ceiling of the lesser of the Plan Sponsor's negotiated price and the pharmacy's usual and customary price applies also to Part D reimbursement for vaccines. For PSC Program members, Defendant provides deep discounts for influenza vaccines, including a 10-percent discount, to reduce the price to approximately $25.00. As such, the individual vaccination price under the PSC Program is substantially lower than the price Defendant charges the Federal Payer Programs for the same vaccine. Based on specific prescription and claims reimbursement data for Federal Beneficiaries, many of whom are also PSC Program members, Defendant knowingly charged Part D and other Federal payer programs the higher negotiated price for influenza vaccines, instead of the lower price made available to PSC Program members, as documented by the following examples:

a.       On November 3, 2011, Patient 13 purchased an influenza vaccine (Fluzone High-Dose 2011-12, 0.5ml SYR) at the Defendant's pharmacy located at 12600 Tamiami Trail, North Port, Florida. Defendant charged the Part D plan (IMMUNMPB) $48.99.

b.       On October 9, 2011, Patient 17 purchased an influenza vaccine (Fluzone High-Dose 2011-12 0.5ml SYR) from Defendant's pharmacy located at 12600 Tamiami Trail, North Port, Florida. Defendant charged the Part D plan (IMMUNMPB) $48.99.

c.       On October 3, 2011, Patient 34 purchased an influenza vaccine (Fluvirin Multidose Vial 2011-12, 0.5ml) at the Defendant's pharmacy located at 1802 West Morton Avenue, Jacksonville, Illinois. Defendant charged the Part D plan (IMMUNMPB) $31.99.

d.      On September 12, 2011, Patient 26 purchased an influenza vaccine

(Fluzone High-Dose 2011-12 0.5ml SYR) from Defendant's pharmacy located at

15 South Indiana Avenue, Englewood, California.  Defendant charged TRICARE

$48.81.

### K. Defendant's Fraudulent Scheme Resulted in False Claims for Payment for Overbilled Drugs in Violation of Federal and State Medicaid Requirements.

124.    Each state Medical Assistance Program, or State Medicaid Program,

contains guidelines for pharmacy reimbursement for covered drugs, which are similar to

the reimbursement guidelines set out for Medicare Part D. The State reimbursement

guidelines are set forth in Exhibit A.

125.    Walgreens violated State Medicaid statutes nationwide through the same

conduct alleged herein to have violated Medicare Part D, by failing to follow statutorily

prescribed state reimbursement guidelines and misrepresenting the usual and customary

prices for prescription drugs.

126.    Similar to the enrollment of Medicare Part D beneficiaries in the PSC

Program, Defendant also enrolled state Medicaid Beneficiaries to falsely inflate its

reimbursement for covered drugs.   Based on specific prescription and claim

reimbursement data for State Medicaid Beneficiaries enrolled in the PSC Program

obtained by Relator, the prices billed to state Medicaid programs substantially exceeded

Defendant's usual and customary price that it offered state Medicaid beneficiaries for the

same drugs, as illustrated by the following examples:

a.      On May 14, 2010, Patient 110 filled a covered Medicaid drug

(Cefdinir 250mg/5ml Suspension, 60ML) with prescription No. 70933-9746 at

Defendant's pharmacy located at 1 Elm Street, Windsor Locks, Connecticut. Based on payer information in Defendant's computer system, Patient 110 was a beneficiary of Connecticut Medicaid (CTMED) at the time, and filled the prescription for Cefdinir under the Medicaid plan, CTMED. Patient 110 paid no co-pay and CTMED paid Defendant $81.12. At the time of this purchase, the PSC price for the same drug, strength and quantity was $9.99.

      b.     On December 10, 2010, Patient 336 filled a covered Medicaid drug (C-Phen DM Drops, 30 quantity) with prescription No. 1733120-9290 at Defendant's pharmacy located at 2500 Grant Street, Gary, Indiana. Based on payer information in Defendant's computer system, Patient 336 was a beneficiary of Indiana Medicaid (INMED) at the time. Patient 336 filled the prescription for C-Phen DM under the Medicaid plan, CTMED. Patient 336 paid no co-pay and INMED reimbursed Defendant $39.99. At the time of this purchase, the PSC price for the same drug, strength and quantity was $9.99.

      c.     On December 1, 2010, Patient 381 filled a covered Medicaid drug (Naproxen Sodium 550mg Tablets, 60 quantity) with prescription No. 2237189-2055, at Defendant's pharmacy located at 10962 Francis Lewis Boulevard, Queen Village, New York. Based on payer information in Defendant's computer system, Patient 381 was a beneficiary of New York Medicaid (NYMED) at the time. Patient 381 filled the prescription for Naproxen Sodium under the Medicaid plan, NYMED. Patient 381 paid a $1.00 co-pay and NYMED reimbursed Defendant $17.53. At the time of this purchase, the PSC price for the same drug, strength and quantity was $10.99.

d.     On August 3, 2010, Patient 65 filled a covered Medicaid drug (Cephalexin 500mg Capsules, 40 quantity) with prescription No. 65195-11522, at Defendant's pharmacy located at 496 Highway 96, Silsbee, Texas. Based on payer information in Defendant's computer system, Patient 65 was a beneficiary of Texas Medicaid (TXMED) at the time. Patient 65 filled the prescription for Cephalexin under the Medicaid plan, TXMED. Patient 65 paid no co-pay and TXMED reimbursed Defendant $18.16. At the time of this purchase, the PSC price for the same drug, strength and quantity was $9.99.

e.     On June 24, 2011, Patient 6 filled a covered Medicaid drug (Digoxin .125mg Tablets, 90 quantity) with prescription No. 94658-9170, at Defendant's pharmacy located at 12600 Tamiami Trail, North Port, Florida. Based on payer information in Defendant's computer system, Patient 6 was a beneficiary of Florida Medicaid (FLMED) at the time. Patient 6 filled the prescription for Digoxin under the Medicaid plan. Patient 6 paid no co-pay and FLMED reimbursed Defendant $15.73. At the time of this purchase, the PSC price for the same drug, strength and quantity was $12.00.

f.     On August 9, 2010, Patient 420 filled a covered Medicaid drug (Lovastatin 20mg Capsules, 30 quantity) with prescription No. 902773-4044, at Defendant's pharmacy located at 1223 Cleveland Avenue NW, Canton, Ohio. Based on payer information in Defendant's computer system, Patient 420 was a beneficiary of Ohio Medicaid (OHMED) at the time. Patient 420 filled the prescription for Lovastatin under the Medicaid plan. Patient 420 paid no co-pay

and OHMED reimbursed Defendant $13.65. At the time of this purchase, the PSC price for the same drug, strength and quantity was $9.99.

g.     On September 26, 2011, Patient 105 filled a covered Medicaid drug (Nitrofurantoin Mono/Mac 100mg Capsules, 20 quantity) with prescription No. 636217-2700, at Defendant's pharmacy located at 1993 Dickerson Boulevard, Monroe, North Carolina. Based on payer information in Defendant's computer system, Patient 105 was a beneficiary of North Carolina Medicaid (NCMED) at the time. Patient 105 filled the prescription for Nitrofurantoin under the Medicaid plan. Patient 105 paid no co-pay and NCMED reimbursed Defendant $54.25. At the time of this purchase, the PSC price for the same drug, strength and quantity was $41.13.

### L. Defendant Made, and Caused to be Made, False Claims and Statements in Reimbursement Claims to Private Insurers.

127.     Both California and Illinois have enacted statutes that allow an "interested person" to bring a *qui tam* action on behalf of the State to recover for false claims submitted to insurance companies.

128.     Relator is an "interested person" within the meaning of the CIFPA and the IICFPA, based on his status as a former Walgreens employee.  He has direct and independent knowledge of the information on which the allegations are based.

129.     The preceding paragraphs are hereby incorporated by reference.  The same wrongful conduct Walgreens perpetrated against the Federal and State governments regarding the misrepresentation of the usual and customary price of prescription drugs extends to claims submitted to private insurance companies nationwide, including but not limited to those in California and Illinois.

74

130.    Contracts between Walgreens and insurance companies or PBMs contain standard language regarding the reimbursement price for prescription drugs. Reimbursement generally may not exceed the pharmacy's usual and customary price for specific drugs.  Agreements typically require that claims will be paid at the lower of the pharmacy's usual and customary charge, the average wholesale price, and the maximum acquisition cost.

131.    Significantly, agreements generally contain express prohibitions on undermining the pharmacies' usual and customary prices.

132.    Relator believes that many of the contracts Walgreens has entered with private insurance companies nationwide contain substantially similar reimbursement provisions.

133.    As with Federal and State programs, Walgreens consistently reported false – and inflated – usual and customary prices in claims submitted to private insurance companies and pharmacy benefit managers nationwide, including in California and Illinois.  The following are examples of drug sales where Defendant filled a prescription for a customer and billed a private insurer listing an inflated usual and customary price for a given drug:

a.    On May 6, 2010, Patient 341 filled a prescription for Lovastatin (20mg Tablets, 180 quantity) with prescription No. 64530-9170 at Defendant's pharmacy located at 12600 Tamiami Trail, North Port, Florida. Based on information in Defendant's computer system, Patient 341 was covered by Humana insurance (HUMFL) at the time, and filled the prescription for Lovastatin under the HUMFL plan.  Patient 341 paid a $2.50 co-pay and HUMFL

reimbursed Defendant $34.28 for a total drug cost of $36.78. At the time of this purchase, the PSC price for the same drug, strength and quantity was $24.00.

      b.      On November 13, 2011, Patient 370 filled a prescription for Metroprolol Tartrate (25mg Tablets, 60 quantity) with prescription No. 102023-9170 at Defendant's pharmacy located at 12600 Tamiami Trail, North Port, Florida. Based on information in Defendant's computer system, Patient 370 was covered by Express Scripts (PERX) insurance, and filled the prescription for Metroprolol Tartrate under the PERX plan. Patient 370 paid a $5.00 co-pay and PERX reimbursed Defendant $11.55 for a total drug cost of $16.55. At the time of this purchase, the PSC price for the same drug, strength and quantity was $6.00.

      c.      On August 14, 2010, Patient 345 filled a prescription for Ciprofloxacin (500mg Tablets, 14 quantity) with prescription No. 655602-1142 at Defendant's pharmacy located at 3938 Highway 54, Osage Beach, Missouri. Based on information in Defendant's computer system, Patient 345 was covered by MOPA insurance, and filled the prescription for Ciprofloxacin under the MOPA plan. Patient 345 paid a $1.00 co-pay and MOPA reimbursed Defendant $18.28 for a total drug cost of $19.28. At the time of this purchase, the PSC price for the same drug, strength and quantity was $8.99.

      d.      On June 4, 2010, Patient 255 filled a prescription for Lisinopril (10mg Tablets, 90 quantity) with prescription No. 1216378-2206, at Defendant's pharmacy located at 300 East Jackson Street, Macomb, Illinois. Based on information in Defendant's computer system, Patient 255 was covered by HAMP insurance, and filled the prescription for Lasinopril under the HAMP plan.

Patient 255 paid a $20 co-pay. At the time of this purchase, the PSC price for the same drug, strength and quantity was $12.

     e.     On September 27, 2010, Patient 255 filled a prescription for Metolazone (2.5mg Tablets, 90 quantity) with prescription No. 12163679-2206 at Defendant's pharmacy located at 300 East Jackson Street, Macomb, Illinois. Based on information in Defendant's computer system, Patient 255 was covered by HAMP insurance, and filled the prescription for Metolazone under the HAMP plan. Patient 255 paid a $20 co-pay. At the time of this purchase, the PSC price for the same drug, strength and quantity was $12.

     f.     On August 27, 2010, Patient 41 filled a prescription for Metformin (500mg Tablets, 120 quantity) with prescription No. 1685258-9771, at Defendant's pharmacy located at 9801 Manchester Road, Rock Hill, Missouri. Based on information in Defendant's computer system, Patient 41 was covered by Aetna insurance, and filled the prescription for Metformin under the Aetna plan. Patient 41 paid a $1.10 co-pay and Aetna reimbursed Defendant $16.15 for a total drug cost of $17.25. At the time of this purchase, the PSC price for the same drug, strength and quantity was $9.99.

     g.     On July 20, 2011, Patient 39 filled a prescription for Amlodipine Besylate (5mg Tablets, 30 quantity) with prescription No. 1225402-2619, at Defendant's pharmacy located at 2102 Green Bay Road, Evanston, Illinois. Based on information in Defendant's computer system, Patient 39 was covered by Prescription Solutions insurance (PRSOLWRP), and filled the prescription for Amlodipine Besylate under the PRSOLWRP plan. Patient 39 paid a $2.50 co-pay

and PRSOLWRK reimbursed Defendant $9.98 for a total drug cost of $12.48. At the time of this purchase, the PSC price for the same drug, strength and quantity was $10.99.

      h.      On August 20, 2011, Patient 39 filled a prescription for Phenytoin Sodium (100mg Ext Capsules, 90 quantity) with prescription No. 2574234-1446, at Defendant's pharmacy located at 4101 Dempster Street, Skokie, Illinois. Based on information in Defendant's computer system, Patient 39 was covered by Prescription Solutions insurance (PRSOLWRP), and filled the prescription for Phenytoin Sodium under the PRSOLWRP plan. Patient 39 paid a $2.50 co-pay and PRSOLWRK reimbursed Defendant $19.55 for a total drug cost of $22.05. At the time of this purchase, the PSC price for the same drug, strength and quantity was $20.99.

## VII.    DEFENDANT MADE, AND CAUSED TO BE MADE, FALSE CLAIMS AND STATEMENTS IN REIMBURSEMENT CLAIMS AND FALSE CERTIFICATIONS OF PAYMENT DATA.

134.    Defendant made false statements and claims to Plan Sponsors, and caused Plan Sponsors to make false statements and claims for covered Part D drugs in violation of the FCA in electronic claims for payment submitted by Defendant pursuant to the National Council for Prescription Drug Programs ("NCPDP") requirements. NCPDP required Defendant to report its usual and customary price for each covered Part D drug in each reimbursement claim processed by Plan Sponsors and CMS.

135.    CMS reimburses Plan Sponsors and contract pharmacies from the Medicare Prescription Drug Account. 42 C.F.R. § 423.315(a). There are four types of payments: (1) direct subsidies for each Part D eligible beneficiary enrolled in a Part D

plan for a month equal to the amount of the plan's approved subsidized bid, adjusted for health status and reduced by the monthly beneficiary premium for the plan; (2) reinsurance subsidy payments on a monthly basis during a year based on either estimated or incurred allowable reinsurance costs, and final reconciliation to actual allowable reinsurance costs; (3) low income cost-sharing subsidy payments, including additional coverage above the initial coverage limits, for certain subsidy-eligible individuals; and (4) lump-sum payments or adjusted monthly payments in the following payment year based on the relationship of the Part D plan's adjusted allowable risk corridor costs to predetermined risk corridor thresholds in the coverage year. 42 C.F.R. § 423.315(b)-(e); 42 C.F.R. § 423.329(a) and (c). CMS reconciles payment year distributions with updated enrollment and health status data, actual low-income cost-sharing costs, and actual allowable reinsurance costs. 42 C.F.R. § 423.315(f).

136.   As an express condition of payment, CMS requires Plan Sponsors and contract pharmacies to provide accurate, complete, and truthful disclosure and provision of information and data necessary for CMS to carry out the payment provisions of Part D. 42 C.F.R. § 423.322(a) ("Payment conditional upon provision of information. Payments to a Part D sponsor are conditioned upon provision of information to CMS that is necessary to carry out this subpart, or as required by law."); Final Rule, 70 Fed. Reg. 4194, 4307 (Jan. 28, 2005). For each Part D prescription, Plan Sponsors must submit data to CMS in the form of a prescription drug event ("PDE") record. The PDE record must contain prescription drug cost and payment data that enables CMS to make payments to plans and otherwise administer the Part D benefit. The submitted data components allow for calculation of payment under the four legislated payment

mechanisms.   CMS uses the data to reconcile low-income cost-sharing subsidy and reinsurance payments and to implement risk sharing between the plan and the federal government through risk corridor payment adjustments, as well as verifying plan administration of TrOOP.

137.   CMS requires payment information from Plan Sponsors to verify whether claims for payment comply with Part D payment requirements.   As such, CMS requires for each claim for payment adjudicated by a Plan Sponsor to include the negotiated price for the covered Part D drug and the pharmacy's usual and customary price for the drug at the point of sale.   Part D regulations require Plan Sponsors to contractually agree to (a) provide CMS with the information CMS determines is necessary to carry out payment provisions in subpart G of this part, and (b) be paid under the contract in accordance with the payment rules in subpart G of this part.   42 C.F.R. § 423.505(b)(9) & (11).

138.   Plan Sponsors require contracted pharmacies to accurately report their prices on Part D prescriptions filled for beneficiaries, including both the negotiated prices and the pharmacies' usual and customary prices.   As a condition of payment, Plan Sponsors must certify "the accuracy, completeness, and truthfulness of all data related to payment," and require all contractors, including contracted pharmacies such as Defendant's, to certify the accuracy, completeness, and truthfulness of the data and acknowledge that the claims data will be used for the purposes of obtaining Federal reimbursement. 42 C.F.R. § 423.505(k).

> (k) Certification of data that determine payment—**(1) General rule. As a condition for receiving a monthly payment under subpart G of this part (or for fallback entities, payment under subpart Q of this part)**, the Part D plan sponsor agrees that its chief executive officer (CEO), chief financial officer (CFO), or an individual delegated the authority to sign on behalf of one of these officers, and who reports directly to the officer,

must request payment under the contract on a document that certifies (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of all data related to payment. The data may include specified enrollment information, claims data, bid submission data, and other data that CMS specifies.

(2) Certification of enrollment and payment information. The CEO, CFO, or an individual delegated the authority to sign on behalf of one of these officers, and who reports directly to the officer, must certify (based on best knowledge, information, and belief) that each enrollee for whom the organization is requesting payment is validly enrolled in a program offered by the organization and the information CMS relies on in determining payment is accurate, complete, and truthful and acknowledge that this information will be used for the purposes of obtaining Federal reimbursement.

(3) Certification of claims data. The CEO, CFO, or an individual delegated with the authority to sign on behalf of one of these officers, and who reports directly to the officer, must certify (based on best knowledge, information, and belief) that the claims data it submits under § 423.329(b)(3) (or for fallback entities, under § 423.871(f)) are accurate, complete, and truthful and acknowledge that the claims data will be used for the purpose of obtaining Federal reimbursement. **If the claims data are generated by a related entity, contractor, or subcontractor of a Part D plan sponsor, the entity, contractor, or subcontractor must similarly certify (based on best knowledge, information, and belief) the accuracy, completeness, and truthfulness of the data and acknowledge that the claims data will be used for the purposes of obtaining Federal reimbursement.**

42 C.F.R. § 423.505(k)(1)-(3) (emphasis added).[6]

---

[6]    A contracted pharmacy is a "first tier, downstream, and related entity" that reports prescription information to Plan Sponsors, which then is reported by the Plan Sponsor to CMS. CMS regulations define a "downstream entity" as "any party that enters into a written arrangement, acceptable to CMS, with persons or entities involved with the Part D benefit, below the level of the arrangement between a Part D plan sponsor (or applicant) and a first tier entity. These written arrangements continue down to the level of the ultimate provider of both health and administrative services." 42 C.F.R. §§ 423.4 & 423.501. A "first tier entity" is defined as "any party that enters into a written arrangement, acceptable to CMS, with a Part D plan sponsor or applicant to provide administrative services or health care services for a Medicare eligible individual under Part D." *Id*. Further, Part D regulations state that "All contracts or written agreements between Part D sponsors and first tier, downstream, and related entities, must contain the following: . . . (iii) A provision requiring that any services or other activity performed by a first tier, downstream, and related entity in accordance with a contract or written

139.    Defendant has knowingly and intentionally submitted false information to Plan Sponsors regarding its usual and customary price for covered Part D drugs, causing Plan Sponsors to adjudicate claims at a higher rate than allowed by CMS.    As documented by Relator, Defendant falsely stated that its usual and customary price for the covered Part D drugs was the full cash price for the drugs, even though the company had few sales at that price and the company regularly sold the covered drugs to Federal Beneficiaries of Plan Sponsors at the lower PSC Program price.  As admitted on the blog hosted by Mark A. Wagner, President – Community Management for Walgreens, lowering the cash price for Federal Beneficiaries required Walgreens to lower the price for its covered drugs:

> The reason we went with the WCARD instead of matching Walmart's $4 generics is because if you lower your Cash price you also have to lower what you charge insurance companies, workers comp, **and the government to the same price.**

(emphasis added).

140.    Defendant has knowingly and intentionally caused Plan Sponsors to make false statements and claims to CMS, including the submission of payment data and information required as a condition of payment in the PDE record, relating to payment of Part D covered drugs.

---

agreement are consistent and comply with the Part D sponsor's contractual obligations. . . . (v) All contracts or written arrangements must specify that first tier, downstream, and related entities must comply with all applicable Federal laws, regulations, and CMS instructions." 42 C.F.R. §§ 423.505(i)(iii) & (iv).

## VIII.   DEFENDANT'S VIOLATIONS UNDERMINE THE PROGRAM INTEGRITY OF PART D AND THREATEN THE FEDERAL BENEFICIARY STATUS OF PATIENTS.

141.    Defendant's unlawful conduct has resulted in injury to the Federal healthcare programs.   It has caused systemic Part D program violations injurious of Federal Beneficiaries and their coverage status, while causing serious Part D program problems. In no order of significance, these violations include, for example:

a.    Periodically filling covered Part D drug prescriptions under the PSC Program at higher prices than available to the beneficiaries under their Part D coverage;[7]

b.    Widespread TrOOP (true out of pocket costs) manipulation;[8]

---

[7]    To illustrate this illegal conduct, on November 3, 2010, Patient 467 filled a covered Part D drug (Simvastatin 40mg Tablets, 30 quantity) with prescription number 1609784-4171 at Defendant's pharmacy located at 1546 North Central Avenue, Chicago, Illinois 60651.   The price was $1.10 for the prescription under his Part D plan (CIGNAMPD). Defendant enrolled Patient 467, a known Federal Beneficiary based on Defendant's computer records, in the PSC Program (Card No. 1609783-4147).   On December 30, 2010, Patient 467 re-filled the prescription for the same drug, dose, and quantity at the same pharmacy.  The price was $1.10 for the prescription which was filled under his Part D plan. On February 1, 2011, Patient 467 re-filled the prescription for the same drug, dose, and quantity at the same pharmacy.   The price was $13.34 for the prescription, which was filled under his Part D plan.  On March 3, 2011, Patient 467 re-filled the prescription for the same drug, dose, and quantity at the same pharmacy.   The price was $11.50 for the prescription, which was filled under his Part D plan.  Finally, on April 8, 2011, Patient 467 re-filled the prescription for the same drug, dose, and quantity at the same pharmacy.   This time the price was $21.99 because Defendant processed it under the PSC Program, and not the beneficiary's Part D plan.

[8]    According to CMS, an incurred cost for purposes of a Beneficiaries TrOOP calculation includes the following:

As provided in section 50.4.2 of chapter 14, costs incurred by enrollees by using a discounted cash price, and not their Part D benefit, provided the purchase is for a covered Part D drug; the purchase is made at a network pharmacy; the discounted cash price is lower than the negotiated price offered by the enrollee's Part D plan; the enrollee is in any applicable

   c.  Undermining the negotiated prices of Plan Sponsors under Part D;

   d.  Prolonging the length of time beneficiaries remain in the doughnut hole prior to reaching catastrophic coverage;

   e.  Artificially inflating the co-payments paid by Federal Beneficiaries for covered drugs;

   f.  Disrupting the coordination of benefits and secondary payer determinations for Federal Beneficiaries by not reporting covered drug transactions to Plan Sponsors and CMS;[9]

   g.  Pushing Federal Beneficiaries into the coverage gap sooner and prolonging the period of time before they reach catastrophic coverage due to the unreported prescriptions;

   h.  Circumventing Plan Sponsors' drug utilization review and safety of drug interaction edits; and

   i.  Imperiling beneficiaries' Part D eligibility status because of undisclosed coverage.

142. The beneficiary eligibility status illustrates the program violations. Under Part D, a Plan Sponsor must dis-enroll an individual if the individual loses eligibility for Part D, or the individual materially misrepresents information that the individual has or

---

deductible or coverage gap phase of his or her benefit; and the enrollee submits appropriate documentation to his or her Part D plan to be credited for the purchase.

Prescription Drug Benefit Manual, Chapter 5: Benefits and Beneficiary Protections, 30.1.

[9] Under Part D, a Plan Sponsor is required to report new or changed primary payer information to the CMS Coordination of Benefits Contractor. 42 C.F.R. § 423.462 (2005).

expects to receive reimbursement for third-party coverage. 42 C.F.R. § 423.44(b)(2)(ii), (v). This is because a beneficiary has a legal obligation to notify the Plan Sponsor of other drug coverage. According to the CMS, "Beneficiaries must supply Part D sponsors with information about other prescription drug coverage the beneficiaries have. As provided in the MMA, beneficiaries are legally obligated to report this information, and any material misrepresentation of such information by a beneficiary may constitute grounds for termination of coverage from Part D." Medicare Prescription Drug Benefit Manual, Chapter 14, at 40.1 & 50.2 ("As provided in the MMA, beneficiaries are legally obligated to report information about other prescription drug coverage or reimbursement for prescription drug costs that the beneficiaries have or expect to receive; any material misrepresentation of such information by a beneficiary may constitute grounds for termination of coverage from a Part D plan"). CMS considers it a material misrepresentation if a beneficiary withholds or fails to disclose other reimbursement coverage. Medicare Prescription Drug Benefit Manual, Chapter 3, at 50.2.5 ("If a PDP enrollee intentionally withholds or falsifies information about third-party reimbursement coverage, CMS requires that the individual be disenrolled from the PDP.")

## IX.    DAMAGES.

143.    The United States and the States of Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Washington, and Wisconsin, the Commonwealths of Massachusetts and Virginia, the District of Columbia, and Doe States 1-20 have suffered damages as a result of the acts

and practices of Defendant, as described herein, in presenting, causing to be presented, and conspiring to present false and fraudulent claims, statements, and records to the United States for covered Part D drugs that were not eligible for reimbursement as a result of systemic kickback violations and overcharging by Defendant.

144. Defendant's false statements were material to the decision of the United States and States to cover and reimburse Defendant for the prescription pharmaceuticals challenged herein.

145. Defendant profited unlawfully from the payment of the false and fraudulent claims by the United States and States.

146. Damages to the United States, the States, and the Federal Payer Programs are substantial.

147. The States of California and Illinois have also suffered damage as a result of the acts and practices of Defendant, as described herein, in presenting or causing to be presented and conspiring to present false and fraudulent claims, statements, and records to private insurance companies.

### COUNT I
### VIOLATIONS OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(A)

148. Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

149. The False Claims Act, 31 U.S.C. § 3729(a)(1)(A), provides in relevant part that any person who:

> knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval . . .

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus three times the amount of damages which the Government sustains because of the act of that person. . . .

150.   By virtue of the acts described herein, Defendant knowingly presented, or caused to be presented, false or fraudulent claims for payment of covered Part D prescription drugs and vaccines to which it was not entitled.  Defendant knew that these claims for payment were false, fraudulent, or fictitious, or were deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

151.   Each claim presented or caused to be presented for reimbursement of the prescription pharmaceuticals challenged herein represents a false or fraudulent claim for payment under the FCA.

152.   Unaware that Defendant submitted false statements to conceal its misconduct, and unaware that Defendant routinely violated the Anti-Kickback Statute and falsely certified compliance with laws and regulations despite pervasive and substantial non-compliance, the United States paid and continues to pay the false claims submitted for Defendant's prescription drugs.  These claims would not have been paid but for Defendant's fraud and false statements.

153.   In reliance on the accuracy of Defendant's statements, records, data, representations, and certifications, the United States has paid said claims and has suffered financial losses as a result of these acts by Defendant.

## COUNT II
## VIOLATIONS OF THE FALSE CLAIMS ACT
## 31  U.S.C. § 3729(a)(1)(B)

154.    The Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

155.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(B), provides in relevant part that any person who:

> knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . .

> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus three times the amount of damages which the Government sustains because of the act of that person. . . .

156.    By virtue of the acts described herein, Defendant knowingly presented, or caused to be presented, false or fraudulent records or statements material to false or fraudulent claims for payment of covered Part D drugs and vaccines to which it was not entitled.  Defendant knew that the records and statements were false, fraudulent, or fictitious, or were deliberately ignorant of the truth or falsity of the records and statements, or acted in reckless disregard for whether the records and statements were true or false.

157.    Each false or fraudulent record or statement material to a false or fraudulent claim for payment or reimbursement of the prescription drugs challenged herein represents a false or fraudulent claim for payment under the FCA.

158.    Unaware that Defendant submitted false records or statements to conceal the its misconduct, and unaware that Defendant routinely violated the Anti-Kickback

Statute and falsely certified compliance with laws and regulations despite pervasive and substantial non-compliance, the United States paid and continues to pay the false claims submitted for Defendant's prescription drugs.  These claims would not have been paid but for Defendant's fraud and false statements.

159.   In reliance on the accuracy of Defendant's statements, records, data, representations, and certifications, the United States has paid said claims and has suffered financial losses as a result of these acts by Defendant.

## COUNT III
## VIOLATIONS OF THE FALSE CLAIMS ACT
## 31  U.S.C. § 3729(a)(1)(C)

160.   Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

161.   The False Claims Act, 31 U.S.C. § 3729(a)(1)(C), provides in relevant part that any person who:

> conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G) . . .

> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . plus three times the amount of damages which the Government sustains because of the act of that person. . . .

162.   By virtue of the acts described herein, Defendant conspired to commit violations of 31 U.S.C. §§ 3729(a)(1)(A) and (B) by knowingly presenting, or causing to be presented, false or fraudulent claims for payment by knowingly making, using, or causing to be made or used, false records or statements material to false or fraudulent claims.  Defendant knew that these claims were false, fraudulent, or fictitious, or were

deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false

163.     Unaware of the conspiracy to submit false records and/or statements to conceal its misconduct,   and unaware that Defendant routinely violated the Anti-Kickback Statute and falsely certified compliance with laws and regulations despite pervasive and substantial non-compliance, the United States paid and continues to pay the false claims submitted for Defendant's covered Part D drugs and vaccines.   These claims would not have been paid but for Defendant's fraud and false statements.

164.     In reliance on the accuracy of Defendant's statements, records, data, representations, and certifications, the United States have paid said claims and have suffered financial losses as a result of these acts by Defendant.

### PRAYER AS TO COUNTS I-III

WHEREFORE, Relator prays that this District Court enter judgment on behalf of Relator and against Defendant in Counts I-III, respectively, as follows:

a.     Damages in the amount of three times the actual damages suffered by the United States Government as a result of each Defendant's conduct;

b.     Civil penalties against the Defendant, respectively, equal to not less than $5,000 and not more than $10,000, adjusted for inflation according to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, for each violation of 31 U.S.C. § 3729;

c.     The fair and reasonable sum to which Relator is entitled under 31 U.S.C. § 3730(b); additionally, Relator is entitled, in equity, to recover attorneys' fees from the fund created for non-participating beneficiaries (those not contributing material time and

expense to generating any settlement or recovery from any Defendant) under the Common Fund doctrine to be paid from the recovery fund generated for such non-participatory beneficiaries from Defendant;

  d.  All costs and expenses of this litigation, including statutory attorneys' fees and costs of court;

  e.  Pre-judgment and post-judgment, as appropriate, interest at the highest rate allowed by law;

  f.  Relator's individual damages, if any, which may be alleged; and

  g.  All other relief on behalf of Relator or the United States Government to which they may be justly entitled, under law or in equity, and the District Court deems just and proper.

**COUNT IV**
**VIOLATIONS OF THE ANTI-KICKBACK STATUTE**
**42  U.S.C. § 1320a-7b**

  165.  Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

  166.  Medicare and Medicaid Patient Protection Act of 1987, 42 U.S.C. § 1320a-7b, provides criminal penalties up to $25,000 or five years in jail or both for the following:

    (1)  whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind—

      (A)  in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in

91

whole or in part under a Federal health care program, or

(B)     in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program

\* \* \*

(2)     whoever knowingly and willfully offers and pays any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

(A)     to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B)     to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program.

42 U.S.C. § 1320a-7b(b).

167.    Each claim for reimbursement for prescription drugs represents a false or fraudulent claim for payment because each procedure carried with it a false certification by Defendant that the service it provided complied with the Anti-Kickback Statute.

168.    Defendant has violated the Anti-Kickback Statute by offering and knowingly and willfully providing a direct and substantial financial incentive in the form of kickbacks to Federal Beneficiaries to induce them to purchase covered Part D drugs and vaccines exclusively from Defendant's pharmacies.  No safe harbor provisions apply.

169.    Unaware of Defendant's violations of the Anti-Kickback Statute and the falsity of the records, statements, and claims made or caused to be made by Defendant,

the United States paid and continues to pay on the claims that would not have been paid but for Defendant's wrongful acts and omissions, as alleged herein.

170. As violations of the Anti-Kickback Statute, the material misrepresentations made by Defendant to induce Federal Beneficiaries to purchase covered Part D drugs from Defendant's pharmacies constitute false claims and statements under the FCA, 31 U.S.C. § 3729 *et seq.*

## PRAYER AS TO COUNT IV

WHEREFORE, Relator prays that this District Court enter judgment on behalf of Relator and against Defendant in Count IV as follows:

a. Damages suffered by the United States Government as a result Defendant's conduct;

b. Civil penalties against Defendant equal to $11,000 for each violation of 31 U.S.C. § 3729;

c. Relator be awarded the a fair and reasonable sum to which he is entitled under 31 U.S.C. § 3730(b); additionally, Relator is entitled, in equity, to recover attorneys' fees from the fund created for non-participating beneficiaries (those not contributing material time and expense to generating any settlement or recovery from any Defendant) under the Common Fund doctrine to be paid from the recovery fund generated for such non-participatory beneficiaries from Defendant;

d. Relator be awarded all costs and expenses of this litigation, including statutory attorneys' fees and costs of court;

e. Pre-judgment and post-judgment, as appropriate, interest at the highest rate allowed by law;

f.      Relator's individual damages, if any, which may be alleged; and

g.      All other relief on behalf of Relator or the United States Government to which they may be justly entitled, under law or in equity, which the District Court deems just and proper.

## COUNT V
## UNJUST ENRICHMENT

171.    Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

172.    Relator, on behalf of the United States, claims the recovery of all monies by which Walgreens has been unjustly enriched, including profits earned by Defendant because of (a) illegal kickbacks offered and provided to Federal Beneficiaries in exchange for Federal payer business and (b) overcharging Medicare Part D and other Federal Payer Programs for covered Part D drugs.

173.    By obtaining monies as a result of its violations of federal and state law, Defendant was unjustly enriched, and is liable to account and pay such amounts, which are to be determined at trial, to the United States.

## PRAYER AS TO COUNT V

WHEREFORE, Relator prays that this District Court enter judgment on behalf of Relator and against Defendant in Count V as follows:

a.      Damages sustained by the United States, including the amounts Defendant unlawfully obtained;

b.      All costs and expenses of this litigation, including statutory attorneys' fees and costs of court;

e.  Pre-judgment and post-judgment, as appropriate, interest at the highest rate allowed by law;

f.  Relator's individual damages, if any, which may be alleged; and

g.  All other relief on behalf of Relator or the United States Government to which they may be justly entitled, under law or in equity, and the District Court deems just and proper.

**COUNT VI**
**VIOLATIONS OF THE ARKANSAS MEDICAID FCA**
**ARK. CODE ANN. § 20-77-902(1)-(3)**

174.  Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

175.  This is a *qui tam* action brought by Marc D. Baker and the State of Arkansas to recover treble damages and civil penalties under the Arkansas Medicaid False Claims Act, ARK. CODE ANN. § 20-77-902(1)-(3) *et seq.*

176.  ARK. CODE ANN. § 20-77-902 provides liability for any person who-

(1)  Knowingly makes or causes to be made any false statement or representation of a material fact in any application for any benefit or payment under the Arkansas Medicaid program;

(2)  At any time knowingly makes or causes to be made any false statement or representation of a material fact for use in determining rights to a benefit or payment; or

(3)  Having knowledge of the occurrence of any event affecting his or her initial or continued right to any benefit or payment or the initial or continued right to any benefit or payment of any other individual in whose behalf he or she has applied for or is receiving a benefit or payment knowingly conceals or fails to disclose that event with an intent fraudulently to secure the benefit or payment either in a greater amount or quantity than is due or when no benefit or payment is authorized.

95

177.    In addition, ARK. CODE ANN. § 5-55-111 prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Arkansas Medicaid program.

178.    Defendant violated ARK. CODE ANN. § 20-77-902 and § 5-55-111, and knowingly caused false claims to be made, used and presented to the State of Arkansas by its violations of Federal and State laws, including false or fraudulent claims for payment for drugs and vaccines to which it was not entitled. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or were deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

179.    Each claim presented or caused to be presented for reimbursement of the prescription drugs challenged herein represents a false or fraudulent claim for payment under the FCA.

180.    The State of Arkansas, by and through the Arkansas Medicaid program and other State health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant and Defendant's pharmacies in connection therewith.

181.    Compliance with applicable Medicare, Medicaid and various other Federal and State laws was a condition of payment of claims submitted to the State of Arkansas. Had the State of Arkansas known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant and Defendant's pharmacies.

182.    As a result of Defendant's violations of ARK. CODE ANN. § 20-77-902, the State of Arkansas has been damaged.

183.    Mr. Baker is a private person with direct and independent knowledge of the allegations of the First Amended Complaint, who has brought this action pursuant to ARK. CODE ANN. § 20-77-902 on behalf of himself and the State of Arkansas.

184.    This court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the Federal claim, and merely asserts separate damages to the State of Arkansas in the operation of the Medicaid program.

### PRAYER AS TO COUNT VI

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF ARKANSAS:

(1)    Three times the amount of actual damages which the State of Arkansas has sustained as a result of Defendant's fraudulent and illegal practices;

(2)    A civil penalty of not less than $5,000 and not more than $10,000 for false claim which Defendant presented or caused to be presented to the State of Arkansas;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To RELATOR:

(1)    A fair and reasonable amount allowed pursuant to ARK. CODE ANN. § 20-77-911 and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Mr. Baker incurred in connection with this action;

(3)     Such further relief as this Court deems equitable and just.

## COUNT VII
## VIOLATIONS OF THE CALIFORNIA FALSE CLAIMS ACT
### CAL. GOV'T CODE § 12651(a)

185.     Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

186.     This is a *qui tam* action brought by Marc D. Baker and the State of California to recover treble damages and civil penalties under the California False Claims Act, CAL. GOV'T CODE § 12650 *et. seq.*

187.     CAL. GOV'T CODE § 12651(a) provides liability for any person who-

   (1)     Knowingly presents, or causes to be presented, to an officer or employee of the state or of any political division thereof, a false claim for payment or approval;

   (2)     Knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision;

   (3)     Conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision.

188.     In addition, the payment or receipt of bribes or kickbacks is prohibited under CAL. BUS. & PROF. CODE § 650 & 650.1 and is also specifically prohibited in treatment of Medi-Cal patients pursuant to CAL. WELF. & INST. CODE § 14107.2.

189.     Defendant violated CAL. GOV'T CODE § 12651(a)(1)-(3) and knowingly caused false claims to be made, used and presented to the State of California by its violations of Federal and State laws, including CAL. BUS. & PROF. CODE § 650 & 650.1 and CAL. WELF. & INST. CODE § 14107.2, and submitted false or fraudulent claims for

payment for drugs and vaccines to which it was not entitled. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or were deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

190.   Each claim presented or caused to be presented for reimbursement of the prescription pharmaceuticals challenged herein represents a false or fraudulent claim for payment under the FCA.

191.   The State of California, by and through the California Medicaid program and other State health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant and Defendant's pharmacies in connection therewith.

192.   Compliance with applicable Medicare, Medicaid and various other Federal and State laws was a condition of payment of claims submitted to the State of California. Had the State of California known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant and Defendant's pharmacies.

193.   As a result of Defendant's violations of CAL. GOV'T CODE §12651(a), CAL. BUS. & PROF. CODE § 650 & 650.1, and CAL. WELF. & INST. CODE § 14107.2, the State of California has been damaged.

194.   Mr. Baker is a private person with direct and independent knowledge of the allegations of the First Amended Complaint, who has brought this action pursuant to CAL. GOV'T CODE § 12652(c) on behalf of himself and the State of California.

195.   This court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the Federal claim, and merely

asserts separate damages to the State of California in the operation of the Medicaid program.

## **PRAYER AS TO COUNT VII**

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant, respectively,

To the STATE OF CALIFORNIA:

(1)     Three times the amount of actual damages which the State of California has sustained as a result of Defendant's fraudulent and illegal practices;

(2)     A civil penalty of not less than $5,500 and not more than $11,000 for false claim which Defendant presented or caused to be presented to the State of California;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To RELATOR:

(1)     A fair and reasonable amount allowed pursuant to CAL. GOV'T CODE § 12652 and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Mr. Baker incurred in connection with this action;

(3)     An award of statutory attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT VIII
## VIOLATIONS OF THE CALIFORNIA INSURANCE FRAUDS PREVENTION ACT
### CAL. INS. CODE § 1871.7(b)

196.    Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

197.    This is a *qui tam* action brought by Marc D. Baker and the State of California to recover treble damages and civil penalties under the California Insurance Frauds Prevention Act, CAL. INS. CODE § 1871 *et. seq.*

198.    CAL. INS. CODE § 1871.7(b) provides liability for any person who violates any provision of Section 1871.7 or Section 549, 550, or 551 of the California Penal Code. Violators shall be subject, in addition to any other penalties prescribed by law, to a civil penalty of not less than five thousand dollars ($5,000) nor more than ten thousand dollars ($10,000), plus an assessment of not more than three times the amount of each claim for compensation.

199.    CAL. PENAL CODE § 550(b) makes it unlawful to do, knowingly assist or conspire with any person to do, *inter alia*:

> (1)    Present or cause to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.

> (2)    Prepare or make any written or oral statement that is intended to be presented to any insurer or any insurance claimant in connection with, or in support of or opposition to, any claim or payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.

(3)    Conceal, or knowingly fail to disclose the occurrence of, an event that affects any person's initial or continued right or entitlement to any insurance benefit or payment, or the amount of any benefit or payment to which the person is entitled.

(4)    Prepare or make any written or oral statement, intended to be presented to any insurer or producer for the purpose of obtaining a motor vehicle insurance policy, that the person to be the insured resides or is domiciled in this state when, in fact, that person resides or is domiciled in a state other than this state.

200.    Defendant violated CAL. PENAL CODE § 550(b) and CAL. INS. CODE § 1871.7(b) when it knowingly caused false claims to be made, used and presented to private insurance companies or PBMs, false or fraudulent claims for payment for drugs and vaccines to which it was not entitled. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or were deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

201.    Had the private insurance companies and PBMs known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant and Defendant's pharmacies.

202.    As a result of Defendant's violations of CAL. PENAL CODE § 550(b) and CAL. INS. CODE § 1871.7(b), the State of California has been damaged.

203.    Mr. Baker is a private person with direct and independent knowledge of the allegations of the First Amended Complaint, who has brought this action pursuant to CAL. INS. CODE § 1871 *et. seq.* on behalf of himself and the State of California.

204.    This court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the Federal claim, and merely asserts separate damages to the State of California under the California Insurance Frauds Prevention Act.

## PRAYER AS TO COUNT VIII

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF CALIFORNIA:

    (1)    Three times the amount of actual damages which the State of California has sustained as a result of Defendant's fraudulent and illegal practices;

    (2)    A civil penalty of not less than $5,000 and not more than $10,000 for  false claim which  Defendant presented or caused to be presented to private insurance companies or pharmacy benefit managers;

    (3)    Prejudgment interest; and

    (4)    All costs incurred in bringing this action.

To RELATOR:

    (1)    A fair and reasonable amount allowed pursuant to CAL. INS. CODE § 1871.7(g) and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses which Mr. Baker incurred in connection with this action;

    (3)    An award of statutory attorneys' fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

## COUNT IX
## VIOLATIONS OF THE COLORADO MEDICAID FALSE CLAIMS ACT
### COLO. REV. STAT. ANN. § 25.5-4-303.5 *et seq.*

205.    Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

206.    This is a *qui tam* action brought by Marc D. Baker and the State of Colorado to recover treble damages and civil penalties under the Colorado Medicaid False Claims Act, COLO. REV. STAT. ANN. § 25.5-4-303.5 *et seq.*

207.    COLO. REV. STAT. ANN § 25.5-4-305 provides liability for any person who, *inter alia*:

        (1)    Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

        (2)    Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

        (3)    Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act", or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act"

        (4)    Conspires to commit a violation…

208.    Defendant violated COLO. REV. STAT. ANN. § 25.5-4-305 and knowingly caused false claims to be made, used and presented to the State of Colorado by its violations of Federal and State laws when it submitted false or fraudulent claims for payment for drugs and vaccines to which it was not entitled.  Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of

104

the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

209.    Each claim presented or caused to be presented for reimbursement of the prescription drugs challenged herein represents a false or fraudulent claim for payment under the FCA.

210.    The State of Colorado, by and through the Colorado Medicaid program and other State health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant and Defendant's pharmacies in connection therewith.

211.    Compliance with applicable Medicare, Medicaid and various other Federal and State laws was a condition of payment of claims submitted to the State of Colorado. Had the State of Colorado known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant and Defendant's pharmacies.

212.    As a result of Defendant's violations of COLO. REV. STAT. ANN. § 25.5-4-305, the State of Colorado has been damaged.

213.    Mr. Baker is a private person with direct and independent knowledge of the allegations of the First Amended Complaint, who has brought this action pursuant to COLO. REV. STAT. ANN. § 25.5-4-305 on behalf of himself and the State of Colorado.

214.    This court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the Federal claim, and merely asserts separate damages to the State of Colorado in the operation of the Medicaid program.

## PRAYER AS TO COUNT IX

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF COLORADO:

    (1)    Three times the amount of actual damages which the State of Colorado has sustained as a result of Defendant's fraudulent and illegal practices;

    (2)    A civil penalty of not less than $5,500 and not more than $11,000 for false claim which Defendant presented or caused to be presented to the State of Colorado;

    (3)    Prejudgment interest; and

    (4)    All costs incurred in bringing this action.

To RELATOR:

    (1)    A fair and reasonable amount allowed pursuant to COLO. REV. STAT. ANN. § 25.5-4-306(3) and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses which Mr. Baker incurred in connection with this action;

    (3)    An award of statutory attorneys' fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

## COUNT X
## VIOLATIONS OF THE CONNECTICUT FALSE CLAIMS ACT FOR MEDICAL ASSISTANCE PROGRAMS
### CONN. GEN. STAT. ANN. § 17b-301a *et seq.*

215.    Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

216.    This is a *qui tam* action brought by Marc D. Baker and the State of Connecticut to recover treble damages and civil penalties under the Connecticut False Claims Act for Medical Assistance Programs, CONN. GEN. STAT. §§ 17b-301 *ET. seq.*

217.    CONN. GEN. STAT. ANN. § 17b-301b(a) provides liability for any person who, *inter alia*:

  (1)    Knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval under a medical assistance program administered by the Department of Social Services;

  (5)    Knowingly make, use or cause to be made or used, a false record or statement material to a false or fraudulent claim under a medical assistance program administered by the Department of Social Services;

  (6)    Conspire to commit a violation of this section . . . .

218.    Defendant violated CONN. GEN. STAT. ANN. § 17b-301b(a) and knowingly caused false claims to be made, used and presented to the State of Connecticut by its violations of Federal and State laws, when it submitted false or fraudulent claims for payment for drugs and vaccines to which it was not entitled.  Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

219.    Each claim presented or caused to be presented for reimbursement of the prescription drugs challenged herein represents a false or fraudulent claim for payment under the FCA.

220.    The State of Connecticut, by and through the Connecticut Medicaid program and other State health care programs, was unaware of Defendant's fraudulent

and illegal practices and paid the claims submitted by Defendant and Defendant's pharmacies in connection therewith.

221.    Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the State of Connecticut.  Had the State of Connecticut known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant and Defendant's pharmacies.

222.    As a result of Defendant's violations of CONN. GEN. STAT. ANN. § 17b-301b(a) and CONN. GEN. STAT. ANN. § 17b-226a, the State of Connecticut has been damaged.

223.    Mr. Baker is a private person with direct and independent knowledge of the allegations of the First Amended Complaint, who has brought this action pursuant to CONN. GEN. STAT. ANN. § 17b-301d(a) on behalf of himself and the State of Connecticut.

224.    This court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the Federal claim, and merely asserts separate damages to the State of Connecticut in the operation of the Medicaid program.

## PRAYER AS TO COUNT X

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF CONNECTICUT:

(1)    Three times the amount of actual damages which the State of Connecticut has sustained as a result of Defendant's fraudulent and illegal practices;

(2)     A civil penalty of not less than $5,500 and not more than $11,000 for false claim which Defendant presented or caused to be presented to the State of Connecticut;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To RELATOR:

(1)     A fair and reasonable amount allowed pursuant to CONN. GEN. STAT. ANN. § 17b-301e(e) and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Mr. Baker incurred in connection with this action;

(3)     An award of statutory attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT XI
## VIOLATIONS OF THE DELAWARE FALSE CLAIMS AND REPORTING ACT
### 6 DEL. CODE ANN. § 1201 *et seq.*

225.    Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

226.    This is a *qui tam* action brought by Marc D. Baker and the State of Delaware to recover treble damages and civil penalties under the Delaware False Claims and Reporting Act, 6 DEL. CODE ANN. § 1201 *et seq.*

227.    6 DEL. CODE ANN. § 1201(a) provides liability for any person who, *inter alia*:

(1)     Knowingly presents, or causes to be presented to an officer or employee of the Government a false or fraudulent claim for payment or approval;

109

(2)   Knowingly makes, uses or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Government;

(3)   Conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

228.   In addition, 31 DEL. CODE ANN. § 1005 prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under any public assistance program.

229.   Defendant violated 6 DEL. CODE ANN. § 1201(a) and 31 DEL. CODE ANN. § 1005, and knowingly caused false claims to be made, used and presented to the State of Delaware by its violations of Federal and State laws when it submitted false or fraudulent claims for payment for drugs and vaccines to which it was not entitled.  Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

230.   Each claim presented or caused to be presented for reimbursement of the prescription pharmaceuticals challenged herein represents a false or fraudulent claim for payment under the FCA.

231.   The State of Delaware, by and through the Delaware Medicaid program and other State health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant and Defendant's pharmacies in connection therewith.

232.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the State of

Delaware.   Had the State of Delaware known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant and Defendant's pharmacies.

233.    As a result of Defendant's violations of 6 DEL. CODE ANN. § 1201(a) and 31 DEL. CODE ANN. § 1005, the State of Delaware has been damaged.

234.    Mr. Baker is a private person with direct and independent knowledge of the allegations of the First Amended Complaint, who has brought this action pursuant to 6 DEL. CODE ANN. § 1203(b) on behalf of himself and the State of Delaware.

235.    This court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the Federal claim, and merely asserts separate damages to the State of Delaware in the operation of the Medicaid program.

### PRAYER AS TO COUNT XI

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF DELAWARE:

(1)    Three times the amount of actual damages which the State of Delaware has sustained as a result of Defendant's fraudulent and illegal practices;

(2)    A civil penalty of not less than $5,500 and not more than $11,000 for  false claim which  Defendant presented or caused to be presented to the State of Delaware;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To RELATOR:

111

(1)   A fair and reasonable amount allowed pursuant to 6 DEL. CODE ANN. § 1205 and/or any other applicable provision of law;

(2)   Reimbursement for reasonable expenses which Mr. Baker incurred in connection with this action;

(3)   An award of statutory attorneys' fees and costs; and

(4)   Such further relief as this Court deems equitable and just.

## COUNT XII
## VIOLATIONS OF THE DISTRICT OF COLUMBIA PROCUREMENT REFORM AMENDMENT ACT
### D.C. CODE ANN. § 2-381.01 *et seq.* [formerly D.C. CODE ANN. §2-308.13 *et seq.*]

236.   Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

237.   This is a *qui tam* action brought by Marc D. Baker and the District of Columbia to recover treble damages and civil penalties under the District of Columbia Procurement Reform Amendment Act, D.C. CODE ANN. § 2-381.01 *et seq.*

238.   D.C. CODE ANN. § 2-381.02 provides liability for any person who, *inter alia*:

(1)   Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2)   Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(3)   Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the District, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the District;

(4)   Conspires to commit a violation of paragraph (1), (2), (3), (4), (5), or (6) of this subsection;

112

239.    Defendant violated D.C. CODE ANN. § 2-381.02 and knowingly caused false claims to be made, used and presented to the District by its violations of Federal and State laws, including by submitting false or fraudulent claims for payment for drugs and vaccines to which it was not entitled.  Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

240.    Each claim presented or caused to be presented for reimbursement of the prescription pharmaceuticals challenged herein represents a false or fraudulent claim for payment under the FCA.

241.    The District, by and through the District's Medicaid program and other State health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant and Defendant's pharmacies in connection therewith.

242.    Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the District. Had the District known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant and Defendant's pharmacies.

243.    As a result of Defendant's violations of D.C. CODE ANN. § 2-381.02 the District has been damaged.

244.    Mr. Baker is a private person with direct and independent knowledge of the allegations of the First Amended Complaint, who has brought this action pursuant to D.C. CODE ANN. § 2-381.03 on behalf of himself and the District.

245.    This court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the Federal claim, and merely asserts separate damages to the District in the operation of the Medicaid program.

## PRAYER AS TO COUNT XII

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant, respectively:

To the DISTRICT OF COLUMBIA:

(1)    Three times the amount of actual damages which the District of Columbia has sustained as a result of Defendant's fraudulent and illegal practices;

(2)    A civil penalty of not less than $5,500 and not more than $11,000 for   false claim which   Defendant presented or caused to be presented to the District;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To RELATOR:

(1)    A fair and reasonable amount allowed pursuant to D.C. CODE ANN. § 2-381-03 and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Mr. Baker incurred in connection with this action;

(3)    An award of statutory attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT XIII
## VIOLATIONS OF THE FLORIDA FALSE CLAIMS ACT
### FLA. STAT. ANN. § 68.081 *et seq.*

246.    Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

247.    This is a *qui tam* action brought by Marc D. Baker and the State of Florida to recover treble damages and civil penalties under the Florida False Claims Act, FLA. STAT. ANN. § 68.081 *et seq.*

248.    FLA. STAT. ANN. § 68.082(2) provides liability for any person who, *inter alia*:

> (1)    Knowingly presents, or causes to be presented, to an officer or employee of an agency a false or fraudulent claim for payment or approval;
>
> (2)    Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by an agency;
>
> (3)    Conspires to submit a false claim to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed or paid.

249.    Defendant violated FLA. STAT. ANN. § 68.082(2) and knowingly caused false claims to be made, used and presented to the State of Florida by its violations of Federal and State laws, including by submitting false or fraudulent claims for payment for drugs and vaccines to which it was not entitled.  Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

115

250.    Each claim presented or caused to be presented for reimbursement of the prescription drugs challenged herein represents a false or fraudulent claim for payment under the FCA.

251.    The State of Florida, by and through the Florida Medicaid program and other State health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant and Defendant's pharmacies in connection therewith.

252.    Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the State of Florida.  Had the State of Florida known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant and Defendant's pharmacies.

253.    As a result of Defendant's violations of FLA. STAT. ANN. § 68.082(2) the State of Florida has been damaged.

254.    Mr. Baker is a private person with direct and independent knowledge of the allegations of the First Amended Complaint, who has brought this action pursuant to FLA. STAT. ANN. § 68.083(2) on behalf of himself and the District.

255.    This court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the Federal claim, and merely asserts separate damages to the State of Florida in the operation of the Medicaid program.

### PRAYER AS TO COUNT XIII

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF FLORIDA:

(1)     Three times the amount of actual damages which the State of Florida has sustained as a result of Defendant's fraudulent and illegal practices;

(2)     A civil penalty of not less than $5,500 and not more than $11,000 for false claim which Defendant presented or caused to be presented to the District;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To RELATOR:

(1)     A fair and reasonable amount allowed pursuant to FLA. STAT. ANN. § 68.085 and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Mr. Baker incurred in connection with this action;

(3)     An award of statutory attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT XIV
## VIOLATIONS OF THE GEORGIA STATE FALSE MEDICAID CLAIMS ACT
### GA. CODE ANN. § 49-4-168 *et seq.*

256.     Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

257.     This is a *qui tam* action brought by Marc D. Baker and the State of Georgia to recover treble damages and civil penalties under the Georgia State False Medicaid Claims Act, GA. CODE ANN. §§ 49-4-168 to 168.6.

258.     GA. CODE ANN. §§ 49-4-168.1 provides liability for any person who, *inter alia*:

117

(1)     Knowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;

(2)     Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the Georgia Medicaid program;

(3)     Conspires to defraud the Georgia Medicaid program by getting a false or fraudulent claim allowed or paid.

259.    Defendant violated GA. CODE ANN. §§ 49-4-168.1 and knowingly caused false claims to be made, used and presented to the State of Georgia by its violations of Federal and State laws, including by submitting false or fraudulent claims for payment for drugs and vaccines to which it was not entitled.  Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

260.    Each claim presented or caused to be presented for reimbursement of the prescription drugs challenged herein represents a false or fraudulent claim for payment under the FCA.

261.    The State of Georgia, by and through the Georgia Medicaid program and other State health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant and Defendant's pharmacies in connection therewith.

262.    Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the State of Georgia.  Had the State of Georgia known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant and Defendant's pharmacies.

118

263.    As a result of Defendant's violations of GA. CODE ANN. §§ 49-4-168.1 the State of Georgia has been damaged.

264.    Mr. Baker is a private person with direct and independent knowledge of the allegations of the First Amended Complaint, who has brought this action pursuant to GA. CODE ANN. §§ 49-4-168.2(b) on behalf of himself and the State of Georgia.

265.    This court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the Federal claim, and merely asserts separate damages to the State of Georgia in the operation of the Medicaid program.

## PRAYER AS TO COUNT XIV

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF GEORGIA:

(1)    Three times the amount of actual damages which the State of Georgia has sustained as a result of Defendant's fraudulent and illegal practices;

(2)    A civil penalty of not less than $5,500 and not more than $11,000 for   false claim which   Defendant presented or caused to be presented to the State of Georgia;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To RELATOR:

(1)    A fair and reasonable amount allowed pursuant to GA. CODE ANN. §§ 49-4-168.2(I) and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Mr. Baker incurred in connection with this action;

(3)     An award of statutory attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT XV
## VIOLATIONS OF THE HAWAII FALSE CLAIMS ACT
### HAW. REV. STAT. § 661-21 *et seq.*

266.    Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

267.    This is a *qui tam* action brought by Marc D. Baker and the State of Hawaii to recover treble damages and civil penalties under the Hawaii False Claims Act, HAW. REV. STAT. § 661-21 *et seq.*

268.    HAW. REV. STAT. § 661-21 provides liability for any person who, *inter alia*:

(1)     Knowingly presents or causes to be presented to an officer or employee of the State a false or fraudulent claim for payment or approval;

(2)     Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;

(3)     Conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

269.    Defendant violated HAW. REV. STAT. § 661-21 and knowingly caused false claims to be made, used and presented to the State of Hawaii by its violations of Federal and State laws, including by submitting false or fraudulent claims for payment for drugs and vaccines to which it was not entitled.  Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or

120

falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

270.    Each claim presented or caused to be presented for reimbursement of the prescription drugs challenged herein represents a false or fraudulent claim for payment under the FCA.

271.    The State of Hawaii, by and through the Hawaii Medicaid program and other State healthcare programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant and Defendant's pharmacies in connection therewith.

272.    Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the State of Hawaii.  Had the State of Hawaii known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant and Defendant's pharmacies.

273.    As a result of Defendant's violations of HAW. REV. STAT. § 661-21 the State of Hawaii has been damaged.

274.    Mr. Baker is a private person with direct and independent knowledge of the allegations of the First Amended Complaint, who has brought this action pursuant to HAW. REV. STAT. § 661-25 on behalf of himself and the State of Hawaii.

275.    This court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the Federal claim, and merely asserts separate damages to the State of Hawaii in the operation of the Medicaid program.

## PRAYER AS TO COUNT XV

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF Hawaii:

(1)     Three times the amount of actual damages which the State of Hawaii has sustained as a result of Defendant's fraudulent and illegal practices;

(2)     A civil penalty of not less than $5,500 and not more than $11,000 for   false claim which   Defendant presented or caused to be presented to the State of Georgia;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To RELATOR:

(1)     A fair and reasonable amount allowed pursuant to HAW. REV. STAT. § 661-27 and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Mr. Baker incurred in connection with this action;

(3)     An award of statutory attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT XVI
## VIOLATIONS OF THE ILLINOIS FALSE CLAIMS ACT
### 740 ILL. COMP. STAT. § 175 *et seq.*

276.    Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

122

277. This is a *qui tam* action brought by Marc D. Baker and the State of Illinois to recover treble damages and civil penalties under the Illinois False Claims Act, 740 ILCS § 175 *et seq.*

278. 740 ILCS § 175/3 provides liability for any person who, *inter alia*:

    (1)    Knowingly presents, or causes to be presented, to an officer or employee of the State or a member of the Guard a false or fraudulent claim for payment or approval;

    (2)    Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State;

    (3)    Conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

279. In addition, 305 ILCS 5/8A-3(b) of the Illinois Public Aid Code (Vendor Fraud and Kickbacks) prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Illinois Medicaid program.

280. Defendant violated 740 ILCS § 175/3 and knowingly caused false claims to be made, used and presented to the State of Illinois by its violations of Federal and State laws, including 305 ILCS 5/8A-3(b),  and by submitting false or fraudulent claims for payment for drugs and vaccines to which it was not entitled.  Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

281.     Each claim presented or caused to be presented for reimbursement of the prescription drugs challenged herein represents a false or fraudulent claim for payment under the FCA.

282.     The State of Illinois, by and through the Illinois Medicaid program and other State health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant and Defendant's pharmacies in connection therewith.

283.     Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the State of Illinois.  Had the State of Illinois known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant and Defendant's pharmacies.

284.     As a result of Defendant's violations of 740 ILCS § 175/3 and 305 ILCS 5/8A-3(b), the State of Illinois has been damaged.

285.     Mr. Baker is a private person with direct and independent knowledge of the allegations of the First Amended Complaint, who has brought this action pursuant to 740 ILCS § 175/4(b) on behalf of himself and the State of Illinois.

286.     This court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the Federal claim, and merely asserts separate damages to the State of Illinois in the operation of the Medicaid program.

### PRAYER AS TO COUNT XVI

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF Illinois:

(1)     Three times the amount of actual damages which the State of Illinois has sustained as a result of Defendant's fraudulent and illegal practices;

(2)     A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which  Defendant presented or caused to be presented to the State of Illinois;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To RELATOR:

(1)     A fair and reasonable amount allowed pursuant to 740 ILCS § 175/4(d) and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Mr. Baker incurred in connection with this action;

(3)     An award of statutory attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT XVII
## VIOLATIONS OF THE ILLINOIS INSURANCE CLAIMS FRAUD PREVENTION ACT
### 740 ILL. COMP. STAT. 92/1 *et seq.*

287.    Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

288.    This is a *qui tam* action brought by Marc D. Baker and the State of Illinois to recover treble damages and civil penalties under the Illinois Insurance Claims Fraud Prevention Act, 740 ILCS 92/1 *et seq*.

289.    740 ILCS 92/1 provides liability for any person who violates any provision of Section 92/1 or Section 17-8.5 or 10.5 of the Criminal Code of 1961 or

2012, or Article 46 of the Criminal Code of 1961. Violators shall be subject, in addition to any other penalties prescribed by law, to a civil penalty of not less than five thousand dollars ($5,000) nor more than ten thousand dollars ($10,000), plus an assessment of not more than three times the amount of each claim for compensation.

290.   ILL. CRIM. CODE § 17-10.5(a) states:

    (1)   A person commits insurance fraud when he or she knowingly obtains, attempts to obtain, or causes to be obtained, by deception, control over the property of an insurance company or self-insured entity by the making of a false claim or by causing a false claim to be made on any policy of insurance issued by an insurance company or by the making of a false claim or by causing a false claim to be made to a self-insured entity, intending to deprive an insurance company or self-insured entity permanently of the use and benefit of that property

    (2)   A person commits health care benefits fraud against a provider, other than a governmental unit or agency, when he or she knowingly obtains or attempts to obtain, by deception, health care benefits and that obtaining or attempt to obtain health care benefits does not involve control over property of the provider.

291.   "Deception" means knowingly to:

    (1) Create or confirm another's impression which is false and which the offender does not believe to be true; or

    (2) Fail to correct a false impression which the offender previously has created or confirmed; or

    (3) Prevent another from acquiring information pertinent to the disposition of the property involved; or

    (4) Sell or otherwise transfer or encumber property, failing to disclose a lien, adverse claim, or other legal impediment to the enjoyment of the property, whether such impediment is or is not valid, or is or is not a matter of official record; or

    (5) Promise performance which the offender does not intend to perform or knows will not be performed. Failure to perform standing alone is not evidence that the offender did not intend to perform.

292.    Defendant violated 740 ILCS § 92/1 and ILL. CRIM. CODE § 17-10.5(a) when it knowingly caused false claims to be made, used and presented to private insurance companies or PBMs, false or fraudulent claims for payment for  drugs and vaccines to which it was not entitled.  Defendant knew that these claims for payment were false, fraudulent, or fictitious, or were deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

293.    Had the private insurance companies and PBMs known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant and Defendant's pharmacies.

294.    As a result of Defendant's violations of 740 ILCS 92/1 and ILL. CRIM. CODE § 17-10.5(a), the State of Illinois has been damaged.

295.    Mr. Baker is a private person with direct and independent knowledge of the allegations of the First Amended Complaint, who has brought this action pursuant to 740 ILCS § 92/15 on behalf of himself and the State of Illinois.

296.    This court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the Federal claim, and merely asserts separate damages to the State of Illinois under the Illinois Insurance Claims Fraud Prevention Act.

### PRAYER AS TO COUNT XVII

297.    WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF Illinois:

(1)    Three times the amount of actual damages which the State of Illinois has sustained as a result of Defendant's fraudulent and

illegal practices;

(2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant presented or caused to be presented to private insurance companies or pharmacy benefit managers;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To RELATOR:

(1)    A fair and reasonable amount allowed pursuant to 740 ILCS 92/25 and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Mr. Baker incurred in connection with this action;

(3)    An award of statutory attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT XVIII
## VIOLATIONS OF THE INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT
### IND. CODE ANN. § 5-11-5.5-1 *et seq.*

298.    Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

299.    This is a *qui tam* action brought by Marc D. Baker and the State of Indiana to recover treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, IND. CODE ANN. § 5-11-5.5-1 *et seq.*

300.    IND. CODE ANN. § 5-11-5.5-1 provides liability for any person who, *inter alia*, knowingly or intentionally:

(1)    presents a false claim to the state for payment or approval;

(2)     Makes or uses a false record or statement to obtain payment or approval of a false claim from the State;

\* \* \*

(7)     Conspires with another person to perform an act described in subdivisions (1) through (6); or

(8)     Causes or induces another person to perform an act described in subdivisions (1) through (6). . . .

301.     In addition, IND. CODE ANN. § 12-15-24-2(1)-(2) prohibits any person who furnishes items or services to an individual for which payment is or may be made under the Indiana Medicaid program from soliciting, offering, or receiving a kickback or bribe in connection with the furnishing of the items or services or the making or receipt of the payment or rebate of a fee or charge for referring the individual to another person for the furnishing of items or services.

302.     Defendant violated IND. CODE ANN. § 5-11-5.5-1 and knowingly caused false claims to be made, used and presented to the State of Indiana by its violations of Federal and State laws, including IND. CODE ANN. § 12-15-24-2(1)-(2), by submitting false or fraudulent claims for payment for drugs and vaccines to which it was not entitled. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

303.     Each claim presented or caused to be presented for reimbursement of the prescription drugs challenged herein represents a false or fraudulent claim for payment under the FCA.

304.     The State of Indiana, by and through the Indiana Medicaid program and other State health care programs, was unaware of Defendant's fraudulent and illegal

practices and paid the claims submitted by Defendant and Defendant's pharmacies in connection therewith.

305.    Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the State of Indiana.  Had the State of Indiana known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant and Defendant's pharmacies.

306.    As a result of Defendant's violations of IND. CODE ANN. § 5-11-5.5-1 and IND. CODE ANN. § 12-15-24-2(1)-(2) the State of Indiana has been damaged.

307.    Mr. Baker is a private person with direct and independent knowledge of the allegations of the First Amended Complaint, who has brought this action pursuant to IND. CODE ANN. § 5-11-5.5-4 on behalf of himself and the State of Indiana.

308.    This court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the Federal claim, and merely asserts separate damages to the State of Indiana in the operation of the Medicaid program.

## PRAYER AS TO COUNT XVIII

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF INDIANA:

(1)    Three times the amount of actual damages which the State of Indiana has sustained as a result of Defendant's fraudulent and illegal practices;

(2)    A civil penalty of at least $5,000 for each false claim which Defendant presented or caused to be presented to the State of Indiana;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To RELATOR:

(5)     A fair and reasonable amount allowed pursuant to IND. CODE ANN. § 5-11-5.5-6 and/or any other applicable provision of law;

(6)     Reimbursement for reasonable expenses which Mr. Baker incurred in connection with this action;

(7)     An award of statutory attorneys' fees and costs; and

(8)     Such further relief as this Court deems equitable and just.

## COUNT XIX
## VIOLATIONS OF THE IOWA FALSE CLAIMS ACT
### IOWA CODE ANN. § 685.2 *et seq.*

309.    Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

310.    This is a *qui tam* action brought by Marc D. Baker and the State of Iowa to recover treble damages and civil penalties under the Iowa False Claims Act, IOWA CODE ANN. § 685.2 *et seq.*

311.    IOWA CODE ANN. § 685.2 provides liability for any person who, *inter alia*:

(1)     Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.

(2)     Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

(3)     Conspires to commit a violation of…

312.    Defendant violated IOWA CODE ANN. § 685.2 and knowingly caused false claims to be made, used and presented to the State of Indiana by its violations of Federal and State laws by submitting false or fraudulent claims for payment for drugs and

vaccines to which it was not entitled.  Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

313.    Each claim presented or caused to be presented for reimbursement of the prescription drugs challenged herein represents a false or fraudulent claim for payment under the FCA.

314.    The State of Iowa, by and through the Iowa Medicaid program and other State health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant and Defendant's pharmacies in connection therewith.

315.    Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the State of Iowa.  Had the State of Iowa known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant and Defendant's pharmacies.

316.    As a result of Defendant's violations of IOWA CODE ANN. § 685.2 the State of Iowa has been damaged.

317.    Mr. Baker is a private person with direct and independent knowledge of the allegations of the First Amended Complaint, who has brought this action pursuant to IOWA CODE ANN. § 685.3(2) on behalf of himself and the State of Iowa.

318.    This court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the Federal claim, and merely asserts separate damages to the State of Iowa in the operation of the Medicaid program.

## PRAYER AS TO COUNT XIX

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF IOWA:

    (1)    Three times the amount of actual damages which the State of Iowa has sustained as a result of Defendant's fraudulent and illegal practices;

    (2)    Civil penalties against the Defendant, respectively, equal to not less than $5,000 and not more than $10,000, adjusted for inflation according to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, for each violation of 31 U.S.C. § 3729, as prescribed by IOWA CODE ANN. § 685.2(1);

    (3)    Prejudgment interest; and

    (4)    All costs incurred in bringing this action.

To RELATOR:

    (1)    A fair and reasonable amount allowed pursuant to IOWA CODE ANN. § 685.3(4) and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses which Mr. Baker incurred in connection with this action;

    (3)    An award of statutory attorneys' fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

## COUNT XX
## VIOLATIONS OF THE LOUISIANA MEDICAL ASSISTANCE PROGRAMS
## INTEGRITY LAW
## LA. REV. STAT. § 46:437.1 *et seq.*

319.    Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

320.    This is a *qui tam* action brought by Marc D. Baker and the State of Louisiana to recover treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law, LA. REV. STAT. § 46:437.1 *et seq.*

321.    LA. REV. STAT. § 46:437.3 provides *inter alia*:

(1)    No person shall knowingly present or cause to be presented a false or fraudulent claim;

(2)    No person shall knowingly engage in misrepresentation to obtain, or attempt to obtain, payment from medical assistance program funds;

(3)    No person shall conspire to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim. . . .

322.    In addition, LA. REV. STAT. ANN. § 438.2(A) prohibits the solicitation, receipt, offering or payment of any financial inducements, including kickbacks, bribes, rebates, etc., directly or indirectly, overtly or covertly, in cash or in kind, for furnishing health care goods or services paid for in whole or in part by the Louisiana medical assistance programs.

323.    Defendant violated LA. REV. STAT. § 46:437.3 and LA. REV. STAT. ANN. § 438.2(A) when it knowingly caused false claims to be made, used and presented to the State of Louisiana by its violations of Federal and State laws by submitting false or

fraudulent claims for payment for drugs and vaccines to which it was not entitled. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

324.    Each claim presented or caused to be presented for reimbursement of the prescription drugs challenged herein represents a false or fraudulent claim for payment under the FCA.

325.    The State of Louisiana, by and through the Louisiana Medicaid program and other State health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant and Defendant's pharmacies in connection therewith.

326.    Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the State of Louisiana.  Had the State of Louisiana known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant and Defendant's pharmacies.

327.    As a result of Defendant's violations of violated LA. REV. STAT. § 46:437.3 and LA. REV. STAT. ANN. § 438.2(A) the State of Louisiana has been damaged.

328.    Mr. Baker is a private person with direct and independent knowledge of the allegations of the First Amended Complaint, who has brought this action pursuant to LA. REV. STAT. § 46:439.1(A) on behalf of himself and the State of Louisiana.

329.    This court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the Federal claim, and merely

135

asserts separate damages to the State of Louisiana in the operation of the Medicaid program.

### **PRAYER AS TO COUNT XX**

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF LOUISIANA:

(1)     Three times the amount of actual damages which the State of Louisiana has sustained as a result of Defendant's fraudulent and illegal practices;

(2)     A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Louisiana;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To RELATOR:

(1)     A fair and reasonable amount allowed pursuant to La. Rev. Stat. § 439.4(A) and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Mr. Baker incurred in connection with this action;

(3)     An award of statutory attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT XXI
## VIOLATIONS OF THE MARYLAND FALSE HEALTH CLAIMS ACT
### MD. HEALTH-GEN. CODE ANN. § 2-601 *et seq.*

330.    Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

331.    This is a *qui tam* action brought by Marc D. Baker and the State of Maryland to recover treble damages and civil penalties under the Maryland False Health Claims Act, MD. HEALTH-GEN. CODE ANN. § 2-601 *et seq.*

332.    MD. HEALTH-GEN. CODE ANN. § 2-602 provides that a person may not, *inter alia*:

> (1)    Knowingly present or cause to be presented a false or fraudulent claim for payment or approval;
>
> (2)    Knowingly make, use, or cause to be made or used a false record or statement material to a false or fraudulent claim;
>
> (3)    Conspire to commit a violation under this subtitle;
> (4)    Knowingly make any other false or fraudulent claim against a State health plan or a State health program.

333.    Defendant violated MD. HEALTH-GEN. CODE ANN. § 2-602 when it knowingly caused false claims to be made, used and presented to the State of Louisiana by its violations of Federal and State laws by submitting false or fraudulent claims for payment for drugs and vaccines to which it was not entitled.  Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

334.    Each claim presented or caused to be presented for reimbursement of the prescription drugs challenged herein represents a false or fraudulent claim for payment under the FCA.

335.    The State of Maryland, by and through the Maryland Medicaid program and other State health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant and Defendant's pharmacies in connection therewith.

336.    Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the State of Maryland.  Had the State of Maryland known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant and Defendant's pharmacies.

337.    As a result of Defendant's violations of violated MD. HEALTH-GEN. CODE ANN. § 2-602 the State of Maryland has been damaged.

338.    Mr. Baker is a private person with direct and independent knowledge of the allegations of the First Amended Complaint, who has brought this action pursuant to MD. HEALTH-GEN. CODE ANN. § 2-604(a) on behalf of himself and the State of Maryland.

339.    This court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the Federal claim, and merely asserts separate damages to the State of Maryland in the operation of the Medicaid program.

## PRAYER AS TO COUNT XXI

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF MARYLAND:

(1) Three times the amount of actual damages which the State of Maryland has sustained as a result of Defendant's fraudulent and illegal practices;

(2) A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Maryland;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR:

(1) A fair and reasonable amount allowed pursuant to MD. HEALTH-GEN. CODE ANN. § 2-605 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Mr. Baker incurred in connection with this action;

(3) An award of statutory attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XXII
## VIOLATIONS OF THE MASSACHUSETTS FALSE CLAIMS ACT
### MASS. GEN. LAWS ANN. ch. 12 § 5A *et seq.*

340.    Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

139

341.   This is a *qui tam* action brought by Marc D. Baker and the State of Massachusetts to recover treble damages and civil penalties under the Massachusetts False Claims Law, MASS. GEN. LAWS ANN. ch. 12 § 5A *et seq.*

342.   MASS. GEN. LAWS ANN. ch. 12 § 5B provides liability for any person who:

(1)   Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2)   Knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth or any political subdivision thereof;

(3)   Conspires to defraud the commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim;

(4)   Is a beneficiary of an inadvertent submission of a false claim to the commonwealth or political subdivision thereof, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the commonwealth or political subdivision within a reasonable time after discovery of the false claim.

343.   In addition, MASS. GEN. LAWS ANN. ch. 118E, § 41 prohibits the solicitation, receipt or offering of any remuneration, including any bribe or rebate, directly or indirectly, overtly or covertly, in case or in kind in return for furnishing any good, service or item for which payment may be made in whole or in part under the Massachusetts Medicaid Program.

344.   Defendant violated MASS. GEN. LAWS ANN. ch. 12 § 5B § 2-602 and MASS. GEN. LAWS ANN. ch. 118E, § 41 when it knowingly caused false claims to be made, used and presented to the State of Massachusetts by its violations of Federal and State laws by submitting false or fraudulent claims for payment for drugs and vaccines to which it was not entitled.   Defendant knew that these claims for payment were false,

fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

345. Each claim presented or caused to be presented for reimbursement of the prescription drugs challenged herein represents a false or fraudulent claim for payment under the FCA.

346. The State of Massachusetts, by and through the Massachusetts Medicaid program and other State health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant and Defendant's pharmacies in connection therewith.

347. Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the State of Massachusetts. Had the State of Massachusetts known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant and Defendant's pharmacies.

348. As a result of Defendant's violations of MASS. GEN. LAWS ANN. ch. 12 § 5B the State of Massachusetts has been damaged.

349. Mr. Baker is a private person with direct and independent knowledge of the allegations of the First Amended Complaint, who has brought this action pursuant to MASS. GEN. LAWS ANN. ch. 12 § 5C(2) on behalf of himself and the State of Massachusetts.

350. This court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the Federal claim, and merely

asserts separate damages to the State of Massachusetts in the operation of the Medicaid program.

## PRAYER AS TO COUNT XXII

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF MASSACHUSETTS:

(1)   Three times the amount of actual damages which the State of Massachusetts has sustained as a result of Defendant's fraudulent and illegal practices;

(2)   A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Massachusetts;

(3)   Prejudgment interest; and

(4)   All costs incurred in bringing this action.

To RELATOR:

(1)   A fair and reasonable amount allowed pursuant to MASS. GEN. LAWS ANN. ch. 12 § 5F and/or any other applicable provision of law;

(2)   Reimbursement for reasonable expenses which Mr. Baker incurred in connection with this action;

(3)   An award of statutory attorneys' fees and costs; and

(4)   Such further relief as this Court deems equitable and just.

## COUNT XXIII
## VIOLATIONS OF THE MICHIGAN MEDICAID FALSE CLAIMS ACT
### MICH. COMP. LAWS § 400.601 *et seq.*

351.   Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

352.   This is a *qui tam* action brought by Marc D. Baker and the State of Michigan to recover treble damages and civil penalties under the Michigan Medicaid False Claims Act, MICH. COMP. LAW § 400.601 *et seq.*

353.   MICH. COMP. LAW § 400.603 states:

    (1)   A person shall not knowingly make or cause to be made a false statement or false representation of a material fact in an application for Medicaid benefits.

    (2)   A person shall not knowingly make or cause to be made a false statement or false representation of a material fact for use in determining rights to a Medicaid benefit.

    (3)   A person, who having knowledge of the occurrence of an event affecting his initial or continued right to receive a Medicaid benefit or the initial or continued right of any other person on whose behalf he has applied for or is receiving a benefit, shall not conceal or fail to disclose that event with intent to obtain a benefit to which the person or any other person is not entitled or in an amount greater than that to which the person or any other person is entitled.

354.   MICH. COMP. LAWS § 400.606 states:

    (1)   A person shall not enter into an agreement, combination, or conspiracy to defraud the state by obtaining or aiding another to obtain the payment or allowance of a false claim under the social welfare act, Act No. 280 of the Public Acts of 1939, as amended, being sections 400.1 to 400.121 of the Michigan Compiled Laws.

355.   MICH. COMP. LAWS § 400.607 states:

    (1)   A person shall not make or present or cause to be made or

presented to an employee or officer of this state a claim under the social welfare act, 1939 PA 280, MCL 400.1 to 400.119b, upon or against the state, knowing the claim to be false.

356.   In addition, MICH. COMP. LAW § 400.604 prohibits a person from soliciting, offering, or receiving a kickback, bribe, etc., in connection with the furnishing of goods or services for which payment is or may be made under the Michigan Medicaid Program.

357.   Defendant violated MICH. COMP. LAW § 400.603, MICH. COMP. LAW § 400.604, MICH. COMP. LAW § 400.606, and MICH. COMP. LAW § 400.607 when it knowingly caused false claims to be made, used and presented to the State of Massachusetts by its violations of Federal and State laws by submitting false or fraudulent claims for payment for drugs and vaccines to which it was not entitled. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

358.   Each claim presented or caused to be presented for reimbursement of the prescription drugs challenged herein represents a false or fraudulent claim for payment under the FCA.

359.   The State of Michigan, by and through the Michigan Medicaid program and other State health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant and Defendant's pharmacies in connection therewith.

360.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the State of

Michigan. Had the State of Michigan known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant and Defendant's pharmacies.

361.   As a result of Defendant's violations of MICH. COMP. LAW §§ 400.603, 400.604, 400.606, and 400.607 the State of Michigan has been damaged.

362.   Mr. Baker is a private person with direct and independent knowledge of the allegations of the First Amended Complaint, who has brought this action pursuant to MICH. COMP. LAW § 400.610a on behalf of himself and the State of Michigan.

363.   This court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the Federal claim, and merely asserts separate damages to the State of Michigan in the operation of the Medicaid program.

## PRAYER AS TO COUNT XXIII

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF MICHIGAN:

(1)   Three times the amount of actual damages which the State of Michigan has sustained as a result of Defendant's fraudulent and illegal practices;

(2)   A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Michigan;

(3)   Prejudgment interest; and

(4)   All costs incurred in bringing this action.

To RELATOR:

(1)    A fair and reasonable amount allowed pursuant to MICH. COMP. LAW § 400.610a and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Mr. Baker incurred in connection with this action;

(3)    An award of statutory attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT XXIV
## VIOLATIONS OF THE MINNESOTA FALSE CLAIMS ACT
### MINN. STAT. § 15C.01 *et seq.*

364.    Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

365.    This is a *qui tam* action brought by Marc D. Baker and the State of Minnesota to recover treble damages and civil penalties under the Minnesota False Claims Act, MINN. STAT. § 15C.01 *et seq.*

366.    MINN. STAT. § 15C.02 creates liability for any person who, *inter alia*:

(1)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2)    knowingly makes or uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(3)    knowingly conspires to commit a violation of [this section] . . .

367.    Defendant violated MINN. STAT. § 15C.02 when it knowingly caused false claims to be made, used and presented to the State of Minnesota by its violations of Federal and State laws by submitting false or fraudulent claims for payment for drugs and vaccines to which it was not entitled.  Defendant knew that these claims for payment

were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

368.    Each claim presented or caused to be presented for reimbursement of the prescription drugs challenged herein represents a false or fraudulent claim for payment under the FCA.

369.    The State of Minnesota, by and through the Minnesota Medicaid program and other State health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant and Defendant's pharmacies in connection therewith.

370.    Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the State of Minnesota.  Had the State of Minnesota known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant and Defendant's pharmacies.

371.    As a result of Defendant's violations of MINN. STAT. § 15C.02 the State of Minnesota has been damaged.

372.    Mr. Baker is a private person with direct and independent knowledge of the allegations of the First Amended Complaint, who has brought this action pursuant to MINN. STAT. § 15C.05 on behalf of himself and the State of Minnesota.

373.    This court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the Federal claim, and merely asserts separate damages to the State of Minnesota in the operation of the Medicaid program.

<u>**PRAYER AS TO COUNT XXIV**</u>

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF MINNESOTA:

(1)    Three times the amount of actual damages which the State of Minnesota has sustained as a result of each Defendant's fraudulent and illegal practices;

(2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Minnesota;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To RELATOR:

(1)    A fair and reasonable amount allowed pursuant to MINN. STAT. § 15C.05 and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Mr. Baker incurred in connection with this action;

(3)    An award of statutory attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

<u>**COUNT XXV**</u>
**VIOLATIONS OF THE MONTANA FALSE CLAIMS ACT**
**MONT. CODE. ANN. § 17-8-401 *et seq.***

374.    Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

375.     This is a *qui tam* action brought by Marc D. Baker and the State of Montana to recover treble damages and civil penalties under the Montana False Claims Act, MONT. CODE. ANN. § 17-8-401 *et seq.*

376.     MONT. CODE ANN. § 17-8-403(1) creates liability for any person who, *inter alia*:

>    (1)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
>    (2)     knowingly makes or uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
>    (3)     conspires to commit a violation of this subsection (1)
>
>    (4)     knowingly makes or uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to a governmental entity or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to a governmental entity

377.     In addition, MONT. CODE. ANN. § 45-6-313 prohibits a person from obtaining a Medicaid payment or benefit for the person or another person by purposefully or knowingly soliciting, accepting, offering, or providing any remuneration, including but not limited to a kickback, bribe, or rebate, other than an amount legally payable under the medical assistance program, for furnishing services or items for which payment may be made under the Medicaid program or in return for purchasing, leasing, ordering, arranging for, or recommending the purchasing, leasing, or ordering of any services or items from a provider for which payment may be made under the Medicaid program; or makes, offers, or accepts a remuneration, a rebate of a fee, or a charge for referring a recipient to another provider for the furnishing of services or items for which payment may be made under the Medicaid program.

378.   Defendant violated MONT. CODE ANN. § 17-8-403(1) and MONT. CODE. ANN. § 45-6-313 when it knowingly caused false claims to be made, used and presented to the State of Minnesota by its violations of Federal and State laws by submitting false or fraudulent claims for payment for drugs and vaccines to which it was not entitled. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

379.   Each claim presented or caused to be presented for reimbursement of the prescription drugs challenged herein represents a false or fraudulent claim for payment under the FCA.

380.   The State of Montana, by and through the Montana Medicaid program and other State health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant and Defendant's pharmacies in connection therewith.

381.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the State of Montana.  Had the State of Montana known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant and Defendant's pharmacies.

382.   As a result of Defendant's violations of MONT. CODE ANN. § 17-8-403(1) and MONT. CODE. ANN. § 45-6-313 the State of Montana has been damaged.

383.   Mr. Baker is a private person with direct and independent knowledge of the allegations of the First Amended Complaint, who has brought this action pursuant to MONT. CODE ANN. § 17-8-406 on behalf of himself and the State of Montana.

384.    This court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the Federal claim, and merely asserts separate damages to the State of Montana in the operation of the Medicaid program.

## PRAYER AS TO COUNT XXV

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF MONTANA:

(1)    Three times the amount of actual damages which the State of Montana has sustained as a result of Defendant's fraudulent and illegal practices;

(2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Montana;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To RELATOR:

(1)    A fair and reasonable amount allowed pursuant to MONT. CODE ANN. § 17-8-410 and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Mr. Baker incurred in connection with this action;

(3)    An award of statutory attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT XXVI
### VIOLATIONS OF THE NEVADA FALSE CLAIMS ACT
NEV. REV. STAT. ANN. § 357.010 *et seq.*
*as amended by* 2013 Nev. Laws Ch. 245 (S.B. 437) effective July 1, 2013

385.    Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

386.    This is a *qui tam* action brought by Marc D. Baker and the State of Nevada to recover treble damages and civil penalties under the Nevada False Claims Act, NEV. REV. STAT. ANN. § 357.010 *et seq.*

387.    NEV. REV. STAT. ANN. § 357.040 provides liability for any person who, *inter alia*:

> (1)    Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.
>
> (2)    Knowingly makes or uses, or causes to be made or used, a false record or statement that is material to a false or fraudulent claim;
>
> (3)    Knowingly makes or uses, or causes to be made or used, a false record or statement that is material to an obligation to pay or transmit money or property to the state or a political subdivision
>
> (4)    Conspires to commit any acts set forth in this subsection

388.    In addition, NEV. REV. STAT. ANN. § 422.560 prohibits any person from selling or leasing to or for use of a provider goods, services, materials, or supplies for which payment may be made under the Nevada Medicaid program, and offer, transfer, or pay anything of value in return for or in connection with the purchase or lease.

389.    Defendant violated NEV. REV. STAT. ANN. § 357.040 and NEV. REV. STAT. ANN. § 422.560 when it knowingly caused false claims to be made, used and presented to

the State of Nevada by its violations of Federal and State laws by submitting false or fraudulent claims for payment for drugs and vaccines to which it was not entitled. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

390.    Each claim presented or caused to be presented for reimbursement of the prescription drugs challenged herein represents a false or fraudulent claim for payment under the FCA.

391.    The State of Nevada, by and through the Nevada Medicaid program and other State health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant and Defendant's pharmacies in connection therewith.

392.    Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the State of Nevada.  Had the State of Nevada known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant and Defendant's pharmacies.

393.    As a result of Defendant's violations of NEV. REV. STAT. ANN. § 357.040 and NEV. REV. STAT. ANN. § 422.560 the State of Nevada has been damaged.

394.    Mr. Baker is a private person with direct and independent knowledge of the allegations of the First Amended Complaint, who has brought this action pursuant to NEV. REV. STAT. ANN. § 357.080 on behalf of himself and the State of Nevada.

395.    This court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the Federal claim, and merely

asserts separate damages to the State of Nevada in the operation of the Medicaid program.

<u>**PRAYER AS TO COUNT XXVI**</u>

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF NEVADA:

(1)    Three times the amount of actual damages which the State of Nevada has sustained as a result of Defendant's fraudulent and illegal practices;

(2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Nevada;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To RELATOR:

(1)    A fair and reasonable amount allowed pursuant to NEV. REV. STAT. ANN. § 357.180 and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Mr. Baker incurred in connection with this action;

(3)    An award of statutory attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT XXVII
## VIOLATIONS OF THE NEW HAMPSHIRE FALSE CLAIMS ACT
### N.H. REV. STAT. ANN. § 167:61 *et seq.*

396.     Relator restates and realleges the allegations contained in the preceding paragraphs as if were stated herein in their entirety and said allegations are incorporated herein by reference.

397.     This is a *qui tam* action brought by Marc D. Baker and the State of New Hampshire to recover treble damages and civil penalties under the New Hampshire False Claims Act, N.H. REV. STAT. ANN. § 167:61 *et seq.*

398.     N.H. REV. STAT. ANN. § 167:61-a(1) states no person shall:

(1)     Knowingly make, present or cause to be made or presented, with intent to defraud, any false or fraudulent claim for payment for any good, service, or accommodation for which payment may be made in whole or in part under RSA 161 or RSA 167;

(2)     Knowingly make, present, or cause to be made or presented, with intent to defraud, any false or fraudulent statement or representation for use in determining rights to benefits or payments which may be made in whole or in part under RSA 161 or RSA 167;

(3)     Knowingly make, present, or cause to be made or presented, with intent to defraud, any false or fraudulent report or filing which is or may be used in computing or determining a rate of payment for goods, services, or accommodations for which payment may be made in whole or in part under RSA 161 or RSA 167; or make, present, or cause to be made or presented any false or fraudulent statement or representation in connection with any such report or filing;

(4)     Knowingly make, present, or cause to be made or presented, with intent to defraud, any claim for payment, for any good, service, or accommodation for which payment may be made in whole or in part under RSA 161 or RSA 167, which is not medically necessary in accordance with professionally recognized standards.

(5)     Knowingly solicit or receive any remuneration, including any bribe or rebate, directly, or indirectly, overtly or covertly, in cash or in

155

kind, in return for purchasing, leasing, ordering, or arranging for or recommending the purchase, lease, or ordering of any good, service, accommodation or facility for which payment may be made in whole or in part under RSA 161 or RSA 167, or knowingly offering to pay any remuneration, including any bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind, to induce a person to purchase, lease, order, or arrange for recommend the purchase, lease, or ordering of any good, service, accommodation of facility for which payment may be made in whole or in part under RSA 161 or RSA 167 . . .

399.    Defendant violated N.H. Rev. Stat. Ann. § 167:61-a(1) when it knowingly caused false claims to be made, used and presented to the State of New Hampshire by its violations of Federal and State laws by submitting false or fraudulent claims for payment for drugs and vaccines to which it was not entitled. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

400.    Each claim presented or caused to be presented for reimbursement of the prescription drugs challenged herein represents a false or fraudulent claim for payment under the FCA.

401.    The State of New Hampshire, by and through the New Hampshire Medicaid program and other State health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant and Defendant's pharmacies in connection therewith.

402.    Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the State of New Hampshire. Had the State of New Hampshire known that Defendant violated the

laws cited herein, it would not have paid the claims submitted by Defendant and Defendant's pharmacies.

403.    As a result of Defendant's violations of N.H. Rev. Stat. Ann. § 167:61-a(1) the State of New Hampshire has been damaged.

404.    Mr. Baker is a private person with direct and independent knowledge of the allegations of the First Amended Complaint, who has brought this action pursuant to N.H. Rev. Stat. Ann. § 167:61-c on behalf of himself and the State of New Hampshire.

405.    This court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the Federal claim, and merely asserts separate damages to the State of New Hampshire in the operation of the Medicaid program.

<u>**PRAYER AS TO COUNT XXVII**</u>

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF NEW HAMPSHIRE:

  (1)    Three times the amount of actual damages which the State of New Hampshire has sustained as a result of Defendant's fraudulent and illegal practices;

  (2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of New Hampshire;

  (3)    Prejudgment interest; and

  (4)    All costs incurred in bringing this action.

To RELATOR:

  (1)    A fair and reasonable amount allowed pursuant to N.H. Rev. Stat. Ann. § 167:61-e and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Mr. Baker incurred in connection with this action;

(3)     An award of statutory attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT XXVIII
### VIOLATIONS OF THE NEW JERSEY FALSE CLAIMS ACT
### N.J. Stat. Ann. §§ 2A:32C-1 *et seq.*

406.    Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

407.    This is a *qui tam* action brought by Marc D. Baker and the State of New Jersey to recover treble damages and civil penalties under the New Jersey False Claims Act, N.J. Stat. Ann. § 2A:32C-1 *et seq.*

408.    N.J. Stat. Ann. § 2A:32C-3 states no person shall:

(1)     Knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval;

(2)     Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State;

(3)     Conspires to defraud the State by getting a false or fraudulent claim allowed or paid by the State.

409.    In addition, N.J. Stat. Ann. § 30:4D-17(c) prohibits any person from soliciting, offering, or receiving any kickback, rebate, or bribe in connection with any items or services for which payment is made under the New Jersey Medicaid program.

410.   Defendant violated N.J. STAT. ANN. § 2A:32C-3 and § 30:4D-17(c) when it knowingly caused false claims to be made, used and presented to the State of New Jersey by its violations of Federal and State laws by submitting false or fraudulent claims for payment for drugs and vaccines to which it was not entitled.  Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

411.   Each claim presented or caused to be presented for reimbursement of the prescription drugs challenged herein represents a false or fraudulent claim for payment under the FCA.

412.   The State of New Jersey, by and through the New Jersey Medicaid program and other State health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant and Defendant's pharmacies in connection therewith.

413.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the State of New Jersey.  Had the State of New Jersey known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant and Defendant's pharmacies.

414.   As a result of Defendant's violations of N.J. STAT. ANN. § 2A:32C-3 and § 30:4D-17(c) the State of New Jersey has been damaged.

415.    Mr. Baker is a private person with direct and independent knowledge of the allegations of the First Amended Complaint, who has brought this action pursuant to N.J. STAT. ANN. § 2A:32C-5 on behalf of himself and the State of New Jersey.

416.    This court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the Federal claim, and merely asserts separate damages to the State of New Jersey in the operation of the Medicaid program.

## PRAYER AS TO COUNT XXVIII

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF NEW JERSEY:

(1)     Three times the amount of actual damages which the State of New Jersey has sustained as a result of Defendant's fraudulent and illegal practices;

(2)     A civil penalty of not less than $5,000 and not more than $10,000, adjusted for inflation according to N.J. STAT. ANN. § 2A:32C-3, for each false claim which Defendant caused to be presented to the State of New Jersey;

(3)     Prejudgment interest; and

(4)     All costs incurred in bringing this action.

To RELATOR:

(1)     A fair and reasonable amount allowed pursuant to N.J. STAT. ANN. § 2A:32C-7 and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Mr. Baker incurred in connection with this action;

(3)     An award of statutory attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT XXIX
## VIOLATIONS OF THE NEW MEXICO MEDICAID FALSE CLAIMS ACT
### N.M. STAT. ANN. §§ 27-14-1 *et seq.*

417.    Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

418.    This is a *qui tam* action brought by Marc D. Baker and the State of New Mexico to recover treble damages and civil penalties under the New Mexico Medicaid False Claims Act, N.M. STAT. ANN. § 27-14-1 *et seq.*

419.    N.M. STAT. ANN. § 27-14-4 provides liability for any person who, *inter alia*:

      (1)    Presents, or causes to be presented, to the state a claim for payment under the Medicaid program knowing that such claim is false or fraudulent;

      (2)    Makes, uses or causes to be made or used a record or statement to obtain a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false;

      (3)    Conspires to defraud the state by getting a claim allowed or paid under the Medicaid program knowing that such claim is false or fraudulent.

420.    N.M. STAT. ANN. § 44-9-3 makes it illegal to, *inter alia*:

      (1)    Knowingly present, or cause to be presented, to an employee, officer or agent of the state or to a contractor, grantee or other recipient of state funds a false or fraudulent claim for payment or approval;

      (2)    Knowingly make or use, or cause to be made or used, a false, misleading or fraudulent record or statement to obtain or support the approval of or the payment on a false or fraudulent claim;

      (3)    Conspire to defraud the state by obtaining approval or payment on a false or fraudulent claim;

(4)    Conspire to make, use or cause to be made or used, a false, misleading or fraudulent record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state;

(5)    As a beneficiary of an inadvertent submission of a false claim and having subsequently discovered the falsity of the claim, fail to disclose the false claim to the state within a reasonable time after discovery.

421.    In addition, N.M. STAT. ANN. § 30-41-1 prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the New Mexico Medicaid program.

422.    Defendant violated N.M. STAT. ANN. § 27-14-4, § 44-9-3 and § 30-41-1 when it knowingly caused false claims to be made, used and presented to the State of New Mexico by its violations of Federal and State laws by submitting false or fraudulent claims for payment for drugs and vaccines to which it was not entitled.  Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

423.    Each claim presented or caused to be presented for reimbursement of the prescription drugs challenged herein represents a false or fraudulent claim for payment under the FCA.

424.    The State of New Mexico, by and through the New Mexico Medicaid program and other State health care programs, was unaware of Defendant's fraudulent

and illegal practices and paid the claims submitted by Defendant and Defendant's pharmacies in connection therewith.

425.     Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the State of New Mexico.  Had the State of New Mexico known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant and Defendant's pharmacies.

426.     As a result of Defendant's violations of N.M. STAT. ANN. § 27-14-4, § 44-9-3, and § 30-41-1 the State of New Mexico has been damaged.

427.     Mr. Baker is a private person with direct and independent knowledge of the allegations of the First Amended Complaint, who has brought this action pursuant to N.M. STAT. ANN. § 27-14-7 and § 44-9-5 on behalf of himself and the State of New Mexico.

428.     This court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the Federal claim, and merely asserts separate damages to the State of New Mexico in the operation of the Medicaid program.

## PRAYER AS TO COUNT XXIX

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF NEW MEXICO:

(1)     Three times the amount of actual damages which the State of New Jersey has sustained as a result of each Defendant's fraudulent and illegal practices;

(2) A civil penalty of not less than $5,000 and not more than $10,000, for false claim which Defendant caused to be presented to the State of New Mexico;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR:

(1) A fair and reasonable amount allowed pursuant to N.M. STAT. ANN. § 27-14-9, 44-9-7 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Mr. Baker incurred in connection with this action;

(3) An award of statutory attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XXX
## VIOLATIONS OF THE NEW YORK FALSE CLAIMS ACT
### N.Y. STATE FIN. §§ 187 *et seq.*

429. Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

430. This is a *qui tam* action brought by Marc D. Baker and the State of New York to recover treble damages and civil penalties under the New York False Claims Act, N.Y. STATE FIN. § 187 *et seq.*

431. N.Y. STATE FIN. § 189 provides liability for any person who, *inter alia*:

(1) Knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(3) Conspires to commit a violation of . . . this subdivision . . .

432.   Defendant violated N.Y. STATE FIN. § 189 when it knowingly caused false claims to be made, used and presented to the State of New York by its violations of Federal and State laws by submitting false or fraudulent claims for payment for drugs and vaccines to which it was not entitled.   Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

433.   Each claim presented or caused to be presented for reimbursement of the prescription drugs challenged herein represents a false or fraudulent claim for payment under the FCA.

434.   The State of New York, by and through the New York Medicaid program and other State health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant and Defendant's pharmacies in connection therewith.

435.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the State of New York.   Had the State of New York known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant and Defendant's pharmacies.

436.   As a result of Defendant's violations of N.Y. STATE FIN. § 189 the State of New York has been damaged.

437.   Mr. Baker is a private person with direct and independent knowledge of the allegations of the First Amended Complaint, who has brought this action pursuant to N.Y. STATE FIN. § 190(2) on behalf of himself and the State of New York.

438.    This court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the Federal claim, and merely asserts separate damages to the State of New York in the operation of the Medicaid program.

## PRAYER AS TO COUNT XXX

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF NEW YORK:

(1)    Three times the amount of actual damages which the State of New York has sustained as a result of Defendant's fraudulent and illegal practices;

(2)    A civil penalty of not less than $6,000 and not more than $12,000, for each false claim which Defendant caused to be presented to the State of New York;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To RELATOR:

(1)    A fair and reasonable amount allowed pursuant to N.Y. STATE FIN. § 190 and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Mr. Baker incurred in connection with this action;

(3)    An award of statutory attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT XXXI
### VIOLATIONS OF THE NORTH CAROLINA FALSE CLAIMS ACT
### N.C. GEN. STAT. §§ 1-605 *et seq.*

439.     Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

440.     This is a *qui tam* action brought by Marc D. Baker and the State of North Carolina to recover treble damages and civil penalties under the North Carolina False Claims Act, N.C. GEN. STAT. § 1-605 *et seq.*

441.     N.C. GEN. STAT. § 1-607 provides liability for any person who, *inter alia*:

(1)     Knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval.

(2)     Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

(3)     Conspires to commit a violation of . . . this section.

442.     Defendant violated N.C. GEN. STAT. § 1-607 when it knowingly caused false claims to be made, used and presented to the State of North Carolina by its violations of Federal and State laws by submitting false or fraudulent claims for payment for drugs and vaccines to which it was not entitled.  Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

443.     Each claim presented or caused to be presented for reimbursement of the prescription drugs challenged herein represents a false or fraudulent claim for payment under the FCA.

444.    The State of North Carolina, by and through the North Carolina Medicaid program and other State health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant and Defendant's pharmacies in connection therewith.

445.    Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the State of North Carolina.  Had the State of North Carolina known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant and Defendant's pharmacies.

446.    As a result of Defendant's violations of N.C. GEN. STAT. § 1-607 the State of North Carolina has been damaged.

447.    Mr. Baker is a private person with direct and independent knowledge of the allegations of the First Amended Complaint, who has brought this action pursuant to N.C. GEN. STAT. § 1-608(b) on behalf of himself and the State of North Carolina.

448.    This court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the Federal claim, and merely asserts separate damages to the State of North Carolina in the operation of the Medicaid program.

## PRAYER AS TO COUNT XXXI

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF NORTH CAROLINA:

(1)    Three times the amount of actual damages which the State of North Carolina has sustained as a result of Defendant's fraudulent

168

and illegal practices;

(2) A civil penalty of not less than $5,500 and not more than $11,000, for each false claim which Defendant caused to be presented to the State of North Carolina;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR:

(1) A fair and reasonable amount allowed pursuant to N.C. GEN. STAT. § 1-610 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Mr. Baker incurred in connection with this action;

(3) An award of statutory attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT XXXII
## VIOLATIONS OF THE OKLAHOMA MEDICAID FALSE CLAIMS ACT
### 63 OKL. ST. ANN. § 5053 *et seq.*

449.    Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

450.    This is a *qui tam* action brought by Marc D. Baker and the State of Oklahoma to recover treble damages and civil penalties under the Oklahoma False Claims Act, 63 OKL. ST. ANN. § 5053 *et seq.*

451.    63 OKL. ST. ANN. § 5053.1 provides liability for any person who, *inter alia*:

(1) Knowingly presents, or causes to be presented, to an officer or employee of the State of Oklahoma, a false or fraudulent claim for payment or approval;

169

(2)   Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state;

(3)   Conspires to defraud the state by getting a false or fraudulent claim allowed or paid;

452.   The Oklahoma Medicaid Program Integrity Act, 56 OKL. STAT. ANN. §

1005 makes it unlawful to willfully and knowingly, *inter alia*:

(1)   Make or cause to be made a claim, knowing the claim to be false, in whole or in part, by commission or omission;

(2)   Make or cause to be made a statement or representation for use in obtaining or seeking to obtain authorization to provide a good or a service knowing the statement or representation to be false, in whole or in part, by commission or omission;

(3)   Make or cause to be made a statement or representation for use by another in obtaining a good or a service under the Oklahoma Medicaid Program, knowing the statement or representation to be false, in whole or in part, by commission or omission;

(4)   Make or cause to be made a statement or representation for use in qualifying as a provider of a good or a service under the Oklahoma Medicaid Program, knowing the statement or representation to be false, in whole or in part, by commission or omission;

(5)   Charge any recipient or person acting on behalf of a recipient, money or other consideration in addition to or in excess of rates of remuneration established under the Oklahoma Medicaid Program;

(6)   Solicit or accept a benefit, pecuniary benefit, or kickback in connection with goods or services paid or claimed by a provider to be payable by the Oklahoma Medicaid Program; or

(7)   Having submitted a claim for or received payment for a good or a service under the Oklahoma Medicaid Program, fail to maintain or destroy such records as required by law or the rules of the Oklahoma Health Care Authority for a period of at least six (6) years following the date on which payment was received.

453.   Defendant violated 63 OKL. STAT. ANN. § 5053.1 and 56 OKL. STAT. ANN.

§ 1005 when it knowingly caused false claims to be made, used and presented to the State

of Oklahoma by its violations of Federal and State laws by submitting false or fraudulent claims for payment for drugs and vaccines to which it was not entitled.  Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

454.    Each claim presented or caused to be presented for reimbursement of the prescription drugs challenged herein represents a false or fraudulent claim for payment under the FCA.

455.    The State of Oklahoma, by and through the Oklahoma Medicaid program and other State health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant and Defendant's pharmacies in connection therewith.

456.    Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the State of Oklahoma.  Had the State of Oklahoma known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant and Defendant's pharmacies.

457.    As a result of Defendant's violations of 63 OKL. STAT. ANN. § 5053.1 and 56 OKL. STAT. ANN. § 1005 the State of Oklahoma has been damaged.

458.    Mr. Baker is a private person with direct and independent knowledge of the allegations of the First Amended Complaint, who has brought this action pursuant to 63 OKL. STAT. ANN. § 5053.2 on behalf of himself and the State of Oklahoma.

459.    This court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the Federal claim, and merely asserts separate damages to the State of Oklahoma in the operation of the Medicaid program.

## PRAYER AS TO COUNT XXXII

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF OKLAHOMA:

(1)    Three times the amount of actual damages which the State of Oklahoma has sustained as a result of  Defendant's fraudulent and illegal practices;

(2)    A civil penalty of not less than $5,000 and not more than $10,000, for each false claim which Defendant caused to be presented to the State of Oklahoma;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To RELATOR:

(1)    A fair and reasonable amount allowed pursuant to 63 OKL. STAT. ANN. § 5053.4 and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Mr. Baker incurred in connection with this action;

(3)    An award of statutory attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

<u>COUNT XXXIII</u>
**VIOLATIONS OF THE RHODE ISLAND STATE FALSE CLAIMS ACT**
**R.I. GEN. LAWS § 9-1.1-1 *et seq.***

460.    Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

461.    This is a *qui tam* action brought by Marc D. Baker and the State of Rhode Island to recover treble damages and civil penalties under the Rhode Island State False Claims Act, R.I. GEN. LAWS § 9-1.1-1 *et seq.*

462.    R.I. GEN. LAW § 9-1.1-3 provides liability for any person who, *inter alia*:

(1)    Knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;

(2)    Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(3)    Conspires to commit a violation of [this section] . . .

463.    Defendant violated R.I. GEN. LAW § 9-1.1-3 when it knowingly caused false claims to be made, used and presented to the State of Rhode Island by its violations of Federal and State laws by submitting false or fraudulent claims for payment for drugs and vaccines to which it was not entitled.  Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

464.    Each claim presented or caused to be presented for reimbursement of the prescription drugs challenged herein represents a false or fraudulent claim for payment under the FCA.

465.    The State of Rhode Island, by and through the Rhode Island Medicaid program and other State health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant and Defendant's pharmacies in connection therewith.

466.    Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the State of Rhode Island.  Had the State of Rhode Island known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant and Defendant's pharmacies.

467.    As a result of Defendant's violations of R.I. GEN. LAW § 9-1.1-3 the State of Rhode Island has been damaged.

468.    Mr. Baker is a private person with direct and independent knowledge of the allegations of the First Amended Complaint, who has brought this action pursuant to R.I. GEN. LAW § 9-1.1-4(b)  on behalf of himself and the State of Rhode Island.

469.    This court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the Federal claim, and merely asserts separate damages to the State of Rhode Island in the operation of the Medicaid program.

## PRAYER AS TO COUNT XXXIII

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF RHODE ISLAND:

(1)    Three times the amount of actual damages which the State of Rhode Island has sustained as a result of Defendant's fraudulent

and illegal practices;

    (2)    A civil penalty of not less than $5,500 and not more than $11,000, for each false claim which Defendant caused to be presented to the State of Rhode Island;

    (3)    Prejudgment interest; and

    (4)    All costs incurred in bringing this action.

To RELATOR:

    (1)    A fair and reasonable amount allowed pursuant to R.I. GEN. LAW § 9-1.1-4(d) and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses which Mr. Baker incurred in connection with this action;

    (3)    An award of statutory attorneys' fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

## COUNT XXXIV
## VIOLATIONS OF THE TENNESSEE MEDICAID FALSE CLAIMS ACT
### TENN. CODE ANN. § 71-5-181 *et seq.*

470.    Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

471.    This is a *qui tam* action brought by Marc D. Baker and the State of Tennessee to recover treble damages and civil penalties under the Tennessee Medicaid False Claims Act, TENN. CODE ANN. § 71-5-181 *et seq.*

472.    TENN. CODE ANN. § 71-5-182(a)(1) provides liability for any person who, *inter alia*:

    (1)    Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval under the Medicaid program;

(2)     Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim under the Medicaid program;

(3)     Conspires to commit a violation of subdivision (a)(1)(A), (a)(1)(B), or (a)(1)(D); or

(4)     Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money, or property to the state, or knowingly conceals, or knowingly and improperly, avoids, or decreases an obligation to pay or transmit money or property to the state, relative to the Medicaid program

473.    Defendant violated TENN. CODE ANN. § 71-5-182(a)(1) when it knowingly caused false claims to be made, used and presented to the State of Tennessee by its violations of Federal and State laws by submitting false or fraudulent claims for payment for drugs and vaccines to which it was not entitled.  Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

474.    Each claim presented or caused to be presented for reimbursement of the prescription drugs challenged herein represents a false or fraudulent claim for payment under the FCA.

475.    The State of Tennessee, by and through the Tennessee Medicaid program and other State health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant and Defendant's pharmacies in connection therewith.

476.    Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the State of

Tennessee. Had the State of Tennessee known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant and Defendant's pharmacies.

477. As a result of Defendant's violations of TENN. CODE ANN. § 71-5-182(a)(1) the State of Tennessee has been damaged.

478. Mr. Baker is a private person with direct and independent knowledge of the allegations of the First Amended Complaint, who has brought this action pursuant to TENN. CODE ANN. § 71-5-183(a)(1) on behalf of himself and the Tennessee.

479. This court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the Federal claim, and merely asserts separate damages to the State of Tennessee in the operation of the Medicaid program.

## PRAYER AS TO COUNT XXXIV

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF TENNESSEE:

(1) Three times the amount of actual damages which the State of Tennessee has sustained as a result of Defendant's fraudulent and illegal practices;

(2) A civil penalty of not less than $5,000 and not more than $25,000, adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, in accordance with TENN. CODE ANN. § 71-5-182(a), for each false claim which Defendant caused to be presented to the State of Tennessee;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To RELATOR:

    (1)    A fair and reasonable amount allowed pursuant to TENN. CODE ANN. § 71-5-183(c) and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses which Mr. Baker incurred in connection with this action;

    (3)    An award of statutory attorneys' fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

## COUNT XXXV
## VIOLATIONS OF THE TEXAS MEDICAID FRAUD PREVENTION LAW
### TEX. HUM. RES. CODE ANN. § 36.001 *et seq.*

480.    Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

481.    This is a *qui tam* action brought by Marc D. Baker and the State of Texas to recover treble damages and civil penalties under the Texas Medicaid Fraud Prevention Law, TEX. HUM. RES. CODE ANN. § 36.001 *et seq.*

482.    TEX. HUM. RES. CODE ANN. § 36.002 provides liability for any person who, *inter alia*:

    (1)    knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

    (2)    knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

    (3)    knowingly applies for and receives a benefit or payment on behalf of another person under the Medicaid program and converts any

part of the benefit or payment to a use other than for the benefit of the person on whose behalf it was received;

(4)     except as authorized under the Medicaid program, knowingly pays, charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or product or the continued provision of a service or product if the cost of the service or product is paid for, in whole or in part, under the Medicaid program;

(5)     conspires to commit a violation of [this section]

483.    In addition, TEX. HUM. RES. CODE ANN. § 32.039 prohibits a person from soliciting, receiving, offering, or paying, directly or indirectly, overtly or covertly any remuneration, including any kickback, bribe, or rebate, in cash or in kind for purchasing, leasing, or ordering, or arranging for or recommending the purchasing, leasing, or ordering of, any good, facility, service, or item for which payment may be made, in whole or in part, under the medical assistance program.

484.    Defendant violated TEX. HUM. RES. CODE ANN. § 36.002 and § 32.039 when it knowingly caused false claims to be made, used and presented to the State of Tennessee by its violations of Federal and State laws by submitting false or fraudulent claims for payment for drugs and vaccines to which it was not entitled. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

485.    Each claim presented or caused to be presented for reimbursement of the prescription drugs challenged herein represents a false or fraudulent claim for payment under the FCA.

486.    The State of Texas, by and through the Texas Medicaid program and other State health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant and Defendant's pharmacies in connection therewith.

487.    Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the State of Texas.  Had the State of Texas known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant and Defendant's pharmacies.

488.    As a result of Defendant's violations of TEX. HUM. RES. CODE ANN. § 36.002 and § 32.039 the State of Texas has been damaged.

489.    Mr. Baker is a private person with direct and independent knowledge of the allegations of the First Amended Complaint, who has brought this action pursuant to TEX. HUM. RES. CODE ANN. § 36.101 on behalf of himself and the State of Texas.

490.    This court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the Federal claim, and merely asserts separate damages to the State of Texas in the operation of the Medicaid program.

**PRAYER AS TO COUNT XXXV**

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF TEXAS:

(1)    Three times the amount of actual damages which the State of Texas has sustained as a result of Defendant's fraudulent and illegal practices;

(2)    A civil penalty as described in TEX. HUM. RES. CODE ANN. § 36.025(a)(3), for each false claim which Defendant caused to be

180

presented to the state of Texas;

    (3)      Prejudgment interest; and

    (4)      All costs incurred in bringing this action.

To RELATOR:

    (1)      A fair and reasonable amount allowed pursuant to TEX. HUM. RES. CODE ANN. § 36.110 and/or any other applicable provision of law;

    (2)      Reimbursement for reasonable expenses which Mr. Baker incurred in connection with this action;

    (3)      An award of statutory attorneys' fees and costs; and

    (4)      Such further relief as this Court deems equitable and just.

## <u>COUNT XXXVI</u>
### VIOLATIONS OF THE VIRGINIA FRAUD AGAINST TAXPAYERS ACT
### VA. CODE ANN. § 8.01-216.1 *et seq.*

491.    Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

492.    This is a *qui tam* action brought by Marc D. Baker and the Commonwealth of Virginia to recover treble damages and civil penalties under the Virginia Medicaid Fraud Prevention Law, VA. CODE ANN. § 8.01-216.1 *et seq.*

493.    VA. CODE ANN. § 8.01-216.3 provides liability for any person who, *inter alia*:

    (1)      Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

    (2)      Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

    (3)      Conspires to commit a violation of [this section]

494.     Defendant violated VA. CODE ANN. § 8.01-216.3 when it knowingly caused false claims to be made, used and presented to the Commonwealth of Virginia by its violations of Federal and State laws by submitting false or fraudulent claims for payment for drugs and vaccines to which it was not entitled.  Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

495.     Each claim presented or caused to be presented for reimbursement of the prescription drugs challenged herein represents a false or fraudulent claim for payment under the FCA.

496.     The Commonwealth of Virginia, by and through the Virginia Medicaid program and other State health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant and Defendant's pharmacies in connection therewith.

497.     Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the Commonwealth of Virginia.  Had the Commonwealth of Virginia known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant and Defendant's pharmacies.

498.     As a result of Defendant's violations of VA. CODE ANN. § 8.01-216.3 the Commonwealth of Virginia has been damaged.

499.    Mr. Baker is a private person with direct and independent knowledge of the allegations of the First Amended Complaint, who has brought this action pursuant to VA. CODE ANN. § 8.01-216.5 on behalf of himself and the Commonwealth of Virginia.

500.    This court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the Federal claim, and merely asserts separate damages to the Commonwealth of Virginia in the operation of the Medicaid program.

### PRAYER AS TO COUNT XXXVI

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant, respectively:

To the COMMONWEALTH OF VIRGINIA:

(1)    Three times the amount of actual damages which the Commonwealth of Virginia has sustained as a result of Defendant's fraudulent and illegal practices;

(2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the Commonwealth of Virginia;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To RELATOR:

(1)    A fair and reasonable amount allowed pursuant to VA. CODE ANN. § 8.01-216.7 and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Mr. Baker incurred in connection with this action;

(3)    An award of statutory attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

### COUNT XXXVII
### VIOLATIONS OF THE WASHINGTON STATE MEDICAID FRAUD
### FALSE CLAIMS ACT
### WASH. REV. CODE ANN. § 74.66.010 *et seq.*

501.   Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

502.   This is a *qui tam* action brought by Marc D. Baker and the State of Washington to recover treble damages and civil penalties under the Washington State Medicaid Fraud False Claims Act, WASH. REV. CODE ANN. § 74.66.010 *et seq.*

503.   WASH. REV. CODE ANN. § 74.66.020 provides liability for any person who, *inter alia*:

(1)   Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(2)   Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(3)   Conspires to commit one or more of the violations in this subsection. . .

504.   In addition, WASH. REV. CODE ANN. § 74.09.240 prohibits any person, including any corporation, from soliciting or receiving any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind ) in return for the purchase, lease, order, or arranging for or recommending purchase, lease, or order of any goods, facility, service, or item for which payment may be made in whole or in part under a medical assistance program, or who offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to purchase, lease, order, or arrange

for or recommend purchasing, leasing, or ordering any goods, facility, service, or item for which payment may be made in whole or in part under a medical assistance program.

505.    Defendant violated WASH. REV. CODE ANN. § 74.66.020 and § 74.09.240 when it knowingly caused false claims to be made, used and presented to the State of Washington by its violations of Federal and State laws by submitting false or fraudulent claims for payment for drugs and vaccines to which it was not entitled.  Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

506.    Each claim presented or caused to be presented for reimbursement of the prescription drugs challenged herein represents a false or fraudulent claim for payment under the FCA.

507.    The State of Washington, by and through the Washington Virginia Medicaid program and other State health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant and Defendant's pharmacies in connection therewith.

508.    Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the State of Washington.  Had the State of Washington known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant and Defendant's pharmacies.

509.    As a result of Defendant's violations of WASH. REV. CODE ANN. § 74.66.020 and § 74.09.240 the State of Washington has been damaged.

185

510.    Mr. Baker is a private person with direct and independent knowledge of the allegations of the First Amended Complaint, who has brought this action pursuant to WASH. REV. CODE ANN. § 74.66.050 on behalf of himself and the State of Washington.

511.    This court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the Federal claim, and merely asserts separate damages to the State of Washington in the operation of the Medicaid program.

## PRAYER AS TO COUNT XXXVII

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF WASHINGTON:

(1)    Three times the amount of actual damages which the State of Washington has sustained as a result of Defendant's fraudulent and illegal practices;

(2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Washington;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To RELATOR:

(1)    A fair and reasonable amount allowed pursuant to WASH. REV. CODE ANN. § 74.66.070 and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Mr. Baker incurred in connection with this action;

(3)    An award of statutory attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

<u>COUNT XXXVIII</u>
## VIOLATIONS OF THE WISCONSIN FALSE CLAIMS FOR MEDICAL ASSISTANCE ACT
WIS. STAT. ANN. § 20.931 *et seq.*

512.   Relator restates and realleges the allegations contained in the preceding paragraphs as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

513.   This is a *qui tam* action brought by Marc D. Baker and the State of Wisconsin to recover treble damages and civil penalties under the Wisconsin State Medicaid Fraud False Claims Act, WIS. STAT. ANN. § 20.931 *et seq.*

514.   WIS. STAT. ANN. § 20.931(2) provides liability for any person who, *inter alia*:

(1)   Knowingly presents or causes to be presented to any officer, employee, or agent of this state a false claim for medical assistance.

(2)   Knowingly makes, uses, or causes to be made or used a false record or statement to obtain approval or payment of a false claim for medical assistance.

(3)   Conspires to defraud this state by obtaining allowance or payment of a false claim for medical assistance, or by knowingly making or using, or causing to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Medical Assistance program.

515.   In addition, WIS. STAT. ANN. § 49.49(2) prohibits a person from soliciting or receiving any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind, in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a medical assistance program.

187

516.   Defendant violated WIS. STAT. ANN. § 20.931(2) and WIS. STAT. ANN. § 49.49(2) when it knowingly caused false claims to be made, used and presented to the State of Wisconsin by its violations of Federal and State laws by submitting false or fraudulent claims for payment for drugs and vaccines to which it was not entitled. Defendant knew that these claims for payment were false, fraudulent, or fictitious, or was deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard for whether the claims were true or false.

517.   Each claim presented or caused to be presented for reimbursement of the prescription drugs challenged herein represents a false or fraudulent claim for payment under the FCA.

518.   The State of Wisconsin, by and through the Wisconsin Medicaid program and other State health care programs, was unaware of Defendant's fraudulent and illegal practices and paid the claims submitted by Defendant and Defendant's pharmacies in connection therewith.

519.   Compliance with applicable Medicare, Medicaid, and various other Federal and State laws was a condition of payment of claims submitted to the State of Wisconsin.  Had the State of Wisconsin known that Defendant violated the laws cited herein, it would not have paid the claims submitted by Defendant and Defendant's pharmacies.

520.   As a result of Defendant's violations of WIS. STAT. ANN. § 20.931(2) the State of Wisconsin has been damaged.

521.    Mr. Baker is a private person with direct and independent knowledge of the allegations of the First Amended Complaint, who has brought this action pursuant to WIS. STAT. ANN. § 20.931(5) on behalf of himself and the State of Wisconsin.

522.    This court is requested to accept pendant jurisdiction over this related state claim as it is predicated upon the same exact facts as the Federal claim, and merely asserts separate damages to the State of Wisconsin in the operation of the Medicaid program.

### PRAYER AS TO COUNT XXXVIII

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant, respectively:

To the STATE OF WISCONSIN:

(1)    Three times the amount of actual damages which the State of Wisconsin has sustained as a result of Defendant's fraudulent and illegal practices;

(2)    A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to the State of Wisconsin;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To RELATOR:

(1)    A fair and reasonable amount allowed pursuant to WIS. STAT. ANN. § 20.931(11) and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Mr. Baker incurred in connection with this action;

(3)    An award of statutory attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

189

## DEMAND FOR JURY TRIAL

Relator demand trial by jury pursuant to Rule 38 of the Federal Rules of Civil

Procedure and the Seventh Amendment to the U.S. Constitution.

Respectfully submitted,

Andrew M. Beato (DC Bar No. 469097)
Admitted *Pro Hac Vice*
ABeato@steinmitchell.com
Jed Wulfekotte (DC Bar No. 977971)
Admitted *Pro Hac Vice*
jwulfekotte@steinmitchell.com
STEIN MITCHELL MUSE & CIPOLLONE LLP
1100 Connecticut Avenue, N.W.
Suite 1100
Washington, D.C.  20036
(202) 737-7777 (telephone)
(202) 296-8312 (fax)

*Counsel for Relator*

December 30, 2013

## CERTIFICATE OF SERVICE

I certify that on this 30th day of December, a true and correct copy of the foregoing

Complaint was filed under seal with the Clerk of Court and was served on the following

parties listed below by U.S. Certified Mail, Return Receipt Requested:

| | |
|---|---|
| The Honorable Eric H. Holder, Jr.<br>United States Attorney General<br>950 Pennsylvania Avenue NW<br>Washington, DC 20530-0001 | Christopher B. Harwood, Esq.<br>Assistant United States Attorney<br>United States Attorney's Office<br>86 Chambers Street<br>Third Floor<br>New York, NY 10007 |
| Dustin McDaniel, Attorney General<br>Office of the Attorney General<br>323 Center Street, Suite 200<br>Little Rock, AR 72201-2610 | Mr. Robin Raveendran<br>Office of Medicaid Inspector General<br>112 West 8th Street<br>Slot S414<br>Little Rock, AR 72201 |
| Kamala Harris, Attorney General<br>Office of the Attorney General<br>1300 I St., Suite 1740<br>Sacramento, CA 95814 | Mark Geiger<br>Bureau of Medi-Cal Fraud & Elder Abuse<br>Office of the Attorney General<br>1425 River Park Drive, Ste. 300<br>Sacramento, CA 95815 |
| John W. Suthers, Attorney General<br>Office of the Attorney General<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway, 10th Floor<br>Denver, CO 80203 | Timothy Sokas<br>Director, MFCU<br>Medicaid Fraud Control Unit of Colorado<br>Ralph L. Carr Colorado Judicial Center<br>1300 Broadway, 9th Floor<br>Denver, CO 80203 |
| George Jepsen, Attorney General<br>Office of the Attorney General<br>55 Elm Street<br>Hartford, CT 06106 | Christopher Godialis<br>Director, MFCU<br>Medicaid Fraud Control Unit of Connecticut<br>Office of the Chief State's Attorney<br>300 Corporate Place<br>Rocky Hill, CT 06067 |
| Joseph R. Biden III, Attorney General<br>Office of the Attorney General<br>Carvel State Office Bldg.<br>820 N. French St.<br>Wilmington, DE 19801 | Christina Showalter<br>Director, MFCU<br>Medicaid Fraud Control Unit of Delaware<br>Office of the Attorney General<br>820 N. French St., 5th Floor<br>Wilmington, DE 19801 |

| | |
|---|---|
| Irvin Nathan, Attorney General<br>Office of the Attorney General<br>1 Judiciary Square<br>441 4th Street NW<br>Suite 1100 S<br>Washington, DC 20001 | Susan Kennedy<br>Director, MFCU<br>Medicaid Fraud Control Unit of D.C.<br>Office of D.C. Inspector General<br>717 14th Street NW, 5th Floor<br>Washington, DC 20005 |
| Pam Bondi, Attorney General<br>Office of the Attorney General<br>The Capitol, PL-01<br>Tallahassee, FL 32399-1050 | James D. Varnado<br>Director, MFCU<br>Medicaid Fraud Control Unit of Florida<br>Office of the Attorney General<br>The Capitol, PL-01<br>Tallahassee, FL 32399-1050 |
| Sam Olens, Attorney General<br>Office of the Attorney General<br>40 Capitol Square SW<br>Atlanta, GA 30334 | Van Pearlberg<br>Director, MFCU<br>Medicaid Fraud Control Unit of Georgia<br>Office of the Attorney General<br>200 Piedmont Ave. SE<br>West Tower, 19th Floor<br>Atlanta, GA 30334 |
| David Louie, Attorney General<br>Office of the Attorney General<br>425 Queen Street<br>Honolulu, HI 96813 | Michael L. Parrish<br>Director, MFCU<br>Medicaid Fraud Control Unit of Hawaii<br>Office of the Attorney General<br>333 Queen Street, 10th Floor<br>Honolulu, HI 96813 |
| Lisa Madigan, Attorney General<br>Office of the Attorney General<br>500 South Second Street<br>Springfield, IL 62706 | William Sheridan<br>Director MFCB<br>Medicaid Fraud Control Bureau<br>801 South 7th Street, Suite 500-A<br>Springfield, IL 62794 |
| Greg Zoeller, Attorney General<br>Office of the Attorney General<br>Indiana Government Center South<br>302 W. Washington St., 5th Floor<br>Indianapolis, IN 46204 | Allen K. Pope<br>Director, MFCU<br>Medicaid Fraud Control Unit of Indiana<br>Office of the Attorney General<br>8005 Castleway Drive<br>Indianapolis, IN 46250-1946 |
| Tom Miller, Attorney General<br>Office of the Attorney General<br>1305 E. Walnut Street<br>Des Moines, IA 50319 | Joshua J. Happe<br>Director, MFCU<br>Medicaid Fraud Control Unit of Iowa<br>Department of Inspections and Appeals<br>3rd Floor, Lucas State Office Building<br>321 E. 12th Street<br>Des Moines, IA 50319 |

| | |
|---|---|
| James D. Caldwell, Attorney General<br>Office of the Attorney General<br>1885 N. Third Street<br>Baton Rouge, LA 70802 | Fred A. Duhy, Jr.<br>Director, MFCU<br>Medicaid Fraud Control Unit of Louisiana<br>Office of the Attorney General<br>1885 North 3rd Street<br>Baton Rouge, LA 70802 |
| Douglas F. Gansler, Attorney General<br>Office of the Attorney General<br>200 St. Paul Place<br>Baltimore, MD 21202 | Ilene J. Nathan<br>Director, MFCU<br>Medicaid Fraud Control Unit of Maryland<br>Office of the Attorney General<br>200 St. Paul Place, 18th Floor<br>Baltimore, MD 21202 |
| Martha Coakley, Attorney General<br>Office of the Attorney General<br>1 Ashburton Place<br>Boston, MA 02108-1518 | Steven Hoffman<br>Director, MFCU<br>Medicaid Fraud Control Unit of Massachusetts<br>Office of the Attorney General<br>1 Ashburton Place<br>Boston, MA 02108-1698 |
| Bill Schuette, Attorney General<br>Office of the Attorney General<br>G. Mennen Williams Building, 7th Floor<br>525 W. Ottawa St.<br>PO Box 30212<br>Lansing, MI 48909 | David Tanay<br>Director, MFCU<br>Medicaid Fraud Control Unit of Michigan<br>Office of the Attorney General<br>2860 Eyde Parkway<br>East Lansing, MI 48823 |
| Lori Swanson, Attorney General<br>Office of the Attorney General<br>1400 Bremer Tower<br>445 Minnesota Street<br>St. Paul, MN 55101 | Chuck Roehrdanz<br>Director, MFCU<br>Medicaid Fraud Control Unit of Minnesota<br>Office of the Attorney General<br>1200 Bremer Tower<br>445 Minnesota Street<br>St. Paul, MN 55101 |
| Tim Fox, Attorney General<br>Office of the Attorney General<br>Justice Bldg., 3rd Floor<br>215 N. Sanders<br>Helena, MT 59620-1401 | Debrah Fosket<br>Director, MFCU<br>Medicaid Fraud Control Unit of Montana<br>Division of Criminal Investigation<br>2225 11th Avenue<br>PO Box 201417<br>Helena, MT 59620-1417 |
| Catherine Cortez Masto, Attorney General<br>Office of the Attorney General<br>100 N. Carson St.<br>Carson City, NV 89701 | Mark N. Kemberling,<br>Director, MFCU<br>Medicaid Fraud Control Unit of Nevada<br>Office of the Attorney General<br>555 East Washington, Ave., Ste. 3900<br>Las Vegas, NV 89101 |

193

| | |
|---|---|
| Joseph Foster, Attorney General<br>Office of the Attorney General<br>State House Annex<br>33 Capitol Street<br>Concord, NH 03301 | Karin M. Eckel<br>Director, MFCU<br>Medicaid Fraud Control Unit of New Hampshire<br>Office of the Attorney General<br>33 Capitol Street<br>Concord, NH 03301 |
| John Jay Hoffman, Acting Attorney General<br>Office of the Attorney General<br>Richard J. Hughes Justice Complex<br>25 Market Street<br>PO Box 080<br>Trenton, NJ 08625 | Nicole Rizzolo<br>Director, MFCU<br>Medicaid Fraud Control Unit of New Jersey<br>Office of the Attorney General<br>25 Market Street, 4th Floor<br>PO Box 094<br>Trenton, NJ 08625 |
| Gary King, Attorney General<br>Office of the Attorney General<br>408 Galisteo Street<br>Villagra Building<br>Santa Fe, NM 87501 | Mr. Jody Curran<br>Director, MFCU<br>Medicaid Fraud Control Unit of New Mexico<br>Office of the Attorney General<br>111 Lomas Blvd. NW, 3rd Floor<br>Albuquerque, NM 87102 |
| Eric Schneiderman, Attorney General<br>Office of the Attorney General<br>The Capitol, 2nd Floor<br>Albany, NY 12224-0341 | Monica Hickey-Martin<br>Director, MFCU<br>Medicaid Fraud Control Unit of New York<br>Office of the Attorney General<br>120 Broadway, 13th Floor<br>New York, NY 10271 |
| Roy Cooper, Attorney General<br>Office of the Attorney General<br>9001 Mail Service Center<br>Raleigh, NC 27699-9001 | Charles Hobgood<br>Director, MFCU<br>Medicaid Fraud Control Unit of North Carolina<br>Office of the Attorney General<br>5505 Creedmoor Rd., Suite 300<br>Raleigh, NC 27612 |
| Scott Pruitt, Attorney General<br>Office of the Attorney General<br>313 NE 21st Street<br>Oklahoma City, OK 73105 | Ms. Mykel Fry<br>Director, MFCU<br>Medicaid Fraud Control Unit of Oklahoma<br>Office of the Attorney General<br>313 NE 21st Street<br>Oklahoma City, OK 73105 |
| Peter Kilmartin, Attorney General<br>Office of the Attorney General<br>150 South Main Street<br>Providence, RI 02903 | James F. Dube<br>Director, MFCU<br>Medicaid Fraud Control Unit of Rhode Island<br>Office of the Attorney General<br>150 South Main Street<br>Providence, RI 02903 |

| | |
|---|---|
| Robert E. Cooper, Jr., Attorney General<br>Office of the Attorney General<br>425 5th Avenue North<br>Nashville, TN 37243 | Norman Tidwell<br>Director, MFCU<br>Medicaid Fraud Control Unit of Tennessee<br>Tennessee Bureau of Investigation<br>901 R.S. Gass Boulevard<br>Nashville, TN 37216-2639 |
| Greg Abbott, Attorney General<br>Office of the Attorney General<br>300 W. 15th Street<br>Austin, TX 78701 | W. Rick Copeland<br>Director, MFCU<br>Medicaid Fraud Control Unit of Texas<br>Office of the Attorney General<br>6330 Hwy 290 East, Suite 250<br>Austin, TX 78723 |
| Ken Cuccinelli, Attorney General<br>Office of the Attorney General<br>900 East Main Street<br>Richmond, VA 23219 | Randall L. Clouse<br>Director, MFCU<br>Medicaid Fraud Control Unit of Virginia<br>Office of the Attorney General<br>900 East Main Street, 5th Floor<br>Richmond, VA 23219 |
| Bob Ferguson, Attorney General<br>Office of the Attorney General<br>1125 Washington Street SE<br>PO Box 40100<br>Olympia, WA 98504-0100 | Doug Walsh<br>Director, MFCU<br>Office of the Attorney General<br>Medicaid Fraud Control Unit<br>2425 Bristol Court SW<br>Olympia, WA 98501 |
| J.B. Van Hollen, Attorney General<br>Office of the Attorney General<br>114 E. State Capitol<br>PO Box 7857<br>Madison, WI 53707-7857 | Tom Storm<br>Director, MFCU<br>Medicaid Fraud Control Unit of Wisconsin<br>Office of the Attorney General<br>114 E. State Capitol<br>PO Box 7857<br>Madison, WI 53707-7857 |

Andrew M. Beato

195